**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
AT PIKEVILLE**

**CIVIL ACTION NO. 13-5-DLB-EBA**

**BENNY LEE HODGE**                                                          **PETITIONER**

**vs.**                          **MEMORANDUM OPINION AND ORDER**

**RANDY WHITE, Warden of**                                            **RESPONDENT**
**the Kentucky State Penitentiary[1]**

******************

I.     **Introduction**

This matter is before the Court upon Petitioner Benny Lee Hodge's Petition for Writ

of Habeas Corpus Pursuant to 28 U.S.C. § 2254 (Doc. 12).  Hodge, who was sentenced

to death in 1986, contends that he is being held at the Kentucky State Penitentiary in

violation of the Constitution of the United States.  In support of this proposition, Hodge

alleges that several errors of constitutional magnitude occurred during his trial, including

prosecutorial misconduct, jury tampering, and ineffective assistance of counsel.  Hodge

has also filed a Motion for Summary Judgment (Doc. # 73), arguing that he is, at a

minimum, entitled to a new penalty phase because his attorney failed to present any

mitigating evidence at that stage of the trial.  Respondent Randy White, Warden of the

Kentucky State Penitentiary, has responded to the Petition and the Motion for Summary

---

1) At the time of filing, this case was styled *Benny Lee Hodge v. Thomas L. Simpson, Warden of the Kentucky State Penitentiary*, 7:13-cv-05.  Because Randy White has since replaced Thomas L. Simpson as Warden of the Kentucky State Penitentiary, the Court has substituted him as Respondent in this action.

1

Judgment, and Hodge has replied, making this matter ripe for the Court's review.  (Docs. # 23, 38, 74, 75, and 76).  For reasons stated herein, Hodge's Petition for Writ of Habeas Corpus (Doc. # 12) and Motion for Summary Judgment (Doc. # 73) are hereby **denied**.

## II.   Factual and Procedural Background

### A.   The Crime

On August 8, 1985, Benny Lee Hodge, Roger Dale Epperson, and Donald Terry Bartley drove to Dr. Roscoe J. Acker's house in Fleming-Neon, Kentucky.  (Docs. # 26-12 at 12; 27-7 at 32-33).  Hodge and Bartley, posing as FBI agents, walked up to the house and knocked on the door while Epperson waited in the car.  (*Id.*).  When Dr. Acker answered, Hodge and Bartley told him that they were investigating one of Dr. Acker's former business associates and that they wished to obtain a statement from him.  (Docs. # 26-12 at 12-13; 27-7 at 35-37).  After some persuading, Dr. Acker agreed to provide a statement and led them into the house.  (*Id.*).  Bartley then grabbed Dr. Acker's daughter, Tammy, and took her into one of the bedrooms at the back of the house, where he tied her up.  (*Id.*).  Meanwhile, Hodge tied Dr. Acker up in the kitchen and covered his head with a sheet.  (*Id.*).

Hodge and Bartley contacted Epperson on a two-way radio and told him to enter the house.  (Doc. # 27-7 at 37).  He did so, and the three men proceeded to ransack each room, looking for valuables.  (Docs. # 26-12 at 13; 27-7 at 39).  They found a safe in Dr. Acker's bedroom, forced him to open it, and removed the stacks of money that were stored within.  (Docs. # 26-12 at 13-14; 27-7 at 40).  All told, the men stole guns, jewelry and almost $2 million in cash from the Acker family.  (Doc. # 27-7 at 43; 27-8 at 1-3).  Once the

theft was complete, the three men decided that they could not leave any witnesses.  (*Id.*).

Hodge stabbed Tammy twelve times in the back with a butcher knife taken from the

kitchen.  (Docs. # 27-7 at 41-43).  Bartley used the electrical cord from a curling iron to

choke Dr. Acker until he lost consciousness.  (Docs. # 26-12 at 14; 27-7 at 41-42).  Hodge,

Epperson, and Bartley fled to Florida, where they were later arrested by the FBI and

transported back to Kentucky to face charges.  (Doc. # 23-3 at 4-12).

### B.    Trial in Letcher County Circuit Court

A Letcher County grand jury indicted Hodge, Epperson, and Bartley on four charges:

(1) the murder of Tammy Acker; (2) the attempted murder of Dr. Roscoe J. Acker; (3) first-

degree robbery; and (4) first-degree burglary.  (Doc. # 23-3 at 19).  Epperson retained

Lester Burns as his attorney.  (Doc. # 23-22 at 23).  Hodge hired Dale Mitchell, Burns's

former associate, to represent him.  (*Id.*).  Curt Davis represented Bartley during most of

the pretrial proceedings, but was eventually replaced by Ned Pillersdorf.  (*Id.*).  Prior to trial,

these attorneys sought extensive discovery, argued for a change of trial venue, fought to

suppress several witness identifications based on a photo lineup, and moved the court to

sever the trials of their clients.  (Docs. # 23-5 at 16-18; 23-6 at 10-20; 23-9 at 23-24; 23-10

at 39-42 and 45-48).  Although these efforts were unsuccessful, Judge F. Byrd Hogg

granted their requests for individualized voir dire and jury sequestration, recognizing that

the case had generated a considerable amount of regional media attention.  (Docs. # 23-

10 at 50-53 and 23-21 at 37).

Meanwhile, Lester Burns was federally indicted on charges of conspiracy to commit

mail fraud and conspiracy to transport stolen money in excess of $5,000 in interstate

commerce.  (Doc. # 24-9 at 1-23).  As to the latter charge,[2] the United States alleged that Burns had knowingly accepted Dr. Acker's stolen money as a retainer for representing Roger Epperson.  (*Id.*).  After learning of Burns's indictment, Judge Hogg explained the potential ramifications to Epperson, with one of Burns's associates present.[3]  (Doc. # 23-17 at 33-35).  Epperson affirmatively stated that he wanted Burns to continue representing him.  (*Id.*).  Consistent with Epperson's wishes, Burns remained on the case through trial. (Doc. # 25-14 at 4).  Hodge's attorney, Dale Mitchell, initially represented Burns in his federal case, but withdrew after the close of Hodge and Epperson's trial due to ethical concerns.  (Doc. # 24-8 at 15-19).  Burns later pled guilty to the charges of conspiracy to commit mail fraud and conspiracy to transport stolen money in interstate commerce.  (Doc. # 24-9).

On June 2, 1986, Hodge and Epperson's trial began.  (Doc. # 25-14 at 4).  The parties had planned to try Bartley alongside Hodge and Epperson, but his case was severed just before trial because he agreed to turn State's witness.  (Docs. # 27-7 at 25-43; 27-8 at 1-60; 27-9 at 1-44; 27-10 at 3-41).  Bartley testified that he and Hodge were the ones that posed as FBI agents and gained entry to the house.  (*Id.*).  He tied up Tammy, while Hodge bound Dr. Acker.  (*Id.*).  Bartley stated that Epperson then came into the house and helped them ransack it.  (*Id.*).  According to Bartley, Epperson was the one who stated that they could not leave any witnesses.  (*Id.*).  In response, Hodge said "I'll take the girl" and went into the back bedroom where Tammy was tied up.  (*Id.*).  Epperson told

---

2) The other charge involved a scheme to defraud insurance using the mails.  (Doc. # 24-9 at 1-23).

3) During this time, Burns was recovering from hip replacement surgery.  (Doc. # 23-17 at 33-35).  His associate, Ralph Gibson, appeared at several pretrial hearings in his stead.  (*Id.*).

Bartley, "I got the last one, you do the doc" and handed him a curling iron. (*Id.*). As Bartley began choking Dr. Acker with the cord of the curling iron, Hodge came back into the kitchen and indicated that he had not been able to strangle Tammy. (*Id.*). Bartley testified that Epperson opened one of the kitchen drawers and tossed him a knife, which Hodge took into the back bedroom. (*Id.*). Epperson then explained to Bartley he needed to reposition the cord around Dr. Acker's neck in order to effectively choke him. (*Id.*). Bartley did as instructed, and choked Dr. Acker until he thought his victim was dead. (*Id.*).

In addition to Bartley's testimony, Commonwealth's Attorney James Wiley Craft presented testimony from Dr. Acker, the pathologist who autopsied Tammy Acker, local law enforcement officers who investigated the crime, FBI agents who apprehended the three men, and various other witnesses who encountered them in the days before the crime. (Docs. # 26-12 at 11-50; 26-13 at 1-51; 26-14 at 12-51; 26-15 at 1-2 and 12-51; 26-16 at 1-30; 26-17 at 16-37 and 41-42; 26-18 at 1-34 and 36-50; 26-19 at 22-61; 27-1 at 5-13; 27-2 at 2-41; 27-3 at 15-50). The jury also heard from Lawrence Anthony Smith, who was incarcerated alongside Hodge in Florida and briefly served as his confidante. (Docs. # 27-5 at 2-21 and 25-32). Smith testified that Hodge confessed to stabbing a young woman during a robbery in Kentucky. (*Id.*).

The jury convicted Hodge and Epperson on all charges. (Doc. # 23-12 at 9-23). During the ensuing penalty phase, Mitchell and Burns presented only brief stipulations on behalf of their clients. (Doc. # 27-14 at 5). Hodge's stipulation indicated that he had a wife and three children, a public-job work record, and a home in Tennessee. (*Id.*). Epperson's stipulation was similarly bare-boned, stating that he had no history of prior criminal activity,

5

that he voluntarily returned to Kentucky to face the charges against them, and that he had a wife and child. (*Id.*). The jury recommended a sentence of sixty years and death for both men. (*Id.* at Docs. # 27-13 at 7-8; 27-14 at 37 and 44). Judge Hogg imposed the recommended sentences that same day. (Doc. # 27-14 at 44). Hodge and Epperson promptly filed Motions for a New Trial, which Judge Hogg denied. (Docs. # 23-12 at 51-57 and 71-72; 23-13 at 12-17; 25-1 at 1-46; 25-2 at 1-28).

### C. Direct Appeal to the Kentucky Supreme Court

Hodge and Epperson appealed their respective convictions and sentences to the Kentucky Supreme Court. *See Epperson v. Commonwealth*, 809 S.W.2d 835 (Ky. 1990). Hodge raised 62 issues on appeal and Epperson presented 69 issues. *Id.* at 837. The court explained that its opinion would "focus on those issues which we believe are most important, although we have considered and rejected all other assignments of error presented by each of the appellants." *Id.* at 837-38. It then analyzed eighteen of Hodge's claims in detail. *Id.*

First, the court concluded that Judge Hogg's refusal to sever Hodge's trial from Epperson's trial did not deprive Hodge of due process. *Id.* at 838-841. Similarly, Judge Hogg's refusal to grant a new trial based on newly discovered evidence about Bartley did not result in a due process violation. *Id.* The court also found that Hodge's due process rights were not violated by the prosecutors' conflict of interest or the admission of victim impact evidence. *Id.* at 841-43.

Next, the court held that Judge Hogg's refusal to grant a continuance or a change of venue did not deprive Hodge of his rights to a fair trial, a rational sentencing, and an

impartial jury.  *Id.* at 842.  It also concluded that these rights were not violated by the admission of graphic crime scene photos and evidence of other crimes. *Id.* at 841, 843.

The court was similarly unconvinced by Hodge's arguments regarding ineffective assistance of counsel, noting that Hodge had not shown why Dale Mitchell's simultaneous representation of him and Lester Burns rendered his performance deficient.  *Id.* at 844. It also dismissed Hodge's complaints about the lack of private consultation because "[t]he record indicates that there was an exaggeration of the conditions at the Pikeville jail." *Id.* at 841.

The court then found that Hodge's right to confront witnesses against him was not violated by the restricted cross-examination of Bartley.  Similarly, Hodge's right to be present at all stages of the proceedings was not violated by Judge Hogg's meeting with the jury in the absence of defense counsel.  *Id.* at 842-43.  It also rejected Hodge's complaints about the Commonwealth's failure to disclose Lawrence Anthony Smith's identity, the Commonwealth's comments about the death sentence during the penalty phase, and Judge Hogg's failure to consider mitigating evidence at sentencing.  *Id.* at 843-45.  Finally, it concluded that the death sentence was not excessive or arbitrary under the circumstances of this case.  *Id.* at 845.  Accordingly, the Kentucky Supreme Court affirmed Hodge's conviction.  *Id.*  It denied Hodge's request for a rehearing on July 3, 1991.  *Id.*

Hodge sought relief from the Supreme Court of the United States.  *Hodge v. Kentucky*, 502 U.S. 103 (1992).  The Court denied his petition for writ of certiorari on January 13, 1992.  *Id.*

7

**D.      Post-Conviction Proceedings in Letcher County Circuit Court**

Hodge and Epperson filed Motions to Vacate or Correct Sentence Pursuant to Kentucky Rule of Criminal Procedure 11.42 ("RCr 11.42").  (Doc. # 25-5.  In their Motions, Hodge and Epperson asserted that counsel was ineffective in searching for possible impeachment evidence for Smith and Bartley and in actually impeaching these witnesses at trial.  (*Id.*).  Although Smith testified that they had not received and did not expect a particular benefit in exchange for his testimony, Hodge and Epperson discovered  that Smith ultimately received lenient treatment.[4]  (*Id.*).  As for Bartley, some of his fellow inmates indicated that he had confessed to stabbing Tammy, contrary to his testimony at trial.  (*Id.*).  Hodge and Epperson also found fault with counsel's numerous conflicts of interest, their voir dire of the jury panel, and their work on the motions for change of venue. (*Id.*).

Additionally, Hodge and Epperson raised claims of jury tampering and ineffective assistance of counsel at the penalty phase.  (*Id.*).  To support the former claim, Hodge and Epperson presented a recorded statement from Gary Rogers, who served as a bailiff during the Hodge trial.  (*Id.*).  In 1989, Rogers told an investigator from the Department of Public Advocacy ("DPA") that Commonwealth's Attorney James Wiley Craft had visited the hotel where the jurors were sequestered on a daily basis.  (Docs. # 25-8 at 35-44; 44 at 3/3/89 CD).  He also indicated that Craft enjoyed a close friendship with Eugene Banks, who served as the jury's foreman, and dated Banks's stepdaughter, Bridgette Combs.

---

4) While the Commonwealth's Attorney did not make any particular promises of leniency for Smith, he stated that he would inform the Florida authorities of Smith's cooperation.  (Doc. # 25-5).  Smith testified to this effect at trial.  (*Id.*).  He later received probation on several pending charges.  (*Id.*).

8

(*Id.*).  Rogers alleged that jurors had regular access to newspapers and television, visited with family and friends at the hotel, and received alcohol from Craft.  (*Id.*).  Most serious of all, Rogers told the DPA investigator that, on the first night of sequestration, the jurors agreed to elect Banks as foreman and return a sentence of death, no matter what the evidence showed at trial.  (*Id.*).  As for the latter claim, Hodge and Epperson simply pointed to the minimal amount of mitigation evidence presented at the penalty phase.  (*Id.*).

The Commonwealth responded with a Motion for Summary Dismissal, arguing that the allegations raised by Hodge and Epperson were too broad and conclusory to justify relief.  (Doc. # 25-6 at 32-37).  Hodge and Epperson responded with a combined Motion for Extension of Time to File Discovery, Motion for More Definite Response, and Motion for Judgment on the Pleadings.  (Docs. # 25-6 at 32-37; 25-5 at 12-13).  They argued that the allegations were sufficiently specific to merit judgment on the pleadings, or at least further consideration by the Letcher County Circuit Court.  (*Id.*).

In the interim, Hodge's and Epperson's attorneys learned that James Wiley Craft's son was clerking for the Honorable Samuel T. Wright, III, who was presiding over the RCr 11.42 proceedings.  (Doc. # 44, 5/8/96 Hearing at 0:00:30–0:06:13).  They also discovered that Judge Wright once dated jury foreman Eugene Banks's stepdaughter, Bridgette Combs.  (*Id.*).  Because Combs had a relationship with both Banks and Craft at the time of the trial, and because Banks had since passed away, Hodge and Epperson thought that she might have valuable information about any improper communications between the two men.  (*Id.*).  They further suggested that Judge Wright might find it difficult to be partial, given his past relationship with Combs.  (*Id.*).  After seeking an advisory opinion from the

9

Kentucky Bar Association's ("KBA") Ethics Committee, Judge Wright chose not to recuse. (Doc. # 44, 8/15/96 Hearing at 0:10:00–0:20:50).

After hearing oral argument from both parties, Judge Samuel Wright entered a written Order denying the Motions to Vacate on December 1, 1998. (Doc. # 25-7 at 25-34). Because the Kentucky Supreme Court had already addressed most of the claims on direct appeal, Judge Wright simply referred to the prior analysis and dismissed the claims. (*Id.*). However, Judge Wright considered the jury tampering claim and the ineffective assistance of counsel claim relating to mitigation evidence in more depth. (*Id.*). Although Hodge and Epperson alleged that the jurors deliberated their case ahead of time and that Craft maintained daily ex parte contact with the jury, Judge Wright concluded that "[n]one of the allegations as to jury misconduct are supported by the record of the trial, and there is no specific factual support asserted for them." (*Id.* at 29).

As for the ineffective assistance of counsel claim, Judge Wright found it to be without merit because "[t]he record shows that the jury was made aware of mitigating circumstances for both Movants by stipulated facts read to the jury by the judge." (Doc. # 25-7 at 31). He further explained that "[t]rial counsel has no absolute duty to present mitigating character evidence at all, nor is counsel required to present all available mitigating evidence in order to render effective assistance." (*Id.*). Finally, Judge Wright noted that, "had counsel introduced additional evidence, the prosecution might have introduced evidence in rebuttal, such as victim impact testimony, which would have made the jury even more likely to impose the death penalty." (*Id.*). Accordingly, Judge Wright held that counsel's performance was not deficient, and even if it was, Hodge and Epperson

10

had failed to produce evidence of prejudice.  (*Id.*).

Upon entry of this Order, Hodge and Epperson filed Motions to Vacate Pursuant to Kentucky Rule of Criminal Procedure 59.05, which Judge Wright also denied.  (Doc. # 25-10 at 8-33).

### E.    Post-Conviction Appeal to the Kentucky Supreme Court

On January 12, 2000, Hodge and Epperson appealed Judge Wright's decision to the Kentucky Supreme Court, raising twelve categories of error.  (Docs. # 25-10 at 4-5; 31-5 at 1-56; 31-6 at 1-56; 31-7 at 1-57; 31-8 at 1-4).  The court noted that many of these allegations "were addressed and resolved on direct appeal and cannot be raised in an RCr 11.42 motion."  *Hodge v. Commonwealth*, 68 S.W.3d 338, 345 (2001).  Accordingly, the court limited its discussion to "whether Epperson's and Hodge's RCr motions established a sufficient basis for granting relief or for holding an evidentiary hearing on the issues" of jury tampering and defense counsel's failure to present mitigating evidence.  *Id.* at 341.

In considering the jury tampering issue, the court found that the allegations rose "to the level of a potential violation of a constitutional right."  *Id.* at 342.  The court further concluded that the allegations were pled with "sufficient specificity" because Hodge and Epperson identified "specific instances of tampering, e.g., daily ex parte contact by the Commonwealth's Attorney, the supplying of newspapers to the jury, and providing the jury access to television, etc."  *Id.*  Thus, the court held that an evidentiary hearing was warranted.  *Id.*

The court also took issue with Judge Wright's perfunctory treatment of the ineffective assistance of counsel claim.  *Id.* at 345.  Specifically, Judge Wright denied

11

Hodge's request for an evidentiary hearing on the grounds that defense counsel does not have an absolute duty to present mitigating character evidence or all available mitigating evidence.  *Id.*  While the Kentucky Supreme Court did not disagree with this basic principle, it concluded that Judge Wright should have continued his analysis so that he could determine whether defense counsel conducted any investigation for mitigating evidence, and if so, what mitigating evidence could have and should have been admitted.  *Id.*  Thus, the court held that "[a]n evidentiary hearing must be held in this case to determine whether the failure to introduce mitigating evidence was trial strategy, or an abdication of advocacy."  *Id.* (internal citations omitted).

Finally, the Kentucky Supreme Court considered Hodge and Epperson's request for Judge Wright to recuse.  *Id.* at 345-46.  While the Kentucky Supreme Court declined to hold that Judge Wright had abused his discretion in denying the motion to recuse, it suggested that Judge Wright reconsider the motion "if it appears likely that [Bridgette] Combs will be called as a witness at the evidentiary hearing on the jury tampering allegations."  *Id.*  On September 27, 2001, the court reversed and remanded the case to the Letcher County Circuit Court.  *Id.*

Hodge filed a Petition for Rehearing, asking the Kentucky Supreme Court to expand the scope of the evidentiary hearing to include other issues raised on appeal.  (Doc. # 31-15 at 1-10).  The Commonwealth of Kentucky also filed a Petition for Rehearing, asking the court to reconsider its analysis as to the jury tampering and ineffective assistance claims.  (Doc. # 31-17).  The Kentucky Supreme Court denied both Petitions.  (*Id.*).

12

### F.      Post-Conviction Evidentiary Hearing in Pike County Circuit Court

Upon remand, Judge Wright recused and the case was reassigned to the Honorable Eddy Coleman of the Pike County Circuit Court. (Doc. # 55, 9/20/13 CD, Box 2-A, Master Index I Vol_5-26-10 at 25-27). Hodge and Epperson then filed a flurry of motions. (Doc. # 44, 1/23/04 at 0:04:00–0:27:45). First, Hodge and Epperson moved for the disclosure of exculpatory/impeachment evidence, which Judge Coleman denied on *res judicata* grounds. (*Id.*). They also sought discovery relating to their RCr 11.42 post-conviction proceedings and records from the Kentucky Attorney General's Office detailing a corruption investigation in Letcher County involving James Wiley Craft.[5] (*Id.*). Judge Coleman denied these requests, noting that discovery is not authorized in post-conviction proceedings. (*Id.*). However, Judge Coleman conducted an *in camera* review of Craft's KBA disciplinary file and discovered an affidavit from former Letcher County Circuit Judge Larry D. Collins, implicating Craft in a bribery scheme. (*Id.*). Judge Coleman released the affidavit to both parties. (*Id.*).

Hodge and Epperson next sought funding for expert witnesses. (*Id.*). Judge Coleman denied this motion, explaining that Hodge and Epperson "have no constitutional right to expert assistance in a collateral attack proceeding" and that "KRS § 31.185(2) funds are not available for RCr 11.42 post-conviction motions." (*Id.*). Judge Coleman also denied Hodge and Epperson's request for funds to secure the presence of out-of-state witnesses, noting that they did not provide him with any supporting case law. (*Id.*). At the parties' suggestion, Judge Coleman then set separate hearing dates for the jury tampering

---

5) Craft surrendered his law license as a result of this investigation. *See Craft v. Ky. Bar Assoc.*, 969 S.W.2d 211 (Ky. 1998).

issue, Hodge's mitigation issue, and Epperson's mitigation issue.  (*Id.*).

On November 13, 2006, the court began the evidentiary hearing on the jury tampering claim.  (Doc. # 44, 11/13/06 Hearing at 0:00:01–1:09:58).  Hodge and Epperson called Gary Rogers as their first witness.  (*Id.* at 1:10:00–3:16:00).  Upon taking the stand, Rogers immediately attempted to invoke his Fifth Amendment right against self-incrimination.  (*Id.*).  Judge Coleman explained to Rogers that his failure to guard the jury or report tampering would only qualify as a misdemeanor.  (*Id.*).  Because the statute of limitations had run on such crimes, Judge Coleman instructed Rogers to answer the questions.  (*Id.*).  Rogers testified that he did not remember speaking with any DPA employees and did not have any knowledge of jury tampering, contrary to his prior statements.  (*Id.*).  However, he later admitted that he saw Craft in the parking lot of the motel on one occasion and that he saw vodka in the hotel room of an alcoholic juror.  (*Id.*).  Because the vodka appeared after Craft's visit, Rogers presumed that Craft had provided it for the juror.  (*Id.*).  Rogers also testified that Craft was friends with jury foreman Eugene Banks, but could not remember whether that friendship developed before or after trial.  (*Id.*).  He later stated that he saw Craft and Banks acknowledge each other in passing in the courthouse.  (*Id.*).

Hodge and Epperson then called DPA investigator Randall Wheeler, who testified by avowal that he had spoken with Rogers about jury tampering in 1989.  (*Id.* at 3:16:00–4:00:00).  According to Wheeler, Rogers described several instances of jury tampering, including premature deliberations, daily ex parte contact with Craft, and access to news outlets.  (*Id.*).  Former Letcher County Circuit Judge Larry Collins also testified that

14

Craft and Banks were involved in a corruption scheme and that he himself had accepted a bribe from them in a civil case.  (*Id.*).  However, Judge Collins had no involvement in the Hodge trial, other than signing a warrant early on in the proceedings.  (*Id.*).  At the close of this testimony, Judge Coleman continued the hearing until January 16, 2007.  (*Id.*).

In December 2006, the parties deposed two former DPA attorneys and two former DPA investigators who were involved with the case.  (Doc. # 55, 9/20/13 CD, Box 2-A, Supplemental Record Depositions of C. Rowe, J. Howard, M. Williams and S. McArdle).  These witnesses testified to their conversations with Gary Rogers, who described varying degrees of jury tampering.  (*Id.*).  The parties also took the deposition of Martha Hogg Thursty, who served as an alternate juror in the Hodge trial.  (Doc. # 55, 9/20/13 CD, Box 2-A, Supplemental Record Deposition of M. Thursty).  She testified that she did not observe any instance of jury tampering while sequestered.  (*Id.*).

On January 16, 2007, the hearing resumed.  (Doc. # 44, 1/16/07 Hearing at 0:00:01–0:55:15).  Hodge and Epperson sought to admit the depositions as substantive evidence.  (*Id.*).  The Commonwealth initially objected to the use of these depositions for anything more than impeachment, but later withdrew that objection.  (*Id.*).  Accordingly, the Court considered Thursty's deposition, as well as those of the DPA investigators and attorneys, as evidence.  (*Id.*).  Although not specifically addressed at the hearing, this ruling seemed to extend to Wheeler's prior testimony as well.  (*Id.*).

After hearing arguments from the parties, Judge Coleman denied Hodge's and Epperson's RCr 11.42 Motions as they related to jury tampering.  (*Id.*).  He explained that Gary Rogers lacked credibility because his hearing testimony was not only internally

inconsistent, it conflicted with various other statements made to DPA investigators and attorneys. (*Id.*). Judge Coleman felt that Rogers's "credibility was further damaged by his courtroom demeanor and admission that he is a convicted felon."[6] (*Id.*). By contrast, Thursty's testimony seemed to be straightforward and consistent, despite her history of bipolar disorder. (*Id.*). Accordingly, Judge Coleman found that Hodge and Epperson "failed to produce competent credible evidence of the specific instances of jury tampering alleged, e.g., daily ex-parte contact by the Commonwealth's Attorney, the supplying of newspapers to the jury, and providing the jury access to television, etc." (*Id.*). He ordered the Commonwealth to prepare proposed findings of fact that were consistent with his oral rulings and submit them to defense counsel for review. (*Id.*).

From there, the court began its evidentiary hearing on Hodge's claim of ineffective assistance of counsel during the penalty phase. (Doc. # 44, 1/17/07 Hearing at 0:55:15–2:03:00). First, Hodge presented testimony from Dale Mitchell, who represented him at trial. (*Id.*). Mitchell explained that Hodge did not wish to undergo a psychological evaluation, so Mitchell decided to focus on mitigation evidence regarding Hodge's devotion to his wife and children. (*Id.*). Hodge and his wife, Sherry, agreed to testify to this effect. (*Id.*). However, when Mitchell found out that the Commonwealth planned to call Lawrence Anthony Smith as a witness, Hodge and Sherry changed their minds about testifying, and the mitigation strategy fell apart. (*Id.*). Mitchell hired an investigator to travel to Florida, hoping to learn more about Smith and his expected testimony, but this plan did not come to fruition because Sherry refused to pay the investigator's expenses. (*Id.*). Mitchell also

---

6) Rogers was federally indicted for improperly certifying applicants for concealed weapons permits. *See USA v. Rogers*, 5:02-cr-37-JBC, Doc. # 1. He pled guilty to that offense on April 17, 2002. *See id.* at Doc. # 19.

attempted to interview a family member in Tennessee, but was unsuccessful in locating them.  (*Id.*).

At the time of Hodge's trial, Mitchell had been a general practitioner for several years.  (*Id.*).  He testified that he had tried five or six death penalty cases before the Hodge trial, all of which resulted in acquittals.  (*Id.*).  However, all but one of these cases had been tried before Kentucky implemented a bifurcated trial system.  (*Id.*).  He could not specifically recall consulting any manuals or reviewing any standards about death penalty litigation in preparation for the Hodge trial.  (*Id.*).

Hodge then presented testimony from Betty Niemi, who served as Capital Trial Branch Manager for the Department of Public Advocacy ("DPA").  (Doc. # 44, 1/17/07 Hearing at 0:28:00–2:18:10).  Niemi testified that there were capital litigation standards in place at the time of the Hodge trial.  (*Id.*).  For example, defense attorneys were expected to devote about fifty-percent of their trial preparation efforts to the penalty phase.  (*Id.*). Defense attorneys were advised to begin investigating immediately upon taking the case. (*Id.*).  Typical sources of information included the client, family members, school records, and medical histories.  (*Id.*).  Niemi opined that Mitchell's efforts to prepare a mitigation defense fell far short of the standards that existed in the mid-1980s.  (*Id.*).  Thus, she concluded that Hodge did not receive effective assistance of counsel at the penalty phase of his trial.  (*Id.*).

Because Hodge could not bear the costs to transport his family members from Tennessee to Lexington, he instead presented affidavits from them.[7]  (*Id.* at

---

7) These affidavits were collected and submitted by DPA Mitigation Specialist Dawn Jenkins.  (Doc. # 44, 1/17/07 Hearing at 4:03:30-5:00:00).

0:00:01–0:28:00).  These sources revealed that Hodge was the youngest of three children. (*Id.*).  He had two older sisters, as well as one half-sister, who did not reside with the rest of the family.  (*Id.*).  Hodge's father abandoned the family when Hodge was two years old. (*Id.*).  After his departure, his mother married five more times.  (*Id.*).  Each of her husbands were substance abusers; some of them also physically abused her.  (*Id.*).  The worst of her husbands, Billy Joe, regularly raped her, beat her, and threatened her with a gun.  (*Id.*). However, Billy Joe was most violent towards Hodge, who often tried to defend his mother and sisters.  (*Id.*).  Hodge's sisters indicated that Billy Joe made Hodge watch while he killed Hodge's dog, while his half-sister recalled an occasion where Billy Joe rubbed Hodge's face in his own feces.  (*Id.*).

Although Hodge exhibited normal intelligence and received average grades throughout elementary school, his grades and attendance worsened once Billy Joe entered his life.  (*Id.*).  At Billy Joe's urging, Hodge began to lie and steal, and ultimately ended up in a juvenile detention facility.  (*Id.*).  Hodge suffered regular beatings at this facility.  (*Id.*). Upon release at age sixteen, Hodge assaulted his stepfather, which landed him back in the juvenile facility until his eighteenth birthday.  (*Id.*).

Next, Hodge presented testimony from Pat Geier, a clinical psychologist, who had reviewed the affidavits submitted by his family members.  (*Id.* at 2:18:00–3:15:30).  Geier described Hodge's family dynamic as "the extreme end of severe dysfunction" and explained that such traumatic experiences set a child up for self-destructive or oppositional behavior.  (*Id.*).  She further testified that Hodge's experience in a brutal reform school may have felt like a "double betrayal," destroying his ability to trust others and advancing his

18

rage. (*Id.*). Although Geier declined to offer a diagnosis, as she had not personally interviewed Hodge, she suggested that Hodge was a child who could have been saved with appropriate intervention. (*Id.*). In support of this proposition, Geier noted that Hodge exhibited normal intelligence, compliant behavior and appropriate attachment to others until adolescence. (*Id.*). Finally, Geier testified that child abuse had developed as a psychological specialty by the 1980s, so this type of analysis would have been available at the time of Hodge's trial. (*Id.*).

Hodge also presented the testimony of Billie Davenport, an attorney and domestic violence specialist who worked for the Brenda D. Cowan Coalition. (*Id.* at 3:15:45–4:03:30). He also reviewed the affidavits submitted by Hodge's family members and testified that Billy Joe Hodge used coercion to exercise power and control over his wife and his stepchildren. (*Id.*). For example, Billy Joe forced Hodge's mother to quit her job after they married, prohibited her from showing affection towards the children, repeatedly beat her and the children, and isolated them from others. (*Id.*). Davenport testified that this environment would cause the children severe anxiety and hamper their social development. (*Id.*). He also noted that adult survivors of child abuse and domestic violence are often reluctant to talk about their experiences. (*Id.*). However, he stated that there are methods for drawing them out. (*Id.*). Davenport opined that the effects of domestic violence and the means of helping survivors were well-established at the time of Hodge's trial. (*Id.*).

After the evidentiary hearing, Hodge supplemented the record with deposition testimony from Dr. Robert Kaplan, a licensed clinical psychologist specializing in post-

19

traumatic stress disorder. (Doc. # 55, 9/20/13 CD, Box 1-A, Deposition for Defendant Deponent Dr. Robert Kaplan). Dr. Kaplan reviewed the records collected by DPA, interviewed Hodge for three hours, and then performed a battery of psychological tests on him. (*Id.* at 10-16). Based upon the results of these tests, Dr. Kaplan believed, within a reasonable degree of medical certainty, that Hodge suffered from post-traumatic stress disorder ("PTSD") due to severe physical abuse by Billy Joe Hodge. (*Id.* at 25-26). He further opined that Hodge's PTSD impaired his ability to think, exercise sound judgment, and control his behavior. (*Id.*). Dr. Kaplan also stated that the abuse effectively arrested his emotional and mental development, making it difficult for Hodge to fully appreciate the wrongfulness of his conduct at the time of the crime. (*Id.*). Although the specific tests performed by Dr. Kaplan were not available at the time of the trial, he confirmed that PTSD was a recognized psychological disorder in 1985 and that there were other methods of diagnosing it. (*Id.* at 24).

Hodge also presented deposition testimony from Dr. David Richart, a forensic social worker who identifies risk factors present in the social histories of criminal defendants. (Doc. # 55, 9/20/13 CD, Box 1-A, Deposition for Defendant Deponent Dr. David Richart at 10). This information aids psychologists "in determining the causative nature of prospective criminal actions." (*Id.*). Dr. Richart testified that there were seven risk factors present in Hodge's background: (1) instability of male role models; (2) alcoholic male parent and step-parents; (3) abandonment by biological father; (4) witness to domestic violence and victim of child abuse; (5) poverty; (6) lack of parental continuity and lack of a male role model; and (7) brutalization in a Tennessee reform school. (*Id.* at 40-42).

According to Dr. Richart, these circumstances set Hodge on "the pipeline to prison." (*Id.*). Had Hodge been able to present this information to the jury, "it would have humanized him instead of demonized him." (*Id.*). Dr. Richart also stated that these concepts were in existence, albeit in more primitive form, in 1985. (*Id.* at 47).

After considering all of the available evidence, Judge Coleman denied Hodge's request for relief as to the ineffective assistance of counsel claim. (Doc. # 31-18 at 35). Judge Coleman found that "Dale Mitchell's performance in his representation of Hodge at the penalty phase of the trial was deficient because of his failure to conduct a reasonable investigation into mitigating evidence." (*Id.*). However, he found that Hodge could not prove prejudice because the mitigating evidence would necessarily have included information about Hodge's prior criminal history, which the jury would have likely viewed as an aggravating factor. (*Id.*). As a result, Judge Coleman concluded that "Hodge has failed to prove by a reasonable probability that, absent the deficient performance, the jury would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." (*Id.*).

### G.    *Second Post-Conviction Appeal to the Kentucky Supreme Court*

On April 19, 2010, Hodge again appealed to the Kentucky Supreme Court, this time asserting three arguments: (1) the trial court erred when it denied Hodge's claim related to the trial prosecutor's tampering with the jury; (2) Hodge received ineffective assistance of counsel when Mitchell failed to investigate, prepare, and present mitigating evidence; and (3) the trial court erred in failing to perform its function and instead deferred that function to the special prosecutor. *Hodge v. Commonwealth*, No. 2009-SC-000791-MR,

2011 WL 3805960 (Ky. Aug. 25, 2011).

The court first addressed the jury tampering issue, finding that there was "more than the requisite substantial evidence in the record to support the trial court's ultimate conclusion that Hodge failed to present competent and credible evidence supporting any of his allegations of jury tampering or misconduct." *Id.* at *3. In support of this proposition, the court pointed out that Gary Rogers "was less than forthcoming at the evidentiary hearing" and "often contradicted his own testimony from moments before or contradicted his own prior statements to investigators." *Id.* at *1.

As for the ineffective assistance of counsel claim, "the Commonwealth concede[d] [on appeal] that Mitchell was deficient in conducting a reasonable investigation to find mitigation evidence." *Id.* at *3. Accordingly, the Kentucky Supreme Court focused its inquiry on "the prejudicial effect of this deficiency." *Id.* The testimony elicited at the evidentiary hearing established that Hodge had a nightmarish childhood and that the abuse he suffered had a lasting psychological impact. *Id.* at 3-4. However, the court found that the result of the penalty phase would not have been any different had this mitigation evidence been presented to the sentencing jury. *Id.* at *4. It reasoned that "the evidence of Hodge's abusive childhood would have also included the damaging evidence of his long and increasingly violent criminal history, his numerous escapes from custody, and the obvious failure of several rehabilitative efforts." *Id.* The court also emphasized the "heinous nature" of the crimes, which "were not just brutal and vicious, but calculated and exceedingly cold-hearted." *Id.*

22

The court then summarized its analysis as follows:

Balancing all of the available evidence in mitigation and aggravation, we are compelled to reach the conclusion that there exists no reasonable probability that the jury would not have sentenced Hodge to death.  There is no doubt that Hodge, as a child, suffered a most severe and unimaginable level of physical and mental abuse.  Perhaps this information may have offered insight for the jury, providing some explanation for the career criminal he later became.  If it had been admitted, the PTSD diagnosis offered in mitigation might have explained Hodge's substance abuse, or perhaps even a crime committed in a fit of rage as a compulsive reaction.  But it offers virtually no rationale for the premeditated, cold-blooded murder and attempted murder of two innocent victims who were complete strangers to Hodge.  Many, if not most, malefactors committing terribly violent and cruel murders are the subjects of terrible childhoods.  Even if the sentencing jury had this mitigation evidence before it, we do not believe, in light of the particularly depraved and brutal nature of these crimes, that it would have spared Hodge the death penalty.

*Id.* at *5.

As a final matter, the Kentucky Supreme Court rejected Hodge's allegation that the trial court abdicated its judicial function to the Commonwealth, stating simply that it "f[ou]nd nothing improper in the trial court assigning to the Commonwealth the clerical task of memorializing, in writing, its oral findings of fact and conclusions of law."  *Id.*  Accordingly, it affirmed the judgment of the Letcher County Circuit Court.  *Id.*

Hodge again sought relief from the Supreme Court of the United States.  *Hodge v. Kentucky*, 133 S. Ct. 506 (2012).  The Court denied his petition for writ of certiorari on December 3, 2012.  *Id.*  However, Justice Sonia Sotomayor wrote a dissent, in which she argued that the Kentucky Supreme Court erred in its analysis of the ineffective assistance of counsel claim.  *Id.*  Justice Sotomayor explained that "[m]itigation evidence need not, and rarely could, 'explain' a heinous crime; rather, mitigation evidence allows a jury to make a reasoned moral decision whether the individual defendant deserves to be

23

executed, or to be shown mercy instead." *Id.*

Justice Sotomayor further reasoned that:

The Kentucky Supreme Court's brief discussion of the weight and impact of Hodge's mitigation evidence reasonably suggests that its prejudice determination flowed from its legal errors. Perhaps if the court had afforded proper consideration to the mitigation evidence, it still would have reached the same result; it might have found no "reasonable probability" that the jury would have weighed Hodge's difficult past more heavily in its moral calculation than the callous nature of the crime and Hodge's history of imprisonment and escape. But, giving full effect to the mitigation evidence, the court may well have concluded that the story of Hodge's childhood was so extraordinary, "there is a reasonable probability that at least one juror would have struck a different balance" had the jury known. A "reasonable probability" is only "a probability sufficient to undermine confidence in the outcome." Absent its errors, the Kentucky Supreme Court may have found that minimal threshold met on these facts.

*Id.* at 510-11.

### H.    Federal Habeas Proceedings

On February 19, 2013, Hodge, by counsel, filed a Petition for Writ of Habeas Corpus

Pursuant to 28 U.S.C. § 2254 (Doc. # 12). In the Petition, Hodge raises the following

twenty-nine (29) claims:

Claim 1:    Petitioner's constitutional rights were violated as a result of counsel's numerous conflicts of interest.

Claim 2:    Petitioner was denied due process of law when the court refused to sever his case from co-defendant Epperson.

Claim 3:    Petitioner was denied due process of law because of the prosecutors' conflict of interest.

Claim 4:    Juror foreman and prosecutor enjoyed a close personal relationship at the time of trial. The failure of either to disclose the relationship violated Petitioner's constitutional right to an impartial jury and due process.

Claim 5:    Petitioner's right to a fair and impartial jury was violated by jury tampering.

24

Claim 6:        Petitioner was deprived of the effective assistance of counsel at the penalty phase by trial counsel's failure to investigate, prepare and present available mitigation.

Claim 7:        Petitioner was denied due process and the right to confront his accusers when Anthony Smith offered perjured testimony and the Commonwealth knowingly used that testimony to procure a conviction and death sentence.

Claim 8:        The trial court violated the Fifth, Sixth, Eighth and Fourteenth Amendments by failing to require disclosure of the confidential informant's identity.

Claim 9:        Petitioner was denied due process of law when the Commonwealth withheld exculpatory evidence.

Claim 10:       Petitioner's Sixth, Eighth and Fourteenth Amendment rights were violated by the trial court's failure to grant a continuance.

Claim 11:       Petitioner's due process and effective assistance of counsel rights under the Sixth and Fourteenth Amendments were violated with respect to the testimony of Donald Bartley.

Claim 12:       Trial counsel was ineffective when counsel failed to object to the prosecutor stating during his closing that the jury had no choice but to give the Petitioner the death penalty.

Claim 13:       The prosecutor's improper comments during argument deprived Petitioner of a fair trial and a rational sentencing.

Claim 14:       Petitioner was denied due process of law and his right to a fair trial by admission of evidence of uncharged murders.

Claim 15:       Trial counsel was ineffective when counsel failed to object to unrelated other acts evidence of murder on direct examination of Bartley and elicited the same on cross-examination of Bartley.

Claim 16:       The court deprived Petitioner of due process by preventing him from questioning prospective jurors on their views about parole.

Claim 17:       Petitioner's rights were violated when the trial court met with the jury in the absence of Petitioner and his counsel.

Claim 18:      The trial court committed reversible error when patients of Dr. Acker were not struck for cause from the jury panel.

Claim 19:      The trial court's refusal to move the venue from Letcher County deprived Petitioner of a fair and impartial jury.

Claim 20:      Trial counsel was ineffective when he informed the jury of a possibility of appeal from their verdict.

Claim 21:      Petitioner's privilege against self-incrimination was violated when the trial court failed to give a "no inference" instruction during the guilt or sentencing phases, and trial counsel was ineffective in failing to request the same.

Claim 22:      Petitioner was denied his right to confront Bartley when the trial court restricted cross-examination.

Claim 23:      Petitioner was erroneously precluded from calling witnesses and forcing them to take the Fifth Amendment before the jury.

Claim 24:      The trial court committed reversible error in failing to suppress evidence of the identification of Petitioner by various witnesses, where such identifications were not reliable and were made from a highly suggestive photo packet.

Claim 25:      The Commonwealth was erroneously allowed to emphasize that a Commonwealth witness had received an anonymous threatening phone call.

Claim 26:      The court erred in refusing to instruct the jury, in both phases, that Bartley was an accomplice as a matter of law and on the necessity of corroboration of an accomplice's testimony.

Claim 27:      Hodge was denied due process because the penalty phase instructions did not inform the jury of their absolute option to return a sentence less than death and otherwise failed to "guide and channel" the jury's discretion adequately.

Claim 28:      The court violated the Sixth, Eighth and Fourteenth Amendments by sentencing Petitioner to death based on unrebutted, confidential information and non-statutory aggravating circumstances.

Claim 29:      On its face, KRS 532.025 violates the Constitutions of Kentucky and the United States.

26

(*Id.*).   On November 15, 2013, the Office of the Kentucky Attorney General filed a Response (Doc. # 23) on behalf of Respondent Randy White.[8]  Hodge then submitted his Traverse (Doc. # 38), rendering this Petition ripe for the Court's review.

Once the Petition was ripe, Hodge submitted a Motion to Supplement the Record, requesting that the State file an unmodified copy of the state court record and a transcript of the post-conviction hearings.  (Doc. # 40).  The State indicated that it had no objection to this request.  (Doc. # 41).  Accordingly, United States Magistrate Judge Edward B. Atkins granted Hodge's Motion.  (Doc. # 42).  The relevant materials were received in May 2014.  (Docs. # 44 and 45).

Next, Hodge filed a Motion for Discovery and for an Evidentiary Hearing.  (Doc. # 48).  Specifically, Hodge sought to review the trial prosecutors' files for evidence relating to Bartley's testimony, their knowing use of Smith's perjured testimony, and their subsequent representation of Dr. Acker in a civil trial against Hodge and Epperson.  (Doc. # 48-2).  Hodge also asked to review the Kentucky Attorney General's files on the public corruption investigation involving James Wiley Craft.  (*Id.*).  Finally, Hodge sought leave to depose Craft, his former Assistant Commonwealth's Attorney L. Mike Caudill, and Dale Mitchell.  (*Id.*).  The State filed a Response in Opposition, and Hodge replied (Docs. # 49 and 50).

Judge Atkins issued an Order denying Hodge's Motion without prejudice.  (Doc. # 61).  He reasoned that there was no need for an evidentiary hearing because § 2254(d)

---

8) Under 28 U.S.C. § 2254, Randy White is the proper Respondent because he is the Warden of the Kentucky State Penitentiary, where Hodge is incarcerated. in which the defendant is incarcerated.  However, because the Office of the Kentucky Attorney General is handling this appeal on White's behalf, the Court will simply refer to Respondent as "the State" for the remainder of this opinion.  (Doc. # 6).

presumably limits the Court's review of these claims to the evidence that was actually before the state court.  (Doc. # 61 at 13).  However, he issued the following caveat: "[i]f the Court determines that any of Petitioner's claims are not barred by § 2254(d), it may then decide whether discovery, and an evidentiary hearing will be necessary to resolve any claims subject to *de novo* review." (*Id.*).  Hodge filed Objections (Doc. # 62) to the Order, which this Court reviewed and overruled (Doc. # 70).

Finally, Hodge filed a Motion for Summary Judgment (Doc. # 73), wherein he asks the Court to grant a conditional writ of habeas corpus conditioned upon commencing a new penalty phase within one hundred and eighty (180) days.  He contemporaneously filed a Supplemental Memorandum in Support of the Petition (Doc. # 74).  The Attorney General having filed a Response to the Motion for Summary Judgment and the Supplemental Memorandum, and Hodge having submitted his Reply, in Opposition, this Motion is also ripe for the Court's review.  (Docs. # 74, 75, and 76).  Accordingly, the Court will now consider each of Hodge's claims for relief.

## III.   Standard of Review

Federal courts have long enjoyed jurisdiction to "entertain an application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).  However, "[t]he Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law."  *Bell*

*v. Cone*, 535 U.S. 685, 693 (2002); *see also Williams v. Taylor*, 529 U.S. 362, 378 (2000) (explaining that AEDPA "relates to the way in which a federal habeas court exercises its duty to decide constitutional questions; [it] does not alter the underlying grant of jurisdiction in § 2254(a)").

The relevant amendment to § 2254 provides as follows:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–

(1)   resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2)   resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding

28 U.S.C. § 2254(d); *see also Harrington v. Richter*, 562 U.S. 86, 102-03 (2011) (characterizing federal habeas review as a "guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction"); *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam) (explaining that § 2254(d)'s "highly deferential standard . . . demands that state-court decisions be given the benefit of the doubt") (internal quotations omitted).

"When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Id.* at 99-100 (reviewing a state-court decision that rejected all of the prisoner's claims in a one-sentence summary order); *see also Johnson v. Williams*, 133 S. Ct. 1088 (2013)

29

(extending *Richter* to situations where the state court decision addresses some of the prisoner's claims but does not explicitly address a federal claim at issue on federal habeas review). After all, the statute "does not require a state court to give reasons before its decision can be deemed to have been 'adjudicated on the merits.'" *Richter*, 562 U.S. at 99.

*Richter*'s presumption "may be overcome when there is reason to think some other explanation for the state court's decision is more likely." *Id.* at 99; *see also Johnson*, 133 S. Ct. at 1096 (rejecting an invitation to make the *Richter* presumption irrebuttable). If the prisoner successfully rebuts that presumption and demonstrates that the state court did not reach the merits of his or her claim, it is no longer subject to AEDPA's deferential standard. *Cone v. Bell*, 556 U.S. 449, 472 (2009). Instead, the claim is reviewed *de novo. Id.*; *see also Rompilla v. Beard*, 545 U.S. 374, 390 (2005).

As noted above, "§ 2254(d) bars re-litigation of any claim 'adjudicated on the merits' in state court, subject only to the exceptions in §§ 2254(d)(1) and (2)." *Richter*, 562 U.S. at 98. Section 2254(d)(1) allows a federal habeas court to review a state-court claim adjudicated on the merits *de novo* if the state court's decision was either "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States. *Rompilla*, 545 U.S. at 390. The "contrary to" and "unreasonable application" clauses have independent meanings. *Bell*, 535 U.S. at 694.

"To determine whether a particular decision is 'contrary to' then-established law, a federal court must consider whether the decision 'applies a rule that contradicts [such] law' and how the decision 'confronts [the] set of facts' that were before the state court." *Cullen*

*v. Pinholster*, 563 U.S.170, 182 (2011) (quoting *Williams*, 529 U.S. at 405). Stated another way, "[a] federal habeas court may issue the writ under the 'contrary to' clause if the state court applies a rule different from the governing law set forth in our cases, or if it decides a case differently than we have done on a set of materially indistinguishable facts." *Bell*, 535 U.S. at 694 (finding that the prisoner's claim was barred by § 2254(d)(1) because the state court correctly identified the principles announced in *Strickland* as those governing the analysis of [his] claim).

By contrast, "[t]he court may grant relief under the 'unreasonable application' clause if the state court correctly identifies the governing legal principles from [Supreme Court] decisions but unreasonably applies it to the facts of the particular case." *Id.* "The 'unreasonable application' clause requires the state court decision to be more than incorrect or erroneous;" it must be "objectively unreasonable." *Lockyer v. Andrade*, 538 U.S. 63, 74 (2003) (citing *Williams*, 529 U.S. at 410). Therefore, "a federal habeas court may not issue the writ simply because [it] concludes in its independent judgment that the state-court decision applied [the law] incorrectly." *Woodford*, 537 U.S. at 24-25. "[T]he state court's ruling on the claim being presented in federal court [must be] so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Richter*, 562 U.S. at 103; *see also Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004) (cautioning that "the range of relevant judgment can depend in part on the nature of the relevant rule").

The Supreme Court has held that the term "clearly-established Federal law" "refers to the holdings, as opposed to the dicta, of [its] decisions as of the time of the relevant

31

state-court decision." *Williams*, 529 U.S. at 412.  Thus, the federal habeas court's review should focus on "the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision."  *Lockyer*, 538 U.S. at 71-72; *see also Pinholster*, 563 U.S. at 182 (citing the "backward-looking" language of the statute as support for this approach).

As for § 2254(d)(2), it permits a federal habeas court to review a state-court claim adjudicated on the merits *de novo* if the state court's decision was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *Brumfield v. Cain*, 135 S. Ct. 2269, 2277 (2015) (finding that both of the state court's "critical factual determinations were unreasonable").  "State-court factual findings . . . are presumed correct; the [prisoner] has the burden of rebutting the presumption by 'clear and convincing evidence.'" *Rice v. Collins*, 546 U.S. 333, 339 (2006) (quoting 28 U.S.C. § 2254(d)(2)).  This "deference does not imply abandonment or abdication of judicial review." *Brumfield*, 135 S. Ct. at 2277. However, federal habeas courts "may not characterize these state-court factual determinations as unreasonable merely because [they] would have reached a different conclusion in the first instance." *Id.* (internal quotations omitted).  While "[r]easonable minds reviewing the record might disagree about [the issue before them] . . . that does not suffice to supersede the trial court's . . . determination." *Id.* at 341-42.

IV.    **Analysis**

A.    *Claim 1: Hodge's Right to Due Process and Right to the Effective Assistance of Counsel Were Violated as a Result of Defense Attorney Dale Mitchell's Conflicts of Interest*

Hodge takes issue with the Kentucky Supreme Court's handling of two claims arising from defense attorney Dale Mitchell's conflicts of interest.[9]  (Docs. # 12 at 12-15; 38 at 11-20).  On direct appeal, Hodge complained that he was denied due process of law and effective assistance of counsel because Mitchell essentially acted as Lester Burns's second chair and represented Burns in a related federal indictment while this case was pending.  (Doc. # 30-13 at 3-6).  In his state post-conviction proceedings, Hodge asserted that Mitchell's assistance was ineffective because he was under federal investigation for his own involvement with the Acker family's stolen money.  (Doc. # 31-6 at 25-28).  Hodge also indicated that Mitchell had given Burns a kickback in exchange for being retained as Hodge's attorney.  (*Id.*).  Hodge concedes that the former claim was adjudicated on the merits by the Kentucky Supreme Court, but insists that the latter was not.  (Doc. # 38 at 11-20).  The Court will consider each of these issues in turn.

1.    **Hodge's Claim on Direct Appeal**

The Supreme Court of the United States has repeatedly recognized that "the Sixth Amendment right to counsel exists, and is needed, in order to protect the fundamental right

_____

9) In his initial Petition for Writ of Habeas Corpus, Hodge does not distinguish between his claim on direct appeal and his state post-conviction claim.  (Doc. # 12 at 12-15).  Instead, he raised it in his Traverse.  (Doc. # 38 at 11).  Although the Court is not obligated to consider arguments asserted in traverse, it will do so out of an abundance of caution.  *Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 553 (6th Cir. 2008) (explaining that the Sixth Circuit has "found issues to be waived when they are raised for the first time in motions requesting consideration *or in replies to responses*") (emphasis added).  However, because Hodge did not make this distinction in his Petition, the State's Response focuses solely on the direct appeal claim.  (Doc. # 23 at 10-11).

to a fair trial." *Strickland v. Washington*, 466 U.S. 668, 685 (1984); *see also Cuyler v. Sullivan*, 446 U.S. 335, 344 (1980) (explaining that this "right is made applicable to the States through the Fourteenth Amendment").  The fact that "a lawyer is present at a trial alongside the accused, however, is not enough to satisfy the constitutional command." *Id.* at 686.  "The Sixth Amendment recognizes the right to the assistance of counsel because it envisions counsel's playing a role that is critical to the ability of the adversarial system to produce just results." *Id.*  Accordingly, the Court has emphasized that "the right to counsel is the right to the *effective assistance* of counsel." *Id.* (internal quotations omitted) (emphasis added).

The Court has also recognized that, "[w]here a constitutional right to counsel exists, . . . there is a correlative right to representation that is free from conflicts of interest." *Wood v. Georgia*, 450 U.S. 261, 271 (1981) (citing *Cuyler*, 446 U.S. at 335 (1980)).  Although "a possible conflict inheres in almost every instance of multiple representation," such an arrangement does not necessarily violate the Sixth Amendment right to conflict-free counsel.  *Cuyler*, 446 U.S. at 348 (noting that there are situations in which multiple representation "gives strength against a common attack") (internal quotations omitted).  Thus, "[i]n order to establish a violation of the Sixth Amendment, a defendant who raised no objection at trial must demonstrate that an actual conflict of interest adversely affected his lawyer's performance." *Id.*

On direct appeal, the Kentucky Supreme Court rejected Hodge's claim with the following analysis:

> Hodge did not have ineffective assistance of counsel merely because of his attorney's dual representation.  Hodge's attorney was also counsel for Lester

34

> Burns on his federal indictments.  Hodge has merely made an allegation
> without demonstrating any impact on his trial.  Dual representation might be
> improper but Hodge must show why such representation made his counsel's
> performance deficient.  He did not.  Hodge has failed to show how his
> counsel's representation created a conflict of interest either actual or
> potential that affected the adequacy of his representation.  *Cuyler v. Sullivan*,
> 446 U.S. 335, 100 S. Ct. 1708, 64 L.Ed.2d 950 (1980).  The burden of
> establishing actual conflict is on Hodge.  *United States v. Knight*, 680 F.2d
> 470 (6th Cir. 1982) (cert. den.) 459 U.S. 1102, 103 S. Ct. 723, 74 L.Ed.2d
> 950 (1983).  Joint representation of multiple defendants by the same counsel
> does not automatically constitute a violation of the constitutional guarantee
> of effective assistance of counsel even in a death penalty case.  *White v.*
> *Commonwealth*, Ky., 671 S.W.2d 241 (1983).

*Epperson v. Commonwealth*, 809 S.W.2d 835, 844 (1990).

Hodge admits that the Kentucky Supreme Court's analysis qualifies as an

"adjudication on the merits."  *See Richter*, 562 U.S. 86, 99-100 (2011).  Nevertheless, he

urges the Court to review his claim *de novo*, asserting that the Kentucky Supreme Court's

decision is "contrary to, or an unreasonable application of, clearly established Federal law."

28 U.S.C. § 2254(d)(1).

Although Hodge invokes both clauses of § 2254(d)(1), he fails to explain why the

Kentucky Supreme Court's decision was "contrary to" clearly established federal law.  In

the absence of any argument on this issue, the Court will be brief in its analysis.  The

Kentucky Supreme Court identified *Cuyler*, 446 U.S. at 335, as the proper rule of decision

for the conflict of interest issue.  Because *Cuyler* is the seminal case addressing "whether

a state prisoner may obtain a federal writ of habeas corpus by showing that his retained

defense counsel represented potentially conflicting interests," the Court cannot conclude

that the Kentucky Supreme Court's decision meets the "contrary to" standard.  *See Bell*,

535 U.S. at 694 (explaining that a decision is "contrary to" clearly established law if the

35

state court "applies a rule different from the governing law set forth in our cases").

As for the second clause of § 2254(d)(1), Hodge contends that the Kentucky Supreme Court's decision amounts to an unreasonable application of clearly established federal law because it did not consider Mitchell's failure to voir dire potential jurors about Lester Burns's federal charges as evidence of adverse impact.  Hodge points out that the Kentucky Supreme Court was well aware of this fact, which is referenced in other portions of the opinion.  *See Epperson*, 809 S.W.2d at 839 (explaining that Hodge was not prejudiced by Judge Hogg's failure to sever his trial from Epperson's trial because he had ample opportunity to voir dire potential jurors about Lester Burns's charges).

However, nothing in the record indicates that Hodge pointed to Mitchell's voir dire failings as evidence of adverse effect.  (Doc. # 30-13 at 3-6).  In fact, Hodge did nothing to demonstrate that Mitchell's simultaneous representation of Burns adversely affected his performance at trial.  (*Id.*).  Hodge cannot now contend that the Kentucky Supreme Court's decision was "objectively unreasonable" simply because it failed to cull the record for potentially relevant facts and make this showing for him.  *See Lockyer*, 538 U.S. at 74; *see also Richter*, 562 U.S. at 103 (explaining that the decision must be "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement").  Further review of this claim is therefore barred by AEDPA.  *See* 28 U.S.C. § 2254(d)(1).

### 2.     Hodge's State Post-Conviction Claim

During his state post-conviction proceedings, Hodge asserted that Mitchell rendered ineffective assistance because he was under investigation for the stolen Acker money and

had given Burns a kickback in exchange for being hired. (Doc. # 31-6 at 25-28). The Kentucky Supreme Court addressed this claim as follows:

> Finally, [Hodge and Epperson] each argue that they were denied effective assistance of counsel due to a conflict of interest between Epperson's counsel, Lester Burns, and Hodge's counsel, Dale Mitchell. As found by the trial court, each of these allegations were addressed and resolved on direct appeal and cannot be raised in an RCr 11.42 motion. *Thacker v. Commonwealth*, 476 S.W.2d 838 (1972).

*Hodge v. Commonwealth*, 68 S.W.3d 338, 345 (2001).

The Court begins with the presumption that the Kentucky Supreme Court adjudicated the claim on the merits "in the absence of any indication or state-law procedural principles to the contrary." *See Richter*, 562 U.S. at 99-100. Hodge seeks to rebut this presumption, arguing that the Kentucky Supreme Court's decision was based upon the "now-defunct procedural principle" announced in *Thacker v. Commonwealth*. (Doc. # 38 at 15-16). Because the Court is not aware of any precedent from the Supreme Court of the United States identifying a "state-law procedural principle" that is sufficient to rebut the *Richter* presumption, it will assume, without deciding, that *Thacker* qualifies as such.[10] Accordingly, it will review Hodge's claim *de novo*. *See Richter*, 562 U.S. at 99-100.

---

10) In *Thacker*, the Kentucky Supreme Court held that "[i]t is not the purpose of RCr 11.42 to permit a convicted defendant to retry issues which could and should have been raised in the original proceeding, nor those that were raised in the trial court and upon an appeal considered by this court." *See* 476 S.W.2d 838, 839 (Ky. 1972). This rule was later expanded to bar ineffective assistance of counsel claims that were related to issues raised on direct appeal. *Leonard v. Commonwealth*, 279 S.W.3d 151, 157 (Ky. 2009) (citing *Sanborn v. Commonwealth*, 975 S.W.2d 905, 908-09 (Ky. 1998) ("An issue raised and rejected on direct appeal may not be relitigated in [11.42] proceedings by claiming that it amounts to ineffective assistance of counsel.")).

The Kentucky Supreme Court later reversed course, holding that a convicted defendant was not precluded from presenting his ineffective assistance of counsel claims in an RCr 11.42 proceeding even though the underlying claim of error had been denied on direct appeal. *Martin v. Commonwealth*, 207 S.W.3d 1, 4-5 (Ky. 2006); *see also Leonard*, 279 S.W.3d at 158 (recognizing that "a direct appeal allegation of palpable error is fundamentally a different claim than a collateral attack allegation of ineffective assistance of counsel based on the alleged palpable error," with the standard of review being broader as to the latter claim).

This post-conviction claim ultimately suffers from the same fatal flaw as Hodge's direct appeal claim regarding conflicts of interest.[11]   Hodge contends that Mitchell was burdened by an "actual conflict of interest" because he was under investigation for his involvement with the stolen Acker money and had given Burns a kickback in exchange for being hired as counsel.   (Doc. # 38 at 15-20).   He further asserts that these conflicts "adversely affected [Mitchell]'s representation."   (*Id.*).   While Mitchell was not a model of ethical advocacy, Hodge has not explained *how* these conflicts of interest adversely affected Mitchell's performance at trial.   *Cuyler*, 446 U.S. at 335.   Once again, Hodge "has merely made allegations without demonstrating an impact on the trial."   *Epperson*, 809 S.W.2d  at 844.   His first claim for relief must be **denied**.

### B.   Claim 2: Hodge's Right to Due Process of Law and Right to a Fair Trial Were Violated When Judge Hogg Refused to Sever his Trial from Co-Defendant Epperson's Trial

"Cases in [the Supreme Court of the United States] have long proceeded on the premise that the Due Process Clause guarantees the fundamental elements of fairness in a criminal trial."   *Spencer v. Texas*, 385 U.S. 554, 563-64 (1967); *see also Lutwak v. United States*, 344 U.S. 604, 619 (1953) (explaining that "a defendant is entitled to a fair trial but not a perfect one").   Accordingly, the Court has recognized that misjoinder can give

---

11) Although Kentucky law now recognizes that allegations of palpable error on direct appeal do not bar a subsequent collateral attack claim arising from the alleged palpable error, it still states that "[w]here the collateral ineffective assistance of counsel claim is presented in the course of the direct appeal, . . . the issue cannot be re-litigated in a collateral attack."   *Leonard*, 279 S.W.3d at 158, n. 3 (citing *Bowling v. Commonwealth*, 981 S.W.2d 545, 549 (Ky. 1998) (reasoning that "the collateral issue of ineffectiveness itself, not just the related direct error, ha[s] already been raised and rejected")).   On direct appeal, Hodge asserted both palpable error and ineffective assistance of counsel due to Mitchell's conflicts of interest.   (Doc. # 30-13 at 3-6).   Thus, the Court recognizes the possibility that Hodge's post-conviction claim was barred by *Bowling*.   However, by citing to *Thacker* in its post-conviction analysis, the Kentucky Supreme Court seemed to recognize two distinct claims arising from Mitchell's conflicts of interest.   The Court has elected to do the same for purposes of this analysis.

rise to a constitutional violation, but "only if it results in prejudice so great as to deny a defendant his Fifth Amendment right to a fair trial." *United States v. Lane*, 474 U.S. 438, 446 n. 8 (1986) (considering the effect of the district court's decision to deny pretrial motions for severance); *see also Schaffer v. United States*, 362 U.S. 511, 513-14 (1960) (focusing on the issue of prejudice in reviewing the district court's decision not to sever the defendants' trials after dismissal of a conspiracy count).

On direct appeal, Hodge claimed that he was deprived of his rights to due process and a fair trial when Judge Hogg refused to sever his trial from Epperson's trial.[12]   (Doc. # 30-12 at 6-13).   In support of this thesis, Hodge argued that Judge Hogg permitted the jury to consider evidence admissible as to Epperson only.   (*Id.*).   For example, Travis McDowell testified that Epperson "wanted to register a red Corvette that he was purchasing (after the robbery/murder) in McDowell's name."[13]   *Id.* at 18.

---

12) On direct appeal, Hodge hinted at two other problems caused by the joint trial.  (Doc. # 30-12 at 6-13). In his Petition, Hodge attempts to develop these sub-issues more fully.   (Doc. # 12 at 21-26).   First, he complains that Burns's presence during the trial had an injurious "spillover effect" on him, as Burns was facing federal charges related to the stolen Acker money.   (*Id.*).   Second, Hodge claims that he was entitled to a separate trial so he could call Epperson as a witness to impeach or rebut Bartley's testimony.   (*Id.*).   Because Hodge and Epperson were tried jointly, Hodge knew that Epperson would claim the protections of the Fifth Amendment if called as a witness.   (*Id.*).   Judge Hogg confirmed this suspicion during a hearing outside the presence of the jury.   (*Id.*).   As a result, Hodge claims that he was unable to effectively rebut Bartley's testimony about statements made by Epperson, which implicated them in other crimes.   (*Id.*).   In short, he attempts to style this issue as a twist on the classic *Bruton* problem.   (*Id.*).

    The Kentucky Supreme Court did not explicitly address either of these issues in its decision. *Epperson*, 809 S.W.2d at 835.   Nevertheless, the Court is obligated to consider Hodge's severance claim as a whole and presume that it was adjudicated on the merits.   *See Richter*, 562 U.S. at 99 (explaining that AEDPA "does not require a state court to give reasons before its decision can be deemed to have been 'adjudicated on the merits'" and prohibiting courts from dividing claims into sub-parts).   Because there is nothing unreasonable about the Kentucky Supreme Court's ultimate disposition of the severance claim, as explained herein, the Court need not consider these sub-issues further.   *Id.*

13) Hodge also takes issue with testimony from Roger McQueen, Roe Adkins, and Bob Loturco.  (Doc. # 38 at 18-19).  McQueen sold Epperson the 1978 blue Oldsmobile that was used in the crime.   (*Id.*).   Adkins once told Epperson about acquiring $50,000 in cash from Dr. Acker on a date when the banks were closed.   (*Id.*).   Loturco sold Epperson an English sports car after the murder.   (*Id.*).   As Hodge concedes, Judge Hogg did admonish the jury to consider Adkins' testimony and Loturco's testimony against Epperson only.   (*Id.*).

The Kentucky Supreme Court considered and rejected these arguments with the following analysis:

> It was not reversible error or an abuse of discretion for the trial judge to refuse to sever the trials of Epperson and Hodge. The trial judge has broad discretion to determine whether the risk of prejudice requires severance and such a decision will be overturned only upon a clear showing of an abuse of discretion. *Commonwealth v. Rogers*, Ky., 698 S.W.2d 839 (1985); *Wilson v. Commonwealth*, Ky., 695 S.W.2d 854 (1985).
>
> The trial judge found that none of the evidence presented by either appellant was prejudicial to the degree that it would require severance under the standards of *Hoskins v. Commonwealth*, Ky., 374 S.W.2d 839 (1964). There were no antagonistic defenses. Neither defendant took the stand, and trial strategy indicated that counsel for both defendants suggested that Bartley was the actual murderer.

*Epperson*, 809 S.W.2d at 835.

The State contends that the Court may not review this decision because the Kentucky Supreme Court relied on state law in rejecting Hodge's claim. In support of this proposition, the State notes that "it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." *See Estelle v. McGuire*, 502 U.S. 62, 72 (1991) (reversing the Ninth Circuit's decision to grant federal habeas relief based on the fact that one of the defendant's jury instructions deviated from the relevant state pattern instruction). However, this does not prohibit a federal habeas court from deciding "whether a conviction violated the Constitution, laws, or treaties of the United States." *Id.* Although the Kentucky Supreme Court relied on state law, Hodge's claim is predicated, in part, on the violation of federal constitutional rights. (Doc. # 30-12 at 6-13). Therefore, the Court is not precluded from reviewing this claim.

Hodge draws a different inference from the Kentucky Supreme Court's reliance on state law. (Doc. # 38 at 26). He suggests that his federal claim has not been adjudicated

40

on the merits because the Kentucky Supreme Court did not rely on any federal law in reaching its decision.  (*Id.*).  However, the Supreme Court of the United States has already considered and rejected a similar argument.  *See Johnson*, 133 S. Ct. at 1096 (2013).  In *Johnson*, the Court held that "[w]hen a state court rejects a federal claim without expressly addressing that claim, a federal habeas court must presume that the federal claim was adjudicated on the merits," subject to rebuttal.  *Id.* at 1096 (suggesting that a claim may be regarded as adjudicated on the merits when "the state-law rule is at least as protective as the federal standard," but not in situations where the state standard is quite different from the federal standard or where the petitioner fails to develop the federal claim).

Here, the state-law rule seems to be as protective as the federal standard. *Compare Lane*, 474 U.S. at 446, n. 8, *with Wilson v. Commonwealth*, 695 S.W.2d 854, 858 (1985) ("This court will not reverse a conviction for failure to grant separate trials unless we are clearly convinced that prejudice occurred and that the likelihood of prejudice was so clearly demonstrated to the trial judge as to make his failure to grant severance an abuse of discretion.").  In both instances, the key inquiry is the nature and extent of the prejudice that a defendant is likely to suffer absent a severance.  *See, e.g., Shaffer*, 362 U.S. at 513-14; *Commonwealth v. Rogers*, 698 S.W.2d 839, 840 (1985) (requiring the defendant to prove that joinder would be so prejudicial as to be "unfair" or "unnecessarily or unreasonably hurtful" to him).  Because the state-law rule and the federal standard are congruent, the Court concludes that this claim was "adjudicated on the merits" by the Kentucky Supreme Court.  *See Johnson*, 133 S. Ct. at 1096.  Thus, habeas relief is only appropriate if the Kentucky Supreme Court was unreasonable in its application of clearly

established Federal law.  *See* 28 U.S.C. § 2254(d)(1).

Having reviewed the record in detail, the Court simply cannot conclude that the Kentucky Supreme Court was unreasonable in denying Hodge's request for severance. Hodge and Epperson did not mount antagonistic defenses during trial.  *See Epperson*, 809 S.W.2d at 835.  Neither man testified during the trial, and both of their attorneys suggested that Bartley was the murderer.  *Id.*  As the Kentucky Supreme Court observed, "the mere fact that evidence competent as to one defendant but incompetent as to the other may be introduced is not alone sufficient to establish such prejudice as to require the granting of separate trials."  *Hoskins v. Commonwealth*, 374 S.W.2d 839, 842 (Ky. 1964); *see also Epperson*, 809 S.W.2d at 835 (citing *Hoskins* in its severance analysis).  Further review is therefore barred by § 2254(d)(1).  Hodge's second claim for relief must be **denied**.

### C.    Claim 3: Hodge was Denied Due Process of Law Because of Commonwealth's Attorney James Wiley Craft's Conflict of Interest

The Supreme Court of the United States has recognized that prosecutors play a unique role in the judicial process:

> [The prosecutor] is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done.  As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape nor innocence suffer.

*Berger v. United States*, 295 U.S. 78, 88 (1935); *see also Young v. U.S. ex rel. Vuitton et Fils S.A.*, 481 U.S. 787, 803 (1987) (citing the American Bar Association's Ethics Rules for the proposition that "[t]he responsibility of a public prosecutor differs from that of the usual advocate" because "his duty is to seek justice, not merely to convict").

42

"[T]he adversary system permits the prosecutor to 'prosecute with earnestness and vigor.'" *United States v. Young*, 470 U.S. 1, 7 (1985) (quoting *Berger*, 295 U.S. at 88). However, "the Court has made clear that traditions of prosecutorial discretion do not immunize from judicial scrutiny cases in which the enforcement decisions of an administrator were motivated by improper factors or were otherwise contrary to law." *Marshall v. Jerrico, Inc.*, 446 U.S. 238, 249 (1980).  "A scheme injecting a personal interest, financial or otherwise, into the enforcement process may bring irrelevant or impermissible factors into the prosecutorial decision and in some contexts raise serious constitutional questions."  *Id.* at 250; *see also Vuitton et Fils*, 481 U.S. at 810 ("It is a fundamental premise of our society that the state wield its formidable criminal enforcement powers in a rigorously disinterested fashion, for liberty itself may be at stake in such matters.").

In such circumstances, reversal is warranted if the prosecutor's conduct amounts to a fundamental error that "undermines confidence in the integrity of the criminal proceeding." *Compare Vuitton et Fils*, 481 U.S. at 810 (finding that such a fundamental error existed because the special prosecutor, who instituted criminal contempt proceedings against a party for violating a court order, was also counsel for the party that benefitted from the court order) *with Young*, 470 U.S. at 16 (upholding a conviction because "the prosecutor's statements, although inappropriate and amounting to error, were not such as to undermine the fundamental fairness of the trial and contribute to a miscarriage of justice").

On direct appeal, Hodge asserted that Commonwealth's Attorney James Wiley Craft and Assistant Commonwealth's Attorney L. Mike Caudill had a conflict of interest that

undermined confidence in the integrity of the trial.  (Doc. # 30-11 at 38-40).  Specifically,

he contends that, during trial, Craft and Caudill were preparing to file a civil suit against him

on Dr. Acker's behalf, seeking return of the stolen money and property.  (*Id.*).  Craft and

Caudill filed this suit two months after the jury returned a guilty verdict against Hodge.  (*Id.*).

> The Kentucky Supreme Court addressed these arguments as follows:
>
> The allegations that the appellants were denied due process of law because of an alleged conflict of interest by the prosecutor are totally without merit.
>
> The final judgment of conviction was rendered on June 20, 1986, and on August 8 of the same year, the surviving victim filed a civil lawsuit against Epperson and Hodge for damages.  The counsel in the matter was, in addition to being a private attorney, an assistant Commonwealth attorney in the criminal prosecution.  The trial judge overruled the motion for a new trial on August 19, 1986.
>
> The representation of the surviving victim in a civil matter was completely after trial.  There is no evidence to the contrary.  The appearance of alleged impropriety without any impact on the trial does not create a sufficient prejudice for a reversal.  The prosecutor's conduct may be inappropriate, but it does not amount to reversible error unless the behavior undermines the fundamental fairness of the trial.  *United States v. Young*, 470 U.S. 1, 105 S. Ct. 1038, 84 L.Ed.2d 1 (1985).  *Jordan v. Commonwealth*, Ky., 371 S.W.2d 632 (1963).

*Epperson*, 809 S.W.2d at 842.

Hodge concedes that his prosecutorial misconduct claim was adjudicated on the

merits.  (Doc. # 38 at 27-30).  However, he urges the Court to review his claim *de novo*

under  §  2254(d)(2)*,*  arguing  that  one  of  the  Kentucky  Supreme  Court's  factual

determination  was  unreasonable  in  light  of  the  evidence  presented  in  the  State  court

proceeding.[14]  (*Id.*).  Hodge believes that the timing of the proceedings directly contradict

---

14)  Hodge also raises this argument for the first time in his Traverse.  (Doc. # 38 at 27-30).  Although the Court is not obligated to consider arguments raised in traverse, it will do so out of an abundance of caution. *Scottsdale Ins. Co.*, 513 F.3d at 553.

the Kentucky Supreme Court's finding that "[t]he representation of the surviving victim in a civil matter was completely after trial" and that "[t]here is no evidence to the contrary." (*Id.*).  After all, his motion for a new trial was still pending before the Letcher County Circuit Court when Craft and Caudill filed the civil suit.  (*Id.*).  Hodge also cites to other "materials which tracked the trial prosecutor's extensive involvement in the civil action," including a letter from Kenneth Smith, Dr. Acker's other attorney, informing Craft that it would be a conflict of interest for him to file a civil action against Hodge for the recovery of Dr. Acker's property.  (*Id.*; Doc. # 58-7 at 7).  The letter was dated June 1986; Smith suggested that this was a typographical error and that the letter was actually written in June 1987.  (Doc. # 58-7 at 7).

None of this evidence leads to the result that Hodge seeks.  The Kentucky Supreme Court explicitly stated that there was no overlap between Hodge's *trial* and the filing of the civil suit.  *Epperson*, 809 S.W.2d at 842.  It did not make any observations about the timing between the civil suit and Hodge's motion for a new trial, nor did it consider the timeline between the civil suit and Hodge's appeal.  *Id.*  As for Smith's letter to Craft, even if it was written in June 1986, the precise date is unknown.  *Id.*  Because the final judgment of conviction was entered on June 20, 1986, it is unclear whether Smith wrote the letter before or after the trial.  *Id.*  This is certainly not clear and convincing evidence of an overlap in representation, and therefore, it is not sufficient to rebut the Kentucky Supreme Court's factual finding.  *See Rice*, 546 U.S. at 338 (citing 28 U.S.C. § 2254(e)(1)).

Anticipating this Court's decision to defer to the Kentucky Supreme Court's factual finding, Hodge "requests discovery and the opportunity to challenge this factual finding

under 28 U.S.C. § 2254(e)(1)."  (Doc. # 38 at 29-30).  However, "[i]n deciding whether to grant an evidentiary hearing, a federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief."  *Schriro*, 550 U.S. at 474.  "It follows that if the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing."  *Id.*

In this case, Hodge has already tried, and failed, to develop this factual allegation before the Kentucky Supreme Court.  *Id.*  The Court has reviewed the record before the Kentucky Supreme Court and found that its factual determination was not unreasonable.  Thus, the Court does not believe that a federal habeas hearing would enable Hodge to prove decades-old allegations that have already failed to pass muster on multiple layers of review.  Hodge's request for a hearing is denied.

As a final matter, Hodge argues that the Kentucky Supreme Court was unreasonable in its application of clearly established Federal law, necessitating *de novo* review of his claim under § 2254(d)(1).  (Doc. # 38 at 27-30).  However, Hodge does little to develop this thesis.  He simply asserts that "[r]epresenting the victim's financial interests while simultaneously obligated to govern impartially undermined confidence in the integrity of Petitioner's trial."  (*Id.* at 30).  This argument depends upon a factual predicate that this Court has already declined to adopt.  Although the Kentucky Supreme Court acknowledged that Craft and Caudill's *subsequent* participation in Dr. Acker's civil suit against Hodge was likely improper, that circumstance did not undermine the fundamental fairness of Hodge's criminal prosecution.  Having reviewed the relevant case law in depth, the Court finds that

46

the Kentucky Supreme Court's decision was well-within the bounds of *Vuitton et Fils* and *Young*.  Further review is therefore barred by § 2254(d)(1) and (2).  Accordingly, the Court must **deny** Hodge's third request for relief.

> ### D. Claims 4 and 5: Hodge was Denied Due Process of Law and the Right to an Impartial Jury Because Commonwealth's Attorney James Wiley Craft and Jury Foreman Eugene Banks Failed to Disclose Their Personal Relationship and Tampered With the Jury[15]

"[T]the right to jury trial guarantees the criminally accused a fair trial by a panel of impartial, indifferent jurors."  *Turner v. State of Louisiana*, 379 U.S. 466, 472 (1965) (internal quotations omitted) (describing "the nature of the jury trial which the Fourteenth Amendment commands when trial by jury is what the State has purported to accord"); *see also Duncan v. Louisiana*, 391 U.S. 145, 149 (1968) (later holding that "the Fourteenth Amendment guarantees a right of jury trial in all criminal cases which–were they to be tried in a federal court–would come within the Sixth Amendment's guarantee").

Although "[t]he safeguards of juror impartiality, such as *voir dire* and protective instructions from the trial judge, are not infallible," the Supreme Court has emphatically stated that "due process does not require a new trial every time a juror has been placed in a potentially compromising situation."  *Smith v. Phillips*, 455 U.S. 209, 217 (1982).  Rather, the Court has held that "the remedy for allegations of juror partiality is a hearing in which the defendant has the opportunity to prove actual bias." *Id.* at 215 (citing *Remmer*

---

[15]  Although Hodge separates these issues in his Petition, they were presented to Judge Coleman (and rejected by him) as one claim.  (Docs. # 44, 1/16/07 Hearing at 0:00:01–0:55:15; 31-18 at 35).  Moreover, the Kentucky Supreme Court reviewed these issues as one claim.  *See Hodge*, No. 2009-SC-000791-MR, 2011 WL 3805960, at *1-2 (Aug. 25, 2011).  For the sake of consistency, the Court has elected to do the same.

*v. United States*, 347 U.S. 227 (1954)).[16]

During his state post-conviction proceedings, Hodge claimed that he was deprived of due process and a fair and impartial jury because Craft and Banks had a close personal relationship at the time of the trial and did not disclose this relationship during voir dire. (Doc. # 38 at 31).  As proof of such a relationship, Hodge relied on testimony from former Letcher County Circuit Judge Larry Collins, who testified that he was once involved in a bribery scheme with Craft and Banks.  (*Id.*).  Hodge further asserted that he was deprived of a fair and impartial jury because Craft and Banks tampered with the jury.  (*Id.*).  He supported this claim by pointing to Gary Rogers's allegations of premature deliberation, ex parte contact with Craft, and access to media sources.  (*Id.*).

Judge Coleman considered the evidence presented in connection with these allegations and denied Hodge's request for relief as to the jury tampering claim.  (Doc. # 44, 1/16/07 Hearing at 0:00:01–0:55:15).  His findings of fact were reviewed and affirmed by the Kentucky Supreme Court for the following reasons:

> In his RCr 11.42 motion, Hodge alleged several instances of juror misconduct and tampering.  First, he claimed that the juror foreman at his trial had contact with the Commonwealth's Attorney, James Craft, during the trial.  Additionally, he asserted that, while sequestered, jurors were provided alcohol, watched television, and had access to newspapers.   More egregious, Hodge claims that the jury decided the case before the close of evidence.
>
> To support these claims at the evidentiary hearing, Hodge presented the testimony of four live witnesses and the deposition testimony of five others. Gary Rogers, a deputy sheriff who was responsible for overseeing the

---

16) The parties vigorously debated whether *Smith* implicitly overruled *Remmer* by replacing a presumed bias standard with an actual bias standard.  (Doc. # 44, 11/13/06 Hearing at 0:00:01–0:45:00).  However, Judge Coleman did not reach this issue because he found that there was no evidence of jury tampering.   (*Id.*). Because his factual findings are not unreasonable, the Court need not reach this issue either.

48

sequestered jury, was a primary witness. Rogers was less than forthcoming at the evidentiary hearing, even attempting to invoke a Fifth Amendment privilege. On at least eight occasions, the court had to order him to testify. When he did answer questions, he often contradicted his own testimony from moments before or contradicted his own prior statements to investigators. What can be gleaned from Rogers' testimony with any reliability is that he worked with the jury during the trial and guarded them at the hotel. He also admitted that he is a convicted felon. Inexplicably, Rogers testified that the conviction arose from his attempts to assist Hodge and Epperson. However, it was established that he was convicted in a matter wholly unrelated to this case.

Specifically relating to Hodge's claims, Rogers did testify that he saw the jury foreman talking to Craft at the courthouse, though he did not overhear the conversation. He also testified that he saw Craft in the parking lot of the hotel where the jury was sequestered. Rogers remembered that one of the jurors was provided three bottles of vodka and others with televisions and newspapers. However, at various points during his testimony, Rogers contradicted or outright denied portions of his own testimony given moments before. Despite his contradictory testimony moments before, he later emphatically testified that no one approached any juror and that no juror had access to television or newspapers.

Six other persons–all DPA attorneys or DPA investigators–had spoken with Rogers over the years and had taken statements from him regarding these allegations of jury tampering. Rogers denied ever speaking to or giving a statement to any of them, though all testified regarding their conversations with him. At times, his testimony at the evidentiary hearing comported with a prior statement, while at other times it diverged significantly. Additionally, his own statements to the investigators contradicted one another. In short, Rogers' testimony was confused, inconsistent, and contradictory.

In addition to Rogers and the DPA representatives, the trial court heard the testimony of Marsha Hogg Thursty, who served as an alternate juror at the trial. She acknowledged that she suffered from post-traumatic stress disorder and bipolar disease. She testified that no jurors were allowed visitors during sequestration and that no one communicated with the jury. She further testified that the jury did not discuss the case and that she had no knowledge of anyone watching television or listening to the radio. Thursty also denied Hodge's allegation that she gave a 'thumbs-up' sign to anyone during the trial, nor did she witness any other juror do so.

In considering an RCr 11.42 motion, the trial court's findings of fact will not be disturbed unless they are clearly erroneous. Here, the trial court very accurately described Rogers' testimony as 'inconsistent with itself and

inconsistent with the various inconsistent statements he made to investigators and attorneys for Hodge . . .' There is more than the requisite substantial evidence on the record to support the trial court's ultimate conclusion that Hodge failed to present competent and credible evidence supporting any of his allegations of jury tampering or misconduct. Hodge's contention that portions of Rogers' and Thursty's testimony went uncontested by the Commonwealth and, therefore, must be taken as true by the trial court, is unavailing. The fact-finder–here, the trial court–is free to believe all of a witness' testimony, portions of it, or none of it. *Commonwealth v. Anderson*, 934 S.W.2d 276, 278 (Ky. 1996).

The parties disagree as to whether the presumption of prejudice established in *Remmer v. United States*, 347 U.S. 227, 74 S. Ct. 450, 98 L.Ed. 654 (1954) was overruled in *Smith v. Phillips*, 455 U.S. 209, 102 S. Ct. 940, 71 L.Ed.2d 78 (1982). *See generally Parker v. Head*, 244 F.3d 831, 839 n. 6 (11th Cir. 2001). We need not address the parties' arguments because there has been no credible evidence to support a conclusion that any jury tampering or misconduct occurred. Therefore, we need not assess any resulting prejudice.

Hodge's RCr 11.42 motion on the grounds of jury tampering was properly denied.

*Hodge v. Commonwealth*, 2009-SC-000791-MR, 2011 WL 3805960, at *1-2 (Aug. 25, 2011).

First, Hodge complains that Judge Coleman's factual findings are unreasonable because he simply signed off on the Commonwealth's proposed order. (Doc. # 12 at 24-36). He insists that "the verbatim adoption of findings of fact prepared by prevailing parties" is improper, "particularly when those findings have taken the form of conclusory statements unsupported by citation to the record." *See Anderson v. City of Bessemer, N.C.*, 470 U.S. 564, 572 (1985) (criticizing courts for such practices).

This argument simply ignores the fact that Judge Coleman issued oral rulings and then ordered the Commonwealth to submit proposed findings of fact that incorporated his rulings. (Doc. # 44, 1/16/07 Hearing at 0:45:15–0:55:15). He also gave defense counsel

an opportunity to object to any of the proposed findings of fact, thus ensuring that the final order fully and fairly represented the outcome of the hearing. (*Id.*). Because Judge Coleman "does not appear to have uncritically accepted findings prepared without judicial guidance," the Court cannot conclude that his fact-finding was unreasonable. *See Anderson*, 470 U.S. at 572 (finding no error where "[t]he court itself provided the framework for the proposed findings when it issued its preliminary memorandum, which sets forth its essential findings and directed petitioner's counsel to submit a more detailed set of findings consistent with them" and then provided the respondent with "the opportunity to respond at length to the proposed findings").

Hodge next contests Judge Coleman's assessment of Gary Rogers's and Martha Hogg Thursty's testimony. (Doc. # 38 at 33-35). He argues that Judge Coleman was unreasonable in finding that Rogers was not a credible witness because Larry Collins corroborated some of his statements. (*Id.*). Specifically, Collins testified that Craft and Banks knew each other well and had engaged in misconduct during one of his civil trials.[17] (*Id.*).

As Judge Coleman pointed out, neither Collins nor the DPA employees who spoke to Rogers were present at the actual trial. (*Id.*). The parties did not present testimony from motel staff, other jurors, or other bailiffs, leaving Judge Coleman with only two firsthand accounts of what happened during the trial. (*Id.*). After considering Rogers's and Thursty's

_____

17) In his Petition, Hodge states that this testimony was admitted as substantive evidence during the evidentiary hearing. (Doc. # 12 at 24-36). The State insists that Judge Collins was allowed to testify by avowal only. (Doc. # 23 at 14-20). Because the record before this Court did not include video footage of Judge Collins's testimony, it does not know which party is correct. However, even assuming that Hodge is correct and that Judge Collins's testimony was admitted as substantive evidence, the result is still the same, for reasons explained herein.

51

testimony, he decided to credit Thursty's testimony.  (*Id.*).  Based on testimony provided, Judge Coleman found that Hodge and Epperson had set forth nothing more than "bald allegations" of jury tampering.  (*Id.*).

Having reviewed the record in detail, the Court finds that Judge Coleman was wise in focusing on the testimony of the two witnesses who actually played a role in the trial, rather than those with anecdotal evidence of misconduct.  Moreover, the Court finds that Judge Coleman was reasonable in crediting Thursty's testimony over Rogers's testimony. Although Thursty suffered from bipolar disorder and PTSD, her account of the trial was straightforward and consistent.  Rogers's testimony, by contrast, suffered from notable internal inconsistencies and bore little resemblance to his prior statements.  The fact that Epperson's mother first put Rogers in contact with DPA investigators further eroded his already-suspect credibility. Because Judge Coleman's factual determinations were not unreasonable in light of the evidence presented during the 11.42 hearing, further review is barred under AEDPA.  *See* 28 U.S.C. § 2254(d)(2).  Hodge's fourth and fifth claims for relief are hereby **denied**.

### E.    *Claim 6: Hodge was Deprived of the Effective Assistance of Counsel at the Penalty Phase Because Defense Attorney Dale Mitchell Failed to Investigate, Prepare, and Present Available Mitigating Evidence*

The Supreme Court of the United States has recognized that the Sixth Amendment "right to counsel is the right to the effective assistance of counsel."  *Strickland v. Washington*, 466 U.S. 668, 685 (1984).  In capital cases, this right applies to the trial itself as well as subsequent sentencing proceedings.  *Id.* at 687.  After all, a capital sentencing proceeding "is sufficiently like a trial in its adversarial format and in the existence of

standards for decision, that counsel's role in the proceeding is comparable to counsel's role at trial–to ensure that the adversarial testing process works to produce a just result under the standards governing decision." *Id.* (explaining further that capital sentencing proceedings offer the defendant an opportunity to present evidence in mitigation).

To establish that counsel's assistance was so defective as to fall below this constitutional guarantee at either stage of a capital case, the defendant must satisfy a two-part test. *Id.* at 686-87. "First, the defendant must show that counsel's performance was deficient." *Id.* at 687. "This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* "Second, the defendant must show that the deficient performance prejudiced the defense." *Id.* This prong requires the defendant to "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

"The governing legal standard plays a critical role in defining the question to be asked in assessing the prejudice from counsel's errors." *Id.* at 695. For example, "[w]hen a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Id.* "When a defendant challenges a death sentence . . ., the question is whether there is a reasonable probability that, absent the errors, the sentencer–including an appellate court, to the extent it independently reweighs the evidence–would have concluded that the balance of aggravating and mitigating circumstances did not warrant

death." *Id.* "In making this determination, a court . . . must consider the totality of the evidence before the judge or jury." *Id.*

During his post-conviction proceedings, Hodge contended that his Dale Mitchell's performance was deficient because he failed to investigate, prepare, and present mitigation evidence during the penalty phase. In support of this proposition, Hodge pointed out that Mitchell did not contact any of his relatives, obtain school records, or uncover other available information about his tumultuous and traumatic childhood. Moreover, Mitchell did not explore the effect of Hodge's early life experiences on his development. Hodge further asserted that Mitchell's failings prejudiced his defense because there was a reasonable probability that at least one person would have voted for a lesser sentence after hearing evidence of Hodge's nightmarish childhood and resulting PTSD.

After considering the testimony presented at the evidentiary hearing, Judge Coleman denied Hodge's request for relief, finding that Mitchell's performance, while deficient, did not prejudice Hodge's defense. On appeal to the Kentucky Supreme Court, the Commonwealth conceded for the first time that Mitchell's performance was deficient. However, it maintained that Hodge had not suffered any prejudice as a result of Mitchell's deficiencies.

The Kentucky Supreme Court reviewed and ultimately affirmed Judge Coleman's analysis as follows:

> Hodge alleges ineffective assistance of counsel because his trial counsel failed to investigate or present any evidence in mitigation during the penalty phase. Rather, the parties agreed to the following stipulation, which was read to the jury: "Benny Lee Hodge has a loving and supportive family–a wife and three children. He has a public job work record and he lives and resides permanently in Tennessee." He argues that the failure to present mitigation evidence regarding his dramatically abusive childhood rendered the jury's

54

sentence of death unreliable.

At the outset, we reiterate Hodge's burden in establishing ineffective assistance of counsel. In order to be ineffective, performance of counsel must fall below the objective standard of reasonableness and be so prejudicial as to deprive a defendant of a fair trial and a reasonable result. *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). This analysis involves mixed questions of law and fact. While we will not disturb the trial court's factual findings if they are supported by substantial evidence, we review its conclusions of law *de novo*. *Brown v. Commonwealth*, 253 S.W.3d 490, 500 (Ky. 2008).

Here, the Commonwealth concedes that the performance of Hodge's defense counsel was deficient in conducting a reasonable investigation to find mitigation evidence. Thus, the inquiry must focus only on the prejudicial effect of this deficiency. "When a defendant challenges a death sentence . . . , the question is whether there is a reasonable probability that, absent the errors, the sentencer–including the appellate court, to the extent it independently reweighs the evidence–would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland*, 466 U.S. 668 at 695, 104 S.Ct. 2052, 80 L.Ed.2d 674. A reasonable probability is one that is "sufficient to undermine confidence in the outcome." *Id.* at 694. Hodge's burden in this respect is "highly demanding." *Williams v. Taylor*, 529 U.S. 362, 394, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000).

Bearing [the *Strickland*] standard in mind, we turn to a review of the mitigation evidence that was available at the time of Hodge's trial. His mitigation case would have been based on his childhood, which was marked by extreme poverty, sustained physical violence, and constant emotional abuse. The trial court's characterization of Hodge's childhood as "difficult" is not inaccurate, but certainly inadequate.

The evidence established that Hodge's mother, Kate, was married to six different men, all of whom were substance abusers and some of whom were physically abusive to Kate. She married Billy Joe when Hodge was eight years old. The majority of Hodge's evidence concerned the extreme violence he suffered at the hands of his stepfather. Again, the trial court's description of Billy Joe as "particularly abusive" is insufficient.

Billy Joe was described by at least four witnesses as a "monster." His rage was explosive and violent, often triggered by Kate's shows of affection towards her children. At other times, he was incited for no apparent reason and the household lived in constant fear as a result. He would regularly rape Kate, threaten her with a gun, and beat her. On one occasion, Billy Joe

assaulted Hodge's mother so violently that she suffered a miscarriage. Hodge's sisters testified that, more than once, they thought Kate had been beaten to death.

Hodge's mother and sisters agreed that Billy Joe was more violent and abusive towards him than any other person in the house. This is perhaps because Hodge, being the only male child in the home, often tried to defend his mother and sisters from physical attacks. He was regularly beaten with a belt and metal buckle, which left bruises and welts on his body that were observed by family members and neighbors alike. At other times, he was kicked, thrown against walls, and punched. Hodge's half-sister specifically recalled an occasion when Billy Joe rubbed Hodge's face in his own feces. His sisters testified that Billy Joe made Appellant watch while he brutally killed the boy's dog. Because his mother, who was evidently paralyzed by fear and substance abuse, refused to protect Hodge, he often ran away from home.

School records indicate that Hodge was of normal intelligence and received average grades through elementary school. After Billy Joe entered the home, his grades declined, he became withdrawn, and he was often truant. He began stealing at the age of twelve and was sentenced to a juvenile detention facility when he was fifteen.

There was testimony that, at the Tennessee residential facility, Hodge was subjected to regular beatings. He escaped from the facility twice and once refused to return after a furlough. After finally being released at the age of sixteen, Hodge assaulted his stepfather, which resulted in his return to the juvenile facility until he was eighteen years old.

At the age of twenty, Hodge pled guilty to his first felonies: burglary and grand larceny. He escaped from custody four days later. Following his capture and eventual parole, he was convicted of a separate armed robbery. Again, he escaped and was recaptured. After serving nearly eight years in prison for that felony, Hodge was again paroled. He was thirty-four years old at the time he killed Tammy Acker. He had been married three times and fathered three children.

At the evidentiary hearing, Hodge presented the expert opinion of two psychologists, both of whom had assessed him in 2009. Both agreed that the violence in Hodge's childhood home was ruinous to his development and compounded by the physical abuse occurring at the Tennessee residential facility. One of the psychologists diagnosed Hodge with post traumatic stress disorder ("PTSD") and opined that it was present at the time of Hodge's crimes and trial. Ths expert further testified that PTSD can render a person violent, hypervigilant, aggressive, and erratic. Both psychologists

56

fond it particularly interesting to note that Hodge did not inflict any abuse on his own children and was described by all as a loving father.

We now turn to the primary inquiry before us, i.e., whether the result of the penalty phase would have been any different had this mitigation evidence been presented to the sentencing jury. In doing so, we must reweigh this mitigation evidence against other aggravating circumstances. First, we consider, as did the trial court, that the evidence of Hodge's abusive childhood would have also included the damaging evidence of his long and increasingly violent criminal history, his numerous escapes from custody, and the obvious failure of several rehabilitative efforts.

And we must also consider the heinous nature of Hodge's crime. *See Epperson and Hodge v. Commonwealth*, 809 S.W.2d 835 (Ky. 1990). The assault on Dr. Acker and the murder of his daughter were not just brutal and vicious, but calculated and exceedingly cold-hearted. The sentencing jury was aware that Hodge and his two co-defendants carefully planned the robbery after learning of the large quantity of cash kept in the home safe, that they traveled from out of state to carry out the plan, and that they packed weapons and tools in advance. They posed as FBI agents to gain entry into the elderly doctor's home and followed him to the kitchen where they pretended to take his statement regarding a former business partner's supposed fraud. They had the doctor call his daughter to the room to witness the statement. At that point, Hodge brandished a handgun. They covered the heads of both the father and the daughter. They restrained Tammy, a young college student due to go back to school the next day, alone in a bedroom. She begged them not to hurt her father. After forcing Dr. Acker to open the safe, Hodge's accomplice strangled him with an electrical cord until he lost consciousness. Hodge went to Tammy's bedroom and stabbed her at least ten times, then stole a bracelet and watch from her wrist. Afterwards, he coolly told Epperson that he knew Tammy was dead because the knife had gone "all the way through her to the floor." Autopsy reports confirmed this boast.

Believing both victims were dead, they left the home. The three men then fled to Florida. Along with their girlfriends, they brazenly spent the stolen money on a lavish lifestyle and luxury goods, including a Corvette. A former cellmate testified that Hodge recounted spreading all the money out on a bed and having sex with his girlfriend on top of it.

We have considered the totality of the evidence before Hodge's sentencing jury, including the proposed mitigation evidence. *Parrish v. Commonwealth*, 272 S.W.3d 161, 169 (Ky. 2008) (reviewing court must consider totality of the evidence in considering prejudice prong of ineffective assistance of counsel claim). Balancing all of the available evidence in mitigation and aggravation,

we are compelled to reach the conclusion that there exists no reasonable probability that the jury would not have sentenced Hodge to death.  There is no doubt that Hodge, as a child, suffered a most severe and unimaginable level of physical and mental abuse.  Perhaps this information may have offered insight for the jury, providing some explanation for the career criminal he later became.  If it had been admitted, the PTSD diagnosis offered in mitigation might have explained Hodge's substance abuse, or perhaps even a crime committed in a fit of rage as a compulsive reaction.  But it offers virtually no rationale for the premeditated, cold-blooded murder and attempted murder of two innocent victims who were complete strangers to Hodge.  Any, if not most, malefactors committing terribly violent and cruel murders are the subjects of terrible childhoods.  Even if the sentencing jury had this mitigation evidence before it, we do not believe, in light of the particularly depraved and brutal nature of these crimes, that it would have spared Hodge the death penalty.  We, therefore, affirm this portion of the trial court's judgment.

*Hodge*, 2011 WL 3805960, at *2-5.

In his current Petition, Hodge concedes that this claim has been adjudicated on the merits.  However, he asserts that the Kentucky Supreme Court's decision amounts to an unreasonable application of *Strickland*'s prejudice prong for three reasons.  First, Hodge argues that the Kentucky Supreme Court erroneously required a nexus between the mitigation evidence and the crime.  Next, he complains that the Kentucky Supreme Court failed to account for the "reasonable probability" standard or consider the totality of the evidence.  Finally, Hodge insists that the Kentucky Supreme Court ignored the "one juror" test and required him to prove that the entire jury would have rejected death.

As Justice Sotomayor pointed out, the Supreme Court of the United States has "consistently rejected States' attempts to limit as irrelevant evidence of a defendant's background or character that he wishes to offer in mitigation."  *Hodge*, 133 S.Ct. at 509.  It has never required a "nexus" between the mitigation evidence and the crime, emphasizing instead that "the only relevant question is whether the proposed mitigation

evidence would give a jury 'a reason to impose a sentence more lenient than death.'" *Id.* (quoting *Smith v. Texas*, 543 U.S. 37, 44-45 (2004) (per curiam)).  According to Justice Sotomayor, the Kentucky Supreme Court ignored this case law and erroneously imposed a nexus requirement by stating that Hodge's horrific childhood could not provide a "rationale for the premeditated, cold-blooded murder and attempted murder of two innocent victims who were complete strangers to Hodge."  *Hodge*, 2011 WL 3805960, at *2-5.

The cases cited by Justice Sotomayor focused on the state court's decision to exclude mitigating evidence or withhold a mitigation instruction based on a non-existent nexus.  Here, by contrast, the Kentucky Supreme Court certainly recognized that the materials presented at the evidentiary hearing were relevant, as it combed through every detail of that evidence and carefully considered its likely impact on a juror's decision. Having reviewed the analysis as a whole, this Court finds that the Kentucky Supreme Court was discussing the potential impact of this mitigation evidence on the jurors, rather than reading a nexus requirement into *Strickland*'s prejudice prong.  Specifically, the Kentucky Supreme Court's decision communicates that the mitigation evidence, although compelling, must still be weighed against a brutal crime that is difficult for most individuals to understand.  Under such circumstances, the Kentucky Supreme Court concluded that there was not a reasonable probability that at least one juror would have struck a different balance.  *See Strickland*, 466 U.S. at 687.

As for Hodge's argument that the Kentucky Supreme Court improperly applied *Strickland*'s prejudice prong, the record simply does not support his assertions.  Hodge complains that the Kentucky Supreme Court failed to consider the totality of the evidence,

59

but does not identify any information that the court overlooked. Rather, the record reflects that the Kentucky Supreme Court conducted an exhaustive review of the evidence and reweighed the aggravating points against the mitigating circumstances. The court was careful to acknowledge the severity of the abuse Hodge suffered as a child and the profound effect that it had on him. However, it also emphasized that Hodge's crime was a brutal and premeditated act on innocent victims and that his actions following the crime showed a lack of remorse. The court then found that there was no reasonable probability that a juror would have spared Hodge the death penalty if presented with the mitigating evidence. While reasonable jurists could certainly disagree with the Kentucky Supreme Court's analysis, its ruling is not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Richter*, 562 U.S. at 103.

Hodge also contends that the Kentucky Supreme Court improperly applied a preponderance of the evidence standard, instead of the reasonable probability standard, in evaluating the prejudice prong. However, the Kentucky Supreme Court identified the proper test at the beginning of its discussion and referred to the reasonable probability standard throughout its opinion. *See Hodge*, 2011 WL 3805960, at *2-5. Thus, Hodge's argument boils down to nothing more than a disagreement with how the Kentucky Supreme Court weighed the evidence and found that there was not a reasonable probability that at least one juror would have struck a different balance. Even if this Court agreed with Hodge's assessment, it could only say that the Kentucky Supreme Court's decision was incorrect or erroneous. *Lockyer*, 538 U.S. at 74. Once again, Hodge has failed to demonstrate that "so lacking in justification that there was an error well understood

and comprehended in existing law beyond any possibility for fairminded disagreement." *Richter*, 562 U.S. at 103.

Finally, Hodge asserts that the Kentucky Supreme Court erroneously required him to show that the whole jury would have spared him the death penalty, not just one juror. He bases this argument on the Kentucky Supreme Court's use of the word "jury" rather than "juror." *See Hodge*, 2011 WL 3805960, at *5 ("Even if the sentencing *jury* had this mitigation evidence before it, we do not believe, in light of the particularly depraved and brutal nature of these crimes, that *it* would have spared Hodge the death penalty.") (emphasis added). While this use of the word "jury" is certainly confusing, the record as a whole reflects that the Kentucky Supreme Court was well aware of the "one juror" test and applied it appropriately. Because Hodge has not demonstrated that the Kentucky Supreme Court was unreasonable in its application of *Strickland*'s prejudice prong, further review of this claim is barred under § 2254(d)(1).

The Court acknowledges that Hodge has presented some thorny issues in connection with this claim. However, even if the foregoing analysis is flawed, it has no impact on Hodge's ultimate fate. After all, Hodge is already under a death sentence for a murder committed in Jackson County and has exhausted his appeals in connection with that case. *See Hodge v. Parker*, 559 U.S. 1075 (2010) (denying certiorari on Hodge's federal habeas claim). For all of the reasons stated herein, Hodge's sixth claim for relief and his accompanying Motion for Summary Judgment (Doc. # 73) are hereby **denied**.

**F.    Claim 7: Hodge was Denied Due Process of Law and the Right to Confront his Accusers When Lawrence Anthony Smith Offered Perjured Testimony and the Commonwealth Knowingly Used that Testimony to Procure a Conviction and Death Sentence**

Hodge takes issue with the Kentucky Supreme Court's handling of two claims arising from Lawrence Anthony Smith's testimony.[18]  (Docs. # 12 at 64-69; 38 at 75-76). On direct appeal, Hodge complained that he was denied due process of law because Smith perjured himself on the witness stand.  (Doc. # 30-11 at 1-50).  Specifically, he objected to Smith's statement that he would not receive a special benefit in exchange for his testimony, noting that a "no prosecution" hearing had already been scheduled for Smith in Florida.  (*Id.*).  In his state post-conviction proceedings, Hodge asserted that Mitchell rendered ineffective assistance by failing to investigate Smith before cross-examining him. (Doc. # 31-5 at 28-38).  Hodge also argued that his attorney was ineffective because he failed to discuss Smith's perjury in the motion for a new trial.  (*Id.*).  Hodge seems to concede that both claims were adjudicated on the merits by the Kentucky Supreme Court. (*Id.*).  However, as Hodge pointed out in his first claim, the Kentucky Supreme Court relied on a state procedural rule in disposing of the ineffective assistance issue, making it difficult to tell whether the claim has actually been adjudicated on the merits.[19]  *See infra* at 32 and

---

18) Hodge also expressed an intent to challenge the Kentucky Supreme Court's factual findings under § 2254(e)(1).  (Doc. # 38 at 75).  He stated that he would be "filing a motion for discovery to develop evidence that clearly and convincingly rebuts the facts found by the Kentucky Supreme Court."  (*Id.*).  Hodge did as promised.  (Doc. # 48).  However, the Court denied his request for discovery, explaining that "the law does not give him a right to conduct discovery and hold an evidentiary hearing in an effort to rebut the presumption of correctness."  (Doc. # 70 at 14).  Since this ruling, Hodge seems to have abandoned his attempt to challenge the Kentucky Supreme Court's factual findings.  (Docs. # 74 and 76).

19) As the Court observed in its analysis of Claim 1, Hodge asserted a claim of palpable error based on Dale Mitchell's conflicts of interest as well as an ineffective assistance of counsel claim arising from the same conflicts of interest.  Hodge then raised an ineffective assistance of counsel claim, again predicated on Dale Mitchell's conflicts of interest, during his first set of RCr 11.42 proceedings.  The Kentucky Supreme Court rejected the latter claim, reasoning that "each of these allegations were addressed and resolved on direct

36-37.  Therefore, out of an abundance of caution, the Court will separate the direct appeal claim from the ineffective assistance claim and examine each in turn.

### 1.    Hodge's Claim on Direct Appeal

It is well-established that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland*, 373 U.S. 83, 87 (1963) (citing *Mooney v. Holohan*, 294 U.S. 103, 112 (1935)); *see also United States v. Agurs*, 427 U.S. 97, (1976) (extending *Brady*'s rule to situations in which the evidence not specifically requested is "of such substantial value to the defense that elementary fairness requires it to be disclosed").

"When the 'reliability of a given witness may well be determinative of guilt or innocence,' nondisclosure of evidence affecting credibility falls within this general rule." *Giglio v. United States*, 405 U.S. 150, 154 (1972) (quoting *Napue v. Illinois*, 360 U.S. 264, 269 (1959) (reversing and remanding the case due to the prosecutor's failure to correct the testimony of an important witness, who falsely stated that he had not received any promise of leniency in exchange for his testimony)).

However, the Supreme Court of the United States does not "automatically require a new trial whenever a combing of the prosecutors' files after the trial has disclosed

---

appeal and cannot be raised in an RCr 11.42 motion."  *See Epperson*, 68 S.W. at 345.  Because this finding was based on a state procedural rule, the Court assumed, out of an abundance of caution, that the claim was not adjudicated on the merits and reviewed it *de novo*.

   The ineffective assistance of counsel claim based on Mitchell's failure to investigate Smith presents a more compelling case for *de novo* review.  In reviewing Hodge's first set of RCr 11.42 proceedings, the Kentucky Supreme Court also rejected this claim on the grounds that it was addressed and resolved on direct appeal. However, the record reflects that Hodge did not actually assert an ineffective assistance of counsel claim on direct appeal, suggesting that the claim has not been adjudicated on the merits.

evidence possibly useful to the defense but not likely to have changed the verdict." *Id.* "A finding of materiality of the evidence is required under *Brady*." *Id.* "A new trial is required if 'the false testimony could . . . in any reasonable likelihood have affected the judgment of the jury." *Id.* (quoting *Napue*, 360 U.S. at 271).

On direct appeal, Hodge claimed that his due process rights were violated when Smith testified that he would not receive a special benefit in exchange for his testimony. (Docs. # 12 at 64-69; 38 at 75-76). Hodge saw this as perjured testimony because a "no prosecution hearing" had already been scheduled for Smith in Florida. (*Id.*). He insisted that the Commonwealth knew of this proceeding and failed to correct Smith's testimony (*Id.*).

The Kentucky Supreme Court considered this claim as follows:

> It was not reversible error for the trial judge to deny Hodge's request for a continuance based on an allegation of a prosecutorial violation of the discovery order due to the prosecution's failure to provide exculpatory evidence relating to a "no prosecution" hearing in Florida. The record indicates that the Commonwealth had no knowledge of the hearing and merely notified Florida authorities of witness Smith's cooperation. There is no evidence in the record beyond Hodge's allegation that a "no prosecution hearing" was ever scheduled or held. Defense counsel effectively cross-examined Smith on the question of leniency. [Hodge] was not denied his right of confrontation. The prosecution did not withhold evidence of leniency in violation of the defendant's right to a fair trial as stated in *United States v. Agurs*, 427 U.S. 97, 96 S.Ct 2392, 49 L.Ed.2d 342 (1976). The prosecutor was in compliance with the discovery order pursuant to RCr 7.26(2). There was no *Brady v. Maryland*, *supra*, violation. Hodge was not prejudiced.

*Epperson*, 809 S.W.2d at 839-41, 845.

Hodge admits that the Kentucky Supreme Court's analysis qualifies as an "adjudication on the merits." *See Richter*, 562 U.S. 86, 99-100 (2011). Nevertheless, he urges the Court to review his claim *de novo*, asserting that the Kentucky Supreme Court's

decision is "contrary to, or an unreasonable application of, clearly established Federal law." 28 U.S.C. § 2254(d)(1).

Although Hodge invokes both clauses of § 2254(d)(1), he does not explain why the Kentucky Supreme Court's decision was "contrary to" clearly established federal law. In the absence of any argument on this issue, the Court will once again be brief in its analysis. Because the Kentucky Supreme Court's opinion relied heavily on *Agurs* and *Brady*, both of which discuss the effect of withheld evidence that is favorable to the defense, the Court cannot conclude that the Kentucky Supreme Court's decision meets the "contrary to" standard. *See Bell*, 535 U.S. at 694 (explaining that a decision is "contrary to" clearly established law if the state court "applies a rule different from the governing law set forth in our cases").

As for the second clause of § 2254(d)(1), Hodge broadly contends that the Kentucky Supreme Court's decision amounts to an unreasonable application of clearly established federal law, but fails to explain how its decision qualifies as unreasonable. Instead, he re-asserts arguments raised before the Kentucky Supreme Court. Hodge's mere disagreement with the Kentucky Supreme Court's decision is insufficient to demonstrate that the opinion is objectively unreasonable. *See Lockyer*, 538 U.S. at 74. Although Smith initially testified that he had not been promised anything in exchange for his testimony, he clarified his situation on cross-examination, stating that he had already pled guilty to charges in Florida but had not yet received his sentence. (Docs. # 27-5 at 2-21 and 25-32). He further indicated that the Commonwealth had promised to notify the Florida authorities of his cooperation in this case. (*Id.*). Moreover, there was nothing in the record before the Kentucky Supreme Court to suggest that the Commonwealth knew of the "no

65

prosecution hearing" scheduled in Florida.  (*Id.*).  Under these circumstances, the Kentucky Supreme Court was not unreasonable in concluding that Hodge's due process rights were not violated by Smith's testimony.   Further review of this claim is therefore barred by AEDPA.  *See* 28 U.S.C. § 2254(d)(1).

### 2.    Hodge's State Post-Conviction Claim

During his state post-conviction proceedings, Hodge asserted that Mitchell rendered ineffective assistance by failing to investigate Lawrence Anthony Smith before cross-examining him.  (Doc. # 31-6 at 25-28).  The Kentucky Supreme Court addressed this claim as follows:

> Finally, [Hodge and Epperson] each argue that they were denied effective assistance of counsel due to a conflict of interest between Epperson's counsel, Lester Burns, and Hodge's counsel, Dale Mitchell.  As found by the trial court, each of these allegations were addressed and resolved on direct appeal and cannot be raised in an RCr 11.42 motion.   *Thacker v. Commonwealth*, 476 S.W.2d 838 (1972).

*Hodge*, 68 S.W.3d at 345.

Once again, the Court begins with the presumption that the Kentucky Supreme Court adjudicated the claim on the merits "in the absence of any indication or state-law procedural principles to the contrary."  *See Richter*, 562 U.S. at 99-100.  Because the Kentucky Supreme Court's decision was based upon the "now-defunct procedural principle" announced in *Thacker*, the Court will assume, without deciding, that the *Richter* presumption has been rebutted.  (Doc. # 12 at 64-69).  Accordingly, it will review this claim *de novo.  See Richter*, 562 U.S. at 99-100.

To establish that counsel's assistance was constitutionally ineffective, a defendant must satisfy the following two-prong test: (1) whether counsel's performance was deficient;

and (2) whether counsel's deficient performance prejudiced the defense. *Strickland*, 466 U.S. at 686-87. First, Hodge claims that Mitchell's performance was deficient because he failed to investigate Smith and develop evidence with which to impeach him. (Doc. # 12 at 67-68). He insists that he was prejudiced by these deficiencies because "the only other evidence presented at trial to establish Hodge as the actual killer was the self-serving testimony of Bartley, who has substantial credibility problems of his own." (*Id.*). Second, Hodge insists that Mitchell was deficient in failing to include Smith's perjury in his motion for a new trial and that this failure also prejudiced his defense. (*Id.* at 68-69).

This post-conviction claim ultimately suffers from the same fatal flaw as Hodge's direct appeal claim regarding Smith's testimony. Assuming *arguendo* that Mitchell was deficient in investigating Smith, the record indicates that he was still able to effectively cross-examine Smith at trial. (Docs. # 27-5 at 2-21 and 25-32). For example, Mitchell elicited that the Commonwealth promised to notify the Florida authorities of Smith's cooperation after the trial. (*Id.*). He also cross-examined Smith about his criminal history. (*Id.*). Because Mitchell was able to elicit this information on cross-examination and use it to impeach Smith, the Court simply cannot conclude that, "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.

Hodge argues that Mitchell was deficient in failing to include Smith's alleged perjury in the motion for a new trial because, under Kentucky law, "perjured testimony will not be a basis for impeaching a jury verdict in an RCr 11.42 proceeding." *Commonwealth v. Basnight*, 770 S.W.2d 231, 238 (Ky. Ct. App. 1989). However, Hodge fails to explain how

this failure prejudiced him.   *Strickland* requires a defendant to prove prejudice by demonstrating "that counsel's errors were so serious as to deprive [him] of a fair trial, a trial whose result is reliable."   *See* 466 U.S. at 687.   Again, the record before the Kentucky Supreme Court reflected that the Commonwealth had no knowledge of the "no prosecution hearing" and that Mitchell was able to effectively cross-examine Smith about the potential benefits of his testimony.   For these reasons, Hodge's seventh claim for relief must be **denied**.

### G.   Claim 8: Judge Hogg's Refusal to Require Disclosure of Smith's Identity Violated Hodge's Right to Present a Defense and Right to Confront Witnesses Against Him

"What is usually referred to as the informer's privilege is in reality the Government's privilege to withhold from disclosure the identity of persons who furnish information of violations of law to officers charged with enforcement of that law."   *Rovario v. United States*, 353 U.S. 53, 59 (1957).   The purpose of this privilege is "the furtherance and protection of the public interest in effective law enforcement."   *Id.* (explaining further that "the privilege recognizes the obligation of citizens to communicate their knowledge of the commission of crimes to law-enforcement officials and, by preserving their anonymity, encourages them to perform that obligation").

The Supreme Court has imposed limitations on the scope of informer's privilege.   *Id.*  For example, "[t]he scope of the privilege is limited by its underlying purpose."   *Id.* at 60.  If the contents of a communication are not likely to reveal the informer's identity, or if the identity of the informer has already been disclosed "to those who would have cause to resent the communication," the privilege no longer applies.   *Id.*  The scope of the privilege

is also limited by "the fundamental requirements of fairness." *Id.* "Where the disclosure of the informer's identity, or the contents of his communication, is relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause, the privilege must give way." *Id.* at 60-61.

Thus, to determine whether disclosure of an informant's identity is appropriate, courts must balance "the public interest in protecting the flow of information against the individual's right to prepare his defense." *Id.* at 62. "Whether a proper balance renders nondisclosure erroneous must depend on the particular circumstances of each case, taking into consideration the crime charge, the possible defenses, the possible significance of the informer's testimony, and other relevant factors. *Id.*

On direct appeal, Hodge contended that the Commonwealth's refusal to disclose Smith's identity prior to trial deprived him of his right to present a defense and his right to confront witness against him. (Doc. # 30-11 at 41-44). In support of this proposition, he noted that "Smith's statement was the first, and only one of two pieces of evidence in the Commonwealth's case suggesting that Petitioner was the actual killer." (*Id.*). He also complained that he received ineffective assistance of counsel as a result of this nondisclosure. (*Id.*). "If Smith's name had been known in time, Petitioner's counsel could have made further inquiries concerning Smith and his background, in an effort to discredit this crucial witness." (*Id.*).

The Kentucky Supreme Court addressed Hodge's arguments as follows:

Arguments by the defendants regarding the nondisclosure of Smith's identity are also without merit. The defendants contend that a court order blanketed individual discovery requests to cover all the codefendants and incorporated Bartley's 1985 motion for all exculpatory evidence. The only such ruling in

69

the record was made in the court order on May 6, 1986 and does not address the issue.  This order was limited solely to its own elements.

. . .

The failure to disclose the identity of Smith did not result in any prejudicial or reversible error.  The appellants' analysis of an informer is not applicable to Smith, and, consequently, the prosecution here was not required to reveal his identity pursuant to RCr 7.24 and *Commonwealth v. Barber*, Ky.App., 643 S.W.2d 592 (1982).  An informer is one who furnishes law enforcement officials with information of legal violations; under such a definition, Smith was not an informant.  *Burks v. Commonwealth*, Ky., 471 S.W.2d 298 (1971); *Rovario v. United States*, 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957).

The allegation that the trial judge erred in failing to hold a pretrial in camera hearing regarding the withholding of Smith's identity is meritless because the defense made no request for such a hearing.  Smiths' identity as a material witness and his address were revealed to the defense in the May 20 court order.

. . .

The nondisclosure of Smith's identity was not error and the appellants' right to exculpatory evidence by impeaching Smith was not compromised because the Commonwealth did not wrongfully withhold any evidence favorable to the defense.  This situation is different from *Rolli v. Commonwealth*, Ky.App., 678 S.W.2d 800 (1984) where the prosecution knowingly withheld information.  Here the trial judge never ordered such production and the prosecution followed proper discovery procedures.

*Epperson*, 809 S.W.2d at 840.

Hodge concedes that this claim was adjudicated on the merits.  (Doc. # 38 at 77).

However, he takes issue with the Kentucky Supreme Court's "unreasonable" and "result-driven" finding that Smith was not an informant.  (*Id.*).  Hodge argues that Smith was "the classic jail house snitch or informant," and therefore, the Kentucky Supreme Court should have analyzed his claim under *Rovario*.  (*Id.* at 77-78).  Because the court failed to do so,

Hodge concludes that its decision was contrary to clearly established federal law.[20]  (*Id.*).

The Court understands why Hodge views Smith as a confidential informant.  In a broad sense, Smith did "furnish information of violations of law to officers charged with enforcement of that law."  *Rovario*, 353 U.S. at 59.  However, Smith did not fulfill the classic role of a confidential informant, who typically "help[s] to set up the commission of the crime and who [i]s present at its occurrence."  *Id.* at 61.  Suppose that the Kentucky Supreme Court had recognized Smith as a confidential informant simply because he received Hodge's confession in jail.  It follows that several other witnesses with after-the-fact information about the crime would also qualify as confidential informants.  Thus, Hodge's conceptualization of the confidential informant leads to a result contrary to that he seeks, as it would allow more witnesses to attempt to claim the privilege.  This cannot be the result that the Supreme Court of the United States intended in *Rovario*.

Hodge's case is distinguishable from *Rovario* on another ground as well.  In that case, the government withheld the identity of the confidential informant throughout the trial.  *Id.* at 63.  The defendant was convicted primarily on the testimony of law enforcement officers who coordinated with the confidential informant.  *Id.*  The Court reversed and

---

20) Although Hodge asserts that the Kentucky Supreme Court's decision is "contrary to and/or an unreasonable application of clearly existing Supreme Court authority," his claim is essentially one of contrariness.  (Doc. # 38 at 78).  He complains that the Kentucky Supreme Court did not analyze his claim under the appropriate law.  *See Bell*, 535 U.S. at 694 (explaining that a decision is "contrary to" federal law if it "applies a rule different from the governing law set forth in our cases, or if it decides a case differently than we have done on a set of materially indistinguishable facts").  He does not assert that the Kentucky Supreme Court "correctly identifie[d] the governing legal principles . . . but unreasonably applie[d] it to the facts of the particular case."  *Id.* (describing the "unreasonable application" clause of AEDPA).

Hodge also suggests that the Kentucky Supreme Court's decision was based on an unreasonable determination of the facts.  (Doc. # 38 at 77-78).  Specifically, he takes issue with the court's finding that Smith was not an informant, as described in *Rovario*.  (*Id.*).  While the Court understands Hodge's point, this determination seems to be part factual finding, part legal conclusion.  At any rate, Hodge has not developed this argument in any detail, choosing instead to focus on the contrariness of the Kentucky Supreme Court's decision.

remanded the case based on this nondisclosure, reasoning that the defendant's "opportunity to cross-examine Police Officer Bryson and Federal Narcotics Agent Durham was hardly a substitute for an opportunity to examine the man who had been nearest to him and took part in the transaction." *Id.* at 64. Here, by contrast, the Commonwealth declined to reveal Smith's identity prior to trial for safety reasons, but Smith himself later testified. Thus, this is not a situation where the Commonwealth's refusal to disclose deprived Hodge of any opportunity to confront a witness against him. For these reasons, the Kentucky Supreme Court's analysis was not contrary to clearly established federal law under 28 U.S.C. § 2254(d)(1). Hodge's eighth claim must be **denied**.

### H.   Claim 9: Hodge was Denied Due Process of Law When the Commonwealth Withheld Exculpatory Evidence

As the Court observed in its discussion of Claim 7, "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87 (citing *Mooney*, 294 U.S. at 112); *see also Giglio*, 405 U.S. at 154 ("When the 'reliability of a given witness may well be determinative of guilt or innocence,' nondisclosure of evidence affecting credibility falls within this general rule.") (quoting *Napue*, 360 U.S. at 269).

This claim is closely related to Claim 7, in that it focuses on the nature of the Commonwealth's relationship with Lawrence Anthony Smith. (Doc. # 38 at 75-76). However, Claim 7 alleges that Hodge's rights were violated by Smith's alleged perjury and the Commonwealth's failure to point out such perjury. (Doc. # 12 at 64-69). This claim, by contrast, centers on the Commonwealth's alleged decision to withhold evidence of deals

72

or promises of leniency made to Smith. (*Id.* at 73-74). Specifically, the Commonwealth did not inform the defense that a "no prosecution hearing" was scheduled in Florida. (*Id.*).

On direct appeal, the Kentucky Supreme Court considered several discovery-related arguments pertaining to Smith's testimony:

> The prosecution was also correct in its response to the discovery request. Hodge's confession was part of the witness Smith's statement. The prosecution had no written or recorded statements of the codefendants until it received Bartley's recorded statement on May 12, 1986. If the defendants were misled by the prosecution's denial of the possession of any codefendant's statements, it was not attributable to any action of the prosecution, and the discovery response was correct. *Cf. White v. Commonwealth*, Ky., 611 S.W.2d 529 (1980). As a regular witness and not an informant, the defendants were not entitled to Smith's statement until his testimony. RCr 7.26(1). Because his statement was made orally to state police, it was not discoverable upon request by the defendant. Hodge made no such discovery motion and because his confession was oral and not written or recorded, the Commonwealth, pursuant to the 1986 RCr 7.24(2) rule, was not compelled to produce Smith's statement prior to his testimony.

> Arguments by the defendants regarding the nondisclosure of Smith's identity are also without merit. The defendants contend that a court order blanketed individual discovery requests to cover all the codefendants and incorporated Bartley's 1985 motion for all exculpatory evidence. The only such ruling in the record was made in the court order on May 6, 1986 and does not address the issue. This order was limited solely to its own elements.

> In December, Hodge requested statements of testifying witnesses. These were discoverable under RCr 7.26(1) at the time of the witnesses' in-court testimony. His request for exculpatory statements was moot on May 23, 1986, because both defendants received information of Smith's statements that day and five days later received Bartley's. Epperson's January request for written or recorded statements or confessions of defendants was ineffective because none existed until Bartley's May confession. Pursuant to RCr 7.24(2), his additional request for written or oral statements made to the police which implicated him were nondiscoverable.

> . . .

> The nondisclosure of Smith's identity was not error and the appellants' right to exculpatory evidence by impeaching Smith was not compromised because the Commonwealth did not wrongfully withhold any evidence favorable to the

73

defense.  This situation is different from *Rolli v. Commonwealth*, Ky.App., 678 S.W.2d 800 (1984) where the prosecution knowingly withheld information.  Here the trial judge never ordered such production and the prosecution followed proper discovery procedures.

There was no error in the behavior of the Commonwealth in regard to the claim of concealing certain exculpatory evidence, including Smith's statement.  The prosecution is under a duty to produce exculpatory evidence in time for due investigation.  *Silverburg v. Commonwealth*, Ky., 587 S.W.2d 241 (1979).  In determining whether this delay in disclosure of Smith's statement was error, this Court must look to see if the prosecution was given a more favorable opportunity to convict.  The record indicates that the Commonwealth was not aided by the delay and that the prosecution was justified in stating that it could not guarantee the safety of Smith who was still under the control of a foreign jurisdiction.  This case is clearly distinguishable from *Brady v. Maryland*, 373 U.S. 83, 83 S.t. 1194, 10 L.Ed.2d 215 (1963) because there was no recommendation for leniency made on behalf of the witness.

Smith's statements actually implicated Epperson as to the crime and was only exculpatory as to punishment labeling Hodge and not Epperson as the actual killer.  Any exculpatory value to Epperson was realized because Epperson received the statement several days before trial and there was sufficient time to prepare a defense before Smith testified.

In addition, on May 20, 1986, the Commonwealth filed a certificate of materiality of a witness who was confined in a penal institution identified as Smith who was lodged in Florida's Orange County jail.  The certificate should have given notice to Epperson but he did not seek a continuance until the beginning of the trial.  Both Epperson and Hodge had from May 28 to June 16 to prepare for Smith's testimony and both defense lawyers effectively cross-examined Smith on the witness stand.

*Epperson*, 809 S.W.2d at 840.

Hodge concedes that this claim has been adjudicated on the merits, but insists that the Kentucky Supreme Court's decision was an unreasonable application of federal law because it failed to account for *Brady*'s timing component.   (Doc. 38 at 73-74). Specifically, Hodge argues that the Commonwealth's decision to withhold this material prevented him from pursuing additional evidence.  (*Id.*).  However, as the Court previously

74

noted, the jury heard that Smith had pled guilty to charges in Florida but had not yet been sentenced.  (Docs. # 27-5 at 2-21 and 25-32).  It also heard that the Commonwealth promised to notify the Florida authorities of Smith's cooperation in this case.  (*Id.*).  There was nothing in the record before the Kentucky Supreme Court to suggest that the Commonwealth knew of the "no prosecution hearing" scheduled in Florida.  (*Id.*).  Absent such evidence, it was not unreasonable for the Kentucky Supreme Court to conclude that Hodge's case was distinguishable from *Brady* because "there was no recommendation for leniency made on behalf of the witness."  *Epperson*, 809 S.W.2d at 840.  Further review of this claim is therefore barred by AEDPA.  *See* 28 U.S.C. § 2254(d)(1).  Hodge's ninth claim for relief is **denied**.

### I.    Claim 10: Judge Hogg's Refusal to Grant a Continuance Deprived Hodge of his Right to Counsel, Right to Confrontation of Witnesses, Right to a Fair Trial and Rational Sentencing, and Due Process of Law

"The matter of continuance is traditionally within the discretion of the trial judge, and it is not every denial of a request for more time that violates due process even if the party fails to offer evidence or is compelled to defend without counsel."  *Ungar v. Sarafite*, 376 U.S. 575, 589 (1964).  However, "a myopic insistence upon expeditiousness in the face of a justifiable request for delay can render the right to defend with counsel an empty formality."  *Id.*  "There are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process."  *Id.*  The answer depends upon "the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied."  *Id.*

75

On direct appeal, Hodge argued that a continuance was necessary so that he could defend against the Commonwealth's efforts at "prosecution by ambush." (Doc. # 30-11). He noted that the Commonwealth failed to disclose its theory that Hodge was the actual murderer until ten days before trial. (*Id.*). At that time, he received the contents of Smith's statement. (*Id.*). Five days later, he received the statement given by his co-defendant, Donald Bartley. (*Id.*). Hodge complained that these late disclosures left him with "a very short period of time in which to prepare a defense to the Commonwealth's newly-revealed theory of the case" and discover evidence that could be used to impeach Smith and Bartley. (*Id.*). Hodge concluded that Judge Hogg's decision to deny his motion to continue deprived him of the right to counsel, the right to confrontation of witnesses, the right to secure the attendance of witnesses, the right to a fair and rational capital sentencing, and the right to due process of law. (Doc. # 38 at 85).

The Kentucky Supreme Court addressed this claim as follows:

This record does not indicate that the prosecution acted in bad faith or that the trial judge abused his discretion in denying continuances because the defense received both Smith's and Bartley's statements, the impeaching evidence of the prosecution, the conviction records, pending charges and any promises of leniency. Hodge's request for a continuance is perhaps at variance with his motion to dismiss for lack of speedy trial on the date trial began. The Commonwealth did not violate any court order of discovery.

. . .

It was not reversible error for the trial judge to deny Hodge's request for a continuance based on an allegation of a prosecutorial violation of the discovery order due to the prosecution's failure to provide exculpatory evidence relating to a "no prosecution hearing" in Florida. The record indicates that the Commonwealth had no knowledge of the hearing and merely notified Florida authorities of witness Smith's cooperation. There is no evidence in the record beyond Hodge's allegation that a "no prosecution hearing" was ever scheduled or held. Defense counsel effectively cross-examined Smith on the question of leniency. [Hodge] was not denied his

76

right of confrontation.  The prosecution did not withhold evidence of leniency in violation of the defendant's right to a fair trial as stated in *United States v. Agurs*, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976).  The prosecutor was in compliance with the discovery order pursuant to RCr 7.26(2).  There was no *Brady v. Maryland*, *supra*, violation.  Hodge was not prejudiced.

*Epperson*, 809 S.W.2d at 844.

Hodge seems to concede that this claim was adjudicated on the merits, but insists that the Kentucky Supreme Court's decision was an unreasonable application of clearly existing federal law.[21]   However, he fails to explain *how* this decision qualifies as unreasonable.  Instead, he re-asserts arguments raised before the Kentucky Supreme Court.  Hodge's mere disagreement with the Kentucky Supreme Court's decision is insufficient to demonstrate that the opinion is objectively unreasonable.  *See Lockyer*, 538 U.S. at 74.

Moreover, the record reflects that the Kentucky Supreme Court carefully considered the circumstances of the case and the proffered reasons for the continuance, as required by *Ungar*.  *See Epperson*, 809 S.W.2d at 844.  It then concluded that a continuance was not necessary because the defense received both Smith's and Bartley's statements, the impeaching evidence of the prosecution, the conviction records, the pending charges and any promises of leniency for both witnesses.  *Id.*  Although the Commonwealth provided these statements to the defense just before trial, the Kentucky Supreme Court found that

---

21) As in Claim 2, the State argues that the Court cannot review this decision because the Kentucky Supreme Court relied on state law in rejecting Hodge's claim.  (Doc. # 23 at 38).  In support of this proposition, the State notes that "it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."  *See Estelle*, 502 U.S. at 72.  However, as this Court already explained, this does not prohibit a federal habeas court from deciding "whether a conviction violated the Constitution, laws, or treaties of the United States."  *Id.*  Although the Kentucky Supreme Court relied on state law, Hodge's claim is predicated, in part, on the violation of federal constitutional rights.  (Doc. # 30-12 at 6-13).  Therefore, the Court is not precluded from reviewing this claim.

the Commonwealth had complied with all applicable discovery rules.  *Id.*  Thus, Hodge's

allegations of discovery violations were insufficient to justify a continuance.  *Id.*  Because

the Kentucky Supreme Court's analysis was consistent with *Ungar*, the Court concludes

that its treatment of Hodge's claim was not unreasonable.  Accordingly, further review is

barred under AEDPA.  *See* 28 U.S.C. § 2254(d)(1).  Hodge's tenth claim for relief is hereby

**denied**.

> ### J.      Claim 11: Hodge's Right to Due Process of Law and Right to the Effective Assistance of Counsel Were Violated With Respect to the Testimony of Donald Bartley[22]

Under *Strickland*, a defendant must satisfy the following two-prong test in order to

establish that counsel's assistance was constitutionally ineffective.  *See* 466 U.S. at 686-

87.  First, the defendant must demonstrate that counsel's performance was deficient.  *Id.*

Counsel's deficiencies must be "so serious that counsel was not functioning as the 'counsel

guaranteed the defendant by the Sixth Amendment."  *Id.*  Second, the defendant must

show that counsel's deficient performance prejudiced the defense.  *Id.*  To satisfy this

prong, the defendant must demonstrate that there is a reasonable probability that, but for

counsel's errors, the result of the proceeding would have been different.  *Id.* at 694.

In his RCr 11.42 motion, Hodge claimed that his attorney, Dale Mitchell, rendered

ineffective assistance of counsel in failing to anticipate that Bartley would turn State's

witness and investigate him accordingly.  (Doc. # 31-5 at 38-43).  He noted that a simple

---

[22] Based on the mere styling of Claim 11, it seems that Hodge wishes to challenge the Kentucky Supreme Court's handling of his direct appeal claim and his RCr 11.42 claim.  (Doc. # 12 at 81). However, Hodge's briefing focuses solely on the ineffective assistance issue.  (Docs. # 12 at 82; 38 at 86-88).  Hodge also seems to address the direct appeal claim in Claim 22.  (Doc. # 12 at 111-12).  Therefore, the Court will focus solely on the ineffective assistance issue at this juncture.

review of Bartley's criminal record would have revealed a history of cooperating with the prosecution.  (*Id.*).  Hodge also took issue with Mitchell's failure to investigate other sources of impeachment evidence for Bartley.  (*Id.*).

The record reflects that Hodge did not raise this issue on direct appeal.  (Docs. # 30-11 and 30-12).  However, the Kentucky Supreme Court's review of his post-conviction claim preceded on the assumption that he had raised the same issue on direct appeal:

> Both Epperson and Hodge argue that they were denied effective assistance of counsel due to each of their counsel's . . . failure to adequately prepare for the testimony of Anthony Smith and Donald Bartley. . . As found by the trial court, each of these allegations were addressed and resolved on direct appeal and cannot be raised in an RCr 11.42 motion.  *Thacker v. Commonwealth*, Ky., 476 S.W.2d 838 (1972).

*Hodge*, 68 S.W.3d at 345.  For this reason, Hodge insists that his ineffective assistance of counsel claim has not been adjudicated on the merits.  (Doc. # 38 at 86-88).  Having reviewed the Kentucky Supreme Court's decision, the Court will assume, without deciding, that Hodge has rebutted the *Richter* presumption and review this claim *de novo.  See Richter*, 562 U.S. at 99-100.

Perhaps Mitchell would have done well to investigate Hodge's co-defendants. Perhaps, if he had undertaken such an investigation, Bartley's criminal history would have given Mitchell reason to anticipate his future testimony on behalf of the Commonwealth. And perhaps Mitchell could have found other sources of impeachment evidence to use against Bartley at trial.  However, these failings are not "so serious that counsel was not functioning as the 'counsel guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687.  After all, the record reflects that Mitchell was able to effectively cross-examine Bartley about his negotiations with the Commonwealth on charges relating

79

to *this* case, which were certainly more pertinent than deals made in other criminal cases.

However, even if Mitchell was deficient in failing to anticipate Bartley's testimony and investigate his past, Hodge has not shown prejudice. He simply suggests that Mitchell's deficiencies must have been prejudicial because Bartley's testimony played such an important role in the trial itself. Again, the record reflects that Bartley was thoroughly and effectively cross-examined over the course of two days. Hodge has not demonstrated that, but for Mitchell's failure to cross-examine Bartley on additional grounds, the result of the trial would have been different. *Strickland*, 466 U.S. at 694. For these reasons, Hodge's eleventh claim for relief must be **denied**.

### K. Claims 12 and 13: Commonwealth's Attorney James Wiley Craft's Improper Comments During Closing Argument Deprived Hodge of a Fair Trial and a Rational Sentencing and Trial Counsel was Ineffective in Failing to Object to these Comments

#### 1. Hodge's Claim on Direct Appeal

As the Court explained in its analysis of Claim 3, "the adversary system permits the prosecutor to 'prosecute with earnestness and vigor.'" *United States v. Young*, 470 U.S. 1, 7 (1985) (quoting *Berger*, 295 U.S. at 88). While attorneys should refrain from "interjecting personal beliefs into the presentation of [the] case, . . . [i]t should come as no surprise that 'in the heat of argument, counsel do occasionally make remarks that are not justified by the testimony, and which are, or may be, prejudicial to the accused." *Young*, 470 U.S. at 8-10.

"The prosecutor's vouching for the credibility of witnesses and expressing his personal opinion concerning the guilt of the accused" can be especially problematic. *Id.* at 18. "[S]uch comments can convey the impression that evidence not presented to the

jury, but known to the prosecutor, supports the charges against the defendant and can thus jeopardize the defendant's right to be tried solely on the basis of the evidence presented to the jury."  *Id.*  Moreover, "the prosecutor's opinion carries with it the imprimatur of the Government and may induce the jury to trust the Government's judgment rather than its own view of the evidence."  *Id.* at 18-19 (citing *Berger*, 295 U.S. at 88-89).

In such circumstances, reversal is warranted if the prosecutor's conduct amounts to a fundamental error that "undermines confidence in the integrity of the criminal proceeding."  *Vuitton et Fils*, 481 U.S. at 810; *see also Young*, 470 U.S. at 16 (upholding a conviction because "the prosecutor's statements, although inappropriate and amounting to error, were not such as to undermine the fundamental fairness of the trial and contribute to a miscarriage of justice"); *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974) (rejecting a claim that the prosecutor's remark about the defendant's expectations at trial "by itself so infected the trial with unfairness as to make the resulting conviction a denial of due process"); *Darden v. Wainwright*, 477 U.S. 168, 183 (1986) (finding that the prosecutor's comments, while improper, did not deprive the defendant of a fair trial because the weight of the evidence against him was heavy and most of the improper comments were invited by the defense's summation).

On direct appeal, Hodge complained that Commonwealth's Attorney James Wiley Craft made the following improper comments during closing argument: (1) referring to facts outside the record, vouching for his own professional integrity, and injecting his personal beliefs into his closing; (2) emphasizing Hodge's failure to testify; (3) vouching for the credibility of Bartley; (4) emphasizing the loss of Tammy Acker's life; (5) minimizing the jury's role at sentencing; and (6) reminding the jury of the heinous nature of the crime.

81

(Doc. # 30-13 at 37-44).

The Kentucky Supreme Court rejected Hodge's claim with the following analysis:

The conduct of the prosecutor during closing argument did not amount to reversible error. The statements made by the prosecutor in closing argument were not so egregious so as to warrant reversal considering the totality of the circumstances in this case. *Cf. Summit v. Bordenkircher*, 608 F.2d 247 (6th Cir. 1979). The prosecution is given reasonably wide latitude in argument to persuade the jurors. *Lynem v. Commonwealth*, Ky., 565 S.W.2d 141 (1978). The brutality of the murder and the amount of evidence make it unlikely that the prosecutorial comments would have affected the outcome of this case. The record clearly indicates that the prosecutor did not trivialize in any way the role of the jury but rather appealed to the jury to make a decision on the penalty. He told the jury, "You must find that the only appropriate penalty is death."

The victim impact evidence presented by the prosecution was relevant and not prejudicial. It is important to note that no objection was made to either the life photograph or the testimony of the surviving father. The production of a photograph of the deceased girl and the surviving victim's testimony in reference to the photograph were relevant to the circumstances surrounding the crime and not unduly inflammatory. *Cf. Ice v. Commonwealth*, Ky., 667 S.W.2d 671 (1984). In addition, the statement by Bartley describing the girl's concern for her father was relevant evidence. The trial judge did not err in allowing the prosecution to depict the victim as a living person. *McQueen v. Commonwealth*, Ky., 669 S.W.2d 519 (1984).

*Epperson*, 809 S.W.2d at 843.

Hodge concedes that the Kentucky Supreme Court adjudicated this claim on the merits,[23] but insists that its decision amounts to an unreasonable application of clearly established federal law. (Doc. # 12 at 89). In support of this proposition, Hodge cites to

---

23) The Court concurs with Hodge's assessment. Although the Kentucky Supreme Court cited only state law in analyzing this claim, the record reflects that Hodge raised federal constitutional claims on direct appeal. "When a state court rejects a federal claim without expressly addressing that claim, a federal habeas court must presume that the federal claim was adjudicated on the merits," subject to rebuttal. *Johnson*, 133 S.Ct. at 1096 (suggesting that a claim may be regarded as adjudicated on the merits when "the state-law rule is at least as protective as the federal standard," but not in situations where the state standard is quite different from the federal standard or where the petitioner fails to develop the federal claim). Because the state law standard seems to be at least as protective as the federal standard in this instance, the Court may conclude that the claim has been adjudicated on the merits. *Compare Young*, 470 U.S. at 16 *with Lynem*, 565 S.W.2d 141 (1978).

*Bates v. Bell*, which instructs federal habeas courts to apply a two-part test in determining whether prosecutorial misconduct requires reversal.  *See* 402 F.3d 635, 641 (6th Cir. 2005); *see also Angel v. Overberg*, 682 F.2d 605, 608 (6th Cir. 1982) (first establishing this test).  The Sixth Circuit has applied this test to claims that have been "adjudicated on the merits" under AEDPA.  *See Bates*, 402 F.3d at 641 ("Under AEDPA, we are required to give deference to the Tennessee Supreme Court's determination of Bates's prosecutorial misconduct claims.").

Under this test, a federal habeas court reviewing a claim of prosecutorial misconduct must first determine whether the comments were improper.  *Id.*  If the comments were improper, the court must consider the following four factors to decide whether the comments were flagrant: (1) the likelihood that the remarks of the prosecutor tended to mislead the jury or prejudice the petitioner; (2) whether the remarks were isolated or extensive; (3) whether the remarks were deliberately or accidentally made; and (4) the total strength of the evidence against the defendant.[24]  *Id.*  These comments must be viewed "within the context of the trial as a whole."  *United States v. Beverly*, 369 F.3d 516, 543 (6th Cir. 2004).

---

24) The Court acknowledges that there is some tension between AEDPA's standard and the Sixth Circuit's two-part test.  Under AEDPA, when a federal constitutional claim has been adjudicated on the merits by a state court, the federal habeas court is limited to reviewing whether the state court's decision was an unreasonable application of clearly established federal law.  *See* 28 U.S.C. § 2254(d)(1).  The Supreme Court of the United States has clarified that "federal law" refers to its own precedent, not that of the Courts of Appeals.  *See Lockyer*, 538 U.S. at 71-72 (explaining that the federal habeas court's review should focus on "the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision").  While it seems that this two-part test is aimed at determining whether the decision is unreasonable, the Court fails to see how it qualifies as clearly established federal law, as that term is understood in AEDPA.  Nevertheless, the Court understands that Sixth Circuit precedent is binding on it and will apply the *Bates* standard despite its apparent tension with AEDPA.  The result would be the same even in the absence of this test.

Hodge cites the following comments as examples of Craft's reflections on his own reputation and his personal opinion about the case:

> You know, as I sat here and listened to Mr. Burns in his presentation and I listened to Mr. Mitchell in his eloquent presentation, I was reminded of the times when I sat on this side of the court and I, too, defended people.  A favorite trick of a defense attorney was to get the jury to try someone else.  Nevermind Roger Epperson and nevermind Bennie [*sic*] Hodge.  Let's try Donnie Bartley.
>
> . . .
>
> I have been practicing law for fifteen years, and I've tried many of these cases from my earliest [days] as defense counsel.  And over the years that I have tried these kinds of cases–criminal cases, I have yet to have been involved in a case in which the evidence was so completely and totally incriminating.
>
> . . .
>
> I am telling you now as the Commonwealth's Attorney for Letcher County, Kentucky, there is not a single doubt in my mind as to what the evidence in this case demonstrates and what penalty the Court ought to give them.
>
> . . .
>
> [A]s the Commonwealth's Attorney for this district I submit to you there's only one appropriate penalty and I don't hesitate an instant when I tell you that the penalty is death.  It's death not only for Bennie [*sic*] Hodge but for the master-minder.

(Docs. # 27-12 at 36; 27-14 at 7-9).

Having reviewed the relevant precedents from the Supreme Court of the United States, this Court recognizes that Craft's general comments regarding his personal opinion of the case and the appropriate penalty may have been improper.  *See, e.g., Young*, 470 U.S. at 16 (finding that the prosecutor should not have expressed his personal opinion about the case); *Darden*, 477 U.S. at 180 (expressing disapproval over the prosecutor's implication that "the death penalty would be the only guarantee against a future similar

84

act"). However, Craft's comments about Tammy Acker were not improper when viewed in the context of the record as a whole. As the Kentucky Supreme Court observed, the Commonwealth was entitled to depict Tammy Acker as a living person. *See Epperson*, 809 S.W.2d at 843. The same can be said of Craft's comments about the heinous nature of the crime. *Id.*

Craft's comments about the jury's role in the trial are also not improper. Specifically, Craft stated that:

> It has taken us a long time, and it took a lot of man hours, and it took a lot of men and a lot of people directly involved in this case. We worked hard, and that is our part in this Shakespearean play. We were appointed a part to perform. I have my credit, and my credit is the Attorney General of the State of Kentucky. The Judge has got to perform his part. His part is directed and supervised by the Supreme Court of Kentucky and the United States. You, ladies and gentlemen, have got to play your part. You've got to play it as well. You must not shirk from your responsibility. I have, mine, the Judge has his.
>
> . . .
>
> There has to be–there has to be something done about those kinds of things. I can only bring you my part, and I have done that. The Judge can only do so much and he has done that.

(Doc. # 27-12 at 46-50). Hodge characterizes this statement as an effort to minimize the jury's role in the proceedings. *See Caldwell v. Mississippi*, 475 U.S. 320, 325 (1985) (finding fault with the prosecutor's efforts to minimize the importance of the jury's sentencing decision by informing them that there would be an appeal). However, when placed in context, it actually serves to emphasize the importance of the jury's task. By outlining all of the work that has gone into this case, Craft emphasizes the seriousness of the matter and indicates that their verdict will be the culmination of all this preparation. In discussing the role of the attorneys and Judge Hogg, Craft highlights the fact that they

85

could not decide Hodge's or Epperson's ultimate fate.  Instead, that fate was left to the jury.  Thus, the Court concludes that Craft did not improperly minimize the jury's role in the proceedings.

Next, Hodge takes issue with the following statement: "Never once did you hear Lester Burns say, shame on you Roger Epperson; shame on you for destroying this man's home and his life.  Shame on you Bennie [*sic*] Hodge, shame on you for destroying this man's home and his life." (*Id.*).  He notes that his counsel could not express remorse on his behalf because he had pled not guilty and exercised his right not to testify.  (Doc. # 30-13 at 41).  Thus, Craft's comments placed him in "the paradoxical position of saying 'I am sorry for a crime of which I am not guilty.'" (*Id.*).  Hodge further suggested that these comments were intended to emphasize his failure to testify.  (*Id.*).

However, this statement was but a part of Craft's broader attack on the defense's theory of the case:

> You know, as I sat here and listened to Mr. Burns in his presentation and I listened to Mr. Mitchell in his eloquent presentation, I was reminded of the times when I sat on this side of the court and I, too, defended people.  A favorite trick of a defense attorney was to get the jury to try someone else.  Nevermind Roger Epperson and nevermind Bennie [*sic*] Hodge.  Let's try Donnie Bartley.  You know, Mr. Burns talked about the fine gentleman Dr. Acker, a citizen of our county.  And, he is a fine gentleman.  He has lived and worked here all his life.  On the night of August 8, 1985, his home was destroyed.  *Never once did you hear Lester Burns say, shame on you, Roger Epperson; shame on you for destroying this man's life.  Shame on you, Bennie* [sic] *Hodge; shame on you for destroying this man's home and his life.*  He didn't say that.  The reason he didn't say that is because he didn't want you trying those people.  He didn't want you trying the true defendants.  He wanted you to try Donald Bartley.

(Doc. # 27-12 at 36) (emphasis added).  When viewing this statement in context, the Court sees no indication that Craft improperly sought to highlight Hodge's failure to testify.

Finally, Hodge objects to the following discussion about Donald Bartley:

Let me tell you something about Donald Bartley. Donald Bartley's soul belongs to me, Mike Caudill and the Judge of this Court, and he will be dealt with. We today are to deal with Roger Epperson and Bennie [sic] Hodge. That's what I'm here to talk to you about.

. . .

Lester Burns and Dale Mitchell want you to try Donald Terry Bartley. I'll tell you one thing, and I'm not going to recount and I'm not going to rehash all this evidence because you've heard it, but I'll tell you one thing. You must analyze the evidence before you. I'll tell you two basic reasons why I think Donald Terry Bartley told you ladies and gentlemen the truth. These are reasons that are hidden deep within all the other evidence. In all the photographs that we introduced of their home, if you remember, Donald Terry Bartley told you that he took this young girl into her room and tied her up. There he laid her on a rug. I'm sure if you ladies and gentlemen went to her room that there you would have seen a rug. That rug covered about one-fourth of that room. But, you examine those pictures that we took there that night, and you cannot possibly find that rug. Because of the pillage, because of the plunder and because of the clothes of this little girl had been pulled from their shelves; had been pulled from their drawers and thrown on the floor to the extent that that rug was completely hidden in the pictures. The body of Tammy Acker was on top of all those clothes. So, at whatever point she was killed, it had to have been after all the plundering and the pillaging of her room, because she died on top of her clothes. Now, Lester Burns wants you to believe that Donald Terry Bartley took her into that room and there he proceeded to kill her. The physical evidence doesn't bear one single piece of that out. And, you can look at it and I want you too. And, the second reason I think that Donald Terry Bartley was telling you ladies and gentlemen the truth is because at the point he took Tammy Acker to her bedroom, the doctor was still standing there with that man right there holding a gun to his head. That knife–this instrument of death came from the kitchen right where Dr. Acker was standing. Dr. Acker told you that he took–he grabbed Tammy and carried her off to her room. He didn't tell you he stopped and got a butcher knife out of the kitchen on his way through. He didn't tell you that he went in there and hollered back for a knife. He told you that he grabbed her and carried her to her room. Now, you remember what Donald Terry Bartley said. Bartley said they looted and they robbed this home; they took the money and then they all three met, and the master planner once again said, which one do you want?

(Doc. # 27-12 at 36-37 and 40-42).

Hodge sees Craft's argument as little more than an attempt to bolster the testimony of his star witness.  However, when viewed in the context of the trial as a whole, it becomes clear that Craft simply restated the testimony and evidence offered during the trial and drew inferences therefrom.  In making these comments, Craft did nothing more than prosecute with "earnestness and vigor."  *See Young*, 470 U.S. at 9, n. 5 (stating that "[t]he prosecutor may argue all reasonable inferences from evidence in the record" ) (citing ABA Standards for Criminal Justice 3-5.8 (2d ed. 1980)).

Having acknowledged that Craft's comments regarding his personal opinion of the case and the appropriate penalty may have been improper, the Court must now determine whether those comments were flagrant.  While Craft's comments were certainly deliberate, they were relatively isolated when compared to Craft's closing as a whole.  Moreover, the record reflects that there was a strong amount of evidence against Hodge.  Because Craft's improper comments were not flagrant, Hodge has failed to demonstrate that reversal is warranted.  Under these circumstances, the Court cannot conclude that the Kentucky Supreme Court's decision was unreasonable.  Accordingly, further review of this claim is barred by AEDPA.  *See* 28 U.S.C. § 2254(d)(1).

## 2.    Hodge's State Post-Conviction Claim

During his state post-conviction proceedings, Hodge argued that Mitchell was ineffective in failing to object to Craft's statement that the jury had no choice but to impose the death penalty.  (Doc. # 31-6 at 51-54).  The Kentucky Supreme Court denied this claim with no apparent analysis.  *Hodge*, 68 S.W.3d at 345.  The court devoted most of its analysis to the jury tampering and mitigation issues, then addressed all remaining claims

in one paragraph:

> Both Epperson and Hodge argue that they were denied effective assistance of counsel due to each of their counsel's failure to adequately voir dire the jury, failure to adequately prepare for the testimony of Anthony Smith and Donald Bartley, and failure to adequately cross-examine each of these witnesses. Further, they argue that the Commonwealth's Attorney failed to disclose exculpatory material to the defense in violation of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Finally, they each argue that they were denied effective assistance of counsel due to a conflict of interest between Epperson's counsel, Lester Burns, and Hodge's counsel, Dale Mitchell. As found by the trial court, each of these allegations were addressed and resolved on direct appeal and cannot be raised in an RCr 11.42 motion. *Thacker v. Commonwealth*, Ky., 476 S.W.2d 838 (1972).

*Id.*

The State argues that Hodge's ineffective assistance claim is procedurally defaulted because the Kentucky Supreme Court "rejected this claim on direct appeal with no analysis, then found that his post-conviction claim was procedurally barred."[25] (Doc. # 23 at 43-45). To clarify, Hodge's direct appeal did not include assertions that Mitchell was ineffective in failing to object to Craft's improper comments. (Docs. # 30-11, 30-12 and 30-13). He simply asserted that Craft's comments deprived him of due process. (Doc. # 30-12 at 37-44). The Kentucky Supreme Court rejected this claim for the reasons discussed above. *Hodge*, 68 S.W.3d at 345. When Hodge raised the related ineffective assistance issue during his state post-conviction proceedings, the Kentucky Supreme Court denied the claim on procedural grounds. *Id.* The court seems to have relied upon now-invalid Kentucky case law that prohibited a defendant from asserting a claim of palpable error on direct appeal, then bringing a derivative claim for ineffective assistance of counsel based

---

25) Although Hodge took issue with the State's invocation of the procedural default doctrine, he did not dispute its recitation of the procedural history. (Doc. # 38 at 89). Nevertheless, the State's summary of events requires some clarification, as the Court will explain herein.

on that error in RCr 11.42 proceedings.[26]  *Thacker*, 476 S.W.2d at 838.

The procedural default doctrine bars a federal habeas court from reviewing a federal constitutional claim "if the state judgment rests on a state-law ground that is both independent of the merits of the federal claim and an adequate basis for the state court's decision." *Munson v. Kapture*, 384 F.3d 310, 313-14 (6th Cir. 2004) (internal quotations omitted).  To determine whether a defendant's claim is procedurally defaulted, federal habeas courts must apply the following four-part test:

> First, the court must determine that there is a state procedural rule that is applicable to the petitioner's claim and that petitioner failed to comply with the rule . . . Second, the court must decide whether the state courts actually enforced the state procedural sanction . . . Third, the court must decide whether the state procedural ground is an adequate and independent state ground on which the state can rely to foreclose review of a federal constitutional claim . . . Once the court determines that a state procedural rule was not complied with and that the rule was an adequate and independent state ground, then the petitioner must demonstrate . . . that there was cause for him not to follow the procedural rule and that he was actually prejudiced by the alleged constitutional error.

*Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986).

---

26) As the Court explained earlier in its opinion, the Kentucky Supreme Court's reasoning is somewhat opaque.  *Thacker* simply stated that "[i]t is not the purpose of RCr 11.42 to permit a convicted defendant to retry issues which could and should have been raised in the original proceeding, nor those that were raised in the trial court and upon an appeal considered by this court."  *See* 476 S.W.2d 838, 839 (Ky. 1972).  This rule was later expanded to bar ineffective assistance of counsel claims that were related to issues raised on direct appeal.  *Leonard*, 279 S.W.3d at 157 (citing *Sanborn*, 975 S.W.2d at 908-09 ("An issue raised and rejected on direct appeal may not be relitigated in [11.42] proceedings by claiming that it amounts to ineffective assistance of counsel.")).  Although the Kentucky Supreme Court later reversed course on this issue and recognized that allegations of palpable error on direct appeal do not bar a subsequent collateral attack claim arising from the alleged palpable error, its holding did not change the rule that "[w]here the collateral ineffective assistance of counsel claim is presented in the course of the direct appeal, . . . the issue cannot be re-litigated in a collateral attack."  *Leonard*, 279 S.W.3d at 158, n. 3 (citing *Bowling*, 981 S.W.2d at 549 (reasoning that "the collateral issue of ineffectiveness itself, not just the related direct error, ha[s] already been raised and rejected")).  In this case, some of Hodge's ineffective assistance of counsel claims were raised on direct appeal and again during state post-conviction proceedings, while others were not.  Thus, it is not entirely clear whether the Kentucky Supreme Court's use of *Thacker* is intended to convey the *Sanborn* rule or the *Bowling* rule.  Because Hodge did not raise this ineffective assistance claim on direct appeal, the Court will presume that the Kentucky Supreme Court was relying on the reasoning expressed in *Sanborn*.

Although the Kentucky Supreme Court relied on a state procedural rule in rejecting Hodge's post-conviction claim, this is not a situation where Hodge failed to comply with a procedural rule.   In fact, this case presents the inverse situation.   Hodge effectively attempted to assert an ineffective assistance of counsel claim during his post-conviction proceedings, but was unable to do so because the Kentucky Supreme Court viewed such a claim as derivative of his direct appeal claim at that time. *See Hodge*, 68 S.W.3d at 345; *Thacker*, 476 S.W.2d at 838.   Instead, these circumstances suggest that Hodge's ineffective assistance of counsel claim was *not* adjudicated on the merits. *See Richter*, 562 U.S. at 98-99.   The Court will therefore presume that the *Richter* presumption has been rebutted and review Hodge's claim *de novo. Id.*

To establish that counsel's assistance was constitutionally ineffective, a defendant must satisfy the now-familiar two-prong test: (1) counsel's performance was deficient; and (2) counsel's deficient performance prejudiced the defense. *Strickland*, 466 U.S. at 686-87.   Even assuming that Mitchell's failure to object was so serious that he was not functioning as the counsel guaranteed by the Sixth Amendment, he has failed to demonstrate that he was prejudiced by Mitchell's failings. *Id.*   As this Court has already observed, the bulk of Craft's comments were not improper, and those that were improper were not flagrant.   Because the Court has already concluded that Craft's comments did not deprive Hodge of a fair trial, it cannot find that, but for Mitchell's failure to object to those comments, the result of the trial would have been different. *Id.* at 694.   Accordingly, Hodge's twelfth and thirteenth habeas claims must be **denied**.

**L.    *Claims 14 and 15: Hodge was Denied Due Process of Law and his Right to a Fair Trial by Admission of Evidence of Uncharged Murders and Defense Attorney Dale Mitchell was Ineffective in Failing to Object to this Evidence***

**1.    Hodge's Claim on Direct Appeal**

In a handful of cases, the Supreme Court of the United States has suggested that erroneous evidentiary rulings may amount to a due process violation, depending on the circumstances.  *See, e.g., Chambers v. Mississippi*, 410 U.S. 284, 302 (1973) (concluding that the defendant did not receive "a trial in accord with traditional and fundamental standards of due process" because he was not permitted to cross-examine an individual who had previously confessed to the crime and then withdrew his confession, nor was he allowed to introduce testimony from officers who received that individual's confession); *Crane v. Kentucky*, 476 U.S. 683, 687 (1986) (holding that the trial court's exclusion of testimony bearing on the circumstances of the defendant's confession deprived him of his fundamental constitutional right to present a defense").  However, it has yet to precisely define the contours of this principle.  *See Montana v. Egelhoff*, 518 U.S. 37, 42 (1996) (discussing the impact of *Chambers* and *Crane*).

On direct appeal, Hodge complained that "considerable evidence of a highly prejudicial and often irrelevant nature was admitted" against him at trial.  (Docs. # 30-11 at 50-51; 30-12 at 1-6).  Specifically, he took issue with the following pieces of evidence: (1) Bartley's reference to another murder committed by Epperson; (2) Bartley's testimony about drug use prior to the crime; (3) FBI Agent William Fluherty's testimony about weapons found in the Florida residence that the three men shared; (4) Lawrence Anthony Smith's testimony that Hodge spoke of spreading the stolen money all over a bed and

having sex on top it; (5) the Commonwealth's introduction of a gold watch that was not stolen from the Acker residence or purchased with proceeds from the robbery; and (6) the pathologist's use of a model skeleton to illustrate that nature and location of Tammy Acker's wounds. (*Id.*). Hodge argued that this evidence was irrelevant and prejudicial, and that its admission at trial deprived him of his due process rights. (*Id.*).

The Kentucky Supreme Court addressed this claim as follows:

The admission of evidence of other crimes and bad acts did not deny either appellant a fair trial and did not constitute reversible error.

Most of the testimony cited by the appellants were single responses during the course of demonstrating the totality of events surrounding the crimes. The only exception is Bartley's testimony that Epperson said, "It's your time. I got the last one. You've got to kill the doctor." This testimony was repeated three times thus magnifying any prejudicial effect. However, the record reveals that this may have been a situation that the appellants themselves created.

The first time Bartley made this statement was on direct examination; it came in the midst of a long narrative testimony and the appellants did not object. The second time Bartley made the statement was the next day during cross examination. The question which produced this response was, "Tell me again exactly what happened. Tell me what you said yesterday." Bartley repeated what he had said and then appellants objected. The trial judge sustained the objection and admonished the jury not to consider the answer to the last question. Bartley was also told not to mention any other crime.

Appellants then immediately questioned Bartley about the Epperson statement and asked again what happened at this point. Bartley again responded with the Epperson statement. Appellants objected and finally Bartley was brought into chambers and told exactly what he could not say. A careful analysis of this sequence of testimony indicates that during cross-examination, Bartley was directly led into repeating the Epperson statement to which the appellants failed to initially object. They cannot now claim reversible error because of these statements. Such a situation would allow the appellants to create error.

There was also no abuse of discretion on the part of the trial judge in determining whether the probative value of evidence of other crimes outweighed its possible prejudicial effect. *Rake v. Commonwealth*, Ky., 450

S.W.2d 527 (1970).   Evidence otherwise admissible is not rendered inadmissible merely because it shows unrelated criminal acts.  *Jones v. Commonwealth*, Ky., 554 S.W.2d 363 (1977).   Here the evidence was admitted to show identity.  *Cf. Pendleton v. Commonwealth*, Ky., 685 S.W.2d 549 (1985).   In addition, the trial judge gave a specific curative limiting admonition.   The defendant was not unduly prejudiced.  *Wonn v. Commonwealth*, Ky. App., 606 S.W.2d 169 (1980).

*Epperson*, 809 S.W.2d at 841-42.

Hodge concedes that the Kentucky Supreme Court adjudicated this claim on the merits, but challenges its finding that his attorney created the error by eliciting testimony of other another murder from Bartley.   (Doc. # 38 at 104-105).   Because the Commonwealth was actually the first to elicit such testimony, Hodge concludes that the Kentucky Supreme Court made an unreasonable factual determination under 28 U.S.C. § 2254(d)(2).[27]  (*Id.*).  Hodge is correct in stating that Bartley first testified about the other murder on direct examination, that Mitchell belatedly objected to this testimony, and that the trial court overruled his objection.  (Doc. # 27-7 at 41-43).  However, Mitchell elicited the same testimony on cross-examination.  (Docs. # 27-7 at 41-43; 27-8 at 18, 58-60; 27-9 at 9-11).  Mitchell asked the trial court to instruct Bartley not to testify about other crimes and admonish the jury not to consider his testimony about other crimes.  (Doc. # 27-9 at 1-6).   The trial court did as he requested, but Mitchell proceeded to elicit the same testimony on two more occasions, thus magnifying its prejudicial effect.  (*Id.*).  On this record, Hodge has simply failed to demonstrate, by clear and convincing evidence, that the Kentucky Supreme Court's factual determination was unreasonable.

---

[27] Hodge first raised this argument in his Traverse, not his original Petition.  Although the Court is not obligated to consider this issue, it will do so out of an abundance of caution.  *See Scottsdale Ins. Co.*, 513 F.3d at 553.

Hodge also suggests that the Kentucky Supreme Court's decision was an unreasonable application of clearly established federal law.[28]  (Doc. # 12 at 90-91).  In support of this proposition, he simply reiterates his previous argument that Bartley's testimony regarding another murder was irrelevant and prejudicial, resulting in a violation of his rights to due process and a fair trial.  (*Id.*).  As the Court has previously observed, Hodge's mere disagreement with the Kentucky Supreme Court's decision is insufficient to demonstrate that the opinion is objectively unreasonable.  *See Lockyer*, 538 U.S. at 74.

Moreover, at the time of the Kentucky Supreme Court's decision, the Supreme Court of the United States had generally acknowledged that evidentiary rulings may amount to due process violations in some circumstances.  *Egelhoff*, 518 U.S. at 42.  The Court had not articulated a precise standard for evaluating these claims.  *Id.*  Although the Court has since attempted to clarify the effect of its rulings in *Chambers* and *Crane*, it still has not created such a standard.  *Id.*  Therefore, the Kentucky Supreme Court's apparent decision to reject Hodge's claim cannot be unreasonable.  *See Yarborough v. Alvarado*, 541 U.S. 652, 666 (2004) (explaining that "[s]ection 2254(d)(1) would be undermined if habeas courts introduced rules not clearly established under the guise of extensions to existing law").  Further review of this claim is barred by 28 U.S.C. § 2254(d)(1) and (2).

## 2.    Hodge's State Post-Conviction Claim

During his state post-conviction proceedings, Hodge argued that Mitchell was

---

28) In responding to the unreasonable application argument, the State again suggests that the Court cannot review this decision because the Kentucky Supreme Court relied on state evidentiary rules in rejecting Hodge's claim.  (Doc. # 23 at 38).  In support of this proposition, the State notes that "it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."  *See Estelle*, 502 U.S. at 72.  However, as this Court already explained, this does not prohibit a federal habeas court from deciding "whether a conviction violated the Constitution, laws, or treaties of the United States."  *Id.*  Accordingly, the Court will proceed with its analysis.

constitutionally ineffective in initially failing to object to Bartley's testimony about another murder on direct examination and in eliciting the same testimony on cross-examination. (Doc. #31-6 at 55-56; 31-7 at 1).

The Kentucky Supreme Court devoted most of its RCr 11.42 analysis to the jury tampering and mitigation issues, then addressed all remaining claims in one paragraph:

> Both Epperson and Hodge argue that they were denied effective assistance of counsel due to each of their counsel's failure to adequately voir dire the jury, failure to adequately prepare for the testimony of Anthony Smith and Donald Bartley, and failure to adequately cross-examine each of these witnesses. Further, they argue that the Commonwealth's Attorney failed to disclose exculpatory material to the defense in violation of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Finally, they each argue that they were denied effective assistance of counsel due to a conflict of interest between Epperson's counsel, Lester Burns, and Hodge's counsel, Dale Mitchell. As found by the trial court, each of these allegations were addressed and resolved on direct appeal and cannot be raised in an RCr 11.42 motion. *Thacker v. Commonwealth*, Ky., 476 S.W.2d 838 (1972).

*Id.*

The State characterizes this ruling as an unexplained merits determination under *Richter*. *See* 562 U.S. at 99. However, Hodge insists that this claim has not been adjudicated on the merits because the Kentucky Supreme Court relied on *Thacker*'s procedural rule in rejecting the claim. (Doc. # 38 at ). He further asserts that the claim has not been procedurally defaulted because Kentucky changed its procedural rules. (*Id.*).

As the Court explained in its analysis of Claim 13, Hodge's situation does not fit into the typical procedural default scenario. *See supra*, p. 87-91. While his claim was denied on procedural grounds, it was not because he failed to abide by a particular rule in

asserting his claim.[29]  The Court will therefore assume that this situation is sufficient to rebut the *Richter* presumption and review this claim *de novo.*

Once again, the Court must look to the *Strickland* test to determine whether Mitchell's assistance was constitutionally ineffective.  *See* 466 U.S. at 686-87.  This test requires Hodge to establish that Mitchell's performance was deficient and that his deficiencies prejudiced the defense.  *Id.*  Although the State insists that Mitchell's failure to initially object to Bartley's testimony was trial strategy, aimed at minimizing the importance of the statement, the Court will assume that Mitchell was deficient in failing to object.  It will also assume that Mitchell was ineffective in eliciting the same testimony on cross-examination.  However, Hodge has not succeeded in showing that these putative errors prejudiced his defense.   The record reflects that the trial court repeatedly admonished the jury not to consider Bartley's testimony about another murder and took appropriate steps to limit further testimony to this effect.  (Docs. # 27-7 at 41-43; 27-8 at 18, 58-60; 27-9 at 1-11).   For this reason, the Court finds that Mitchell was not constitutionally ineffective in this regard.  Hodge's fourteenth and fifteenth claims for relief must be **denied**.

### M.   Claim 16: Judge Hogg Deprived Hodge of Due Process by Preventing his Attorney from Questioning Prospective Jurors on their Views About Parole

As the Court previously observed, "[a] criminal defendant in a state court is guaranteed an 'impartial jury' by the Sixth Amendment as applicable to the States through

---

29) Hodge did not raise this issue on direct appeal, so the Kentucky Supreme Court's citation to *Thacker* likely reflects the application of the derivative procedural rule announced in *Sanborn*, not the res judicata-like rule from *Bowling. See supra*, p. 36-37, n. 2-3.

the Fourteenth Amendment." *Ristaino*, 424 U.S. at 595 n. 6 (quoting *Duncan*, 391 U.S. at 145 (observing further that "[p]rinciples of due process also guarantee a defendant an impartial jury"). However, this does not "always entitle a defendant to have questions posed during voir dire specifically directed to matters that conceivably might prejudice veniremen against him." *Id.* Voir dire "is conducted under the supervision of the court, and a great deal must, of necessity, be left to its sound discretion." *Connors v. United States*, 158 U.S. 408, 413 (1895). "Thus, the State's obligation to the defendant to impanel an impartial jury generally can be satisfied by less than an inquiry into a specific prejudice feared by the defendant." *Ristaino*, 424 U.S. at 595 (citing *Ham v. South Carolina*, 409 U.S. 524, 527-28 (1973)).

During voir dire, Hodge asked one of the prospective jurors whether "he had ever expressed an opinion against rendering life sentences because the parole system released those so sentenced too quickly." (Docs. # 25-19 at 6-11 and 20-22; 30-12 at 29-30). The Commonwealth objected to this question, arguing that parole was not a relevant consideration for the jury in determining guilt or punishment in a capital case. (Doc. # 25-19 at 6-11 and 20-22). Hodge insisted that he was entitled to voir dire prospective jurors on this topic "to determine whether they had any feelings about the parole system that could not be laid aside." (*Id.*). Judge Hogg permitted Hodge to continue, and the prospective juror answered that he would be able to disregard any personal opinions about parole during deliberations. (*Id.*). However, the next prospective juror stated that he did have problems with the parole system. (*Id.*). Hodge attempted to follow up on this statement so that he could "find out if a prospective juror would sentence him to death

98

because of considerations of parole," but Judge Hogg halted this line of questioning.  (*Id.*).

On direct appeal, Hodge argued that Judge Hogg's ruling deprived him of due process.

(Doc. # 30-12 at 29-30).

> The Kentucky Supreme Court quickly dispensed with this claim:

> Hodge should not have introduced the subject of parole and the prosecution's objection to such mention was properly sustained.  The complaints regarding the jurors who expressed concern over the parole system were merely speculative and do not indicate any prejudice or bias. There was no abuse of discretion and no prejudice.

*Epperson*, 809 S.W.2d at 844.

Hodge concedes that this claim was adjudicated on the merits, but insists that the

Kentucky Supreme Court's decision was "contrary to and/or an unreasonable application

of clearly existing Supreme Court authority."  (Doc. # 12 at 95-96).  However, because

Hodge does not actually suggest that the Kentucky Supreme Court applied the incorrect

law, the Court's analysis will focus on whether the Kentucky Supreme Court was

unreasonable in its application of clearly established federal law.  (*Id.*).

According to Hodge, "[t]he state court decision that [his] right to an impartial jury

claim was speculative is astounding given the response from a juror that he 'had a problem

with the parole system' immediately followed by the trial court shutting down any further

questioning on the topic with this or any other prospective juror."  (Doc. # 38 at 114).

However, as the Supreme Court of the United States has observed, Hodge was not

constitutionally entitled to pursue this line of inquiry.  *See Ristaino*, 424 U.S. at 595.

Rather, the scope of voir dire is committed to the discretion of the trial court judge.  *Id.*  The

record reflects that Judge Hogg initially afforded some leeway to defense counsel in

pursuing this line of inquiry.  (Doc. # 25-19 at 28-34).  However, when defense counsel

delved further into the issue, Judge Hogg ruled that Hodge could not pursue this line of inquiry because Kentucky law discouraged any discussion of parole with jurors.  *See Boyle v. Commonwealth*, 694 S.W.2d 711, 712 (Ky. 1985).  Because this ruling was within Judge Hogg's discretion, the Court cannot conclude that the Kentucky Supreme Court was unreasonable in rejecting Hodge's due process claim.  Accordingly, further review of this claim is barred under AEDPA.  *See* 28 U.S.C. § 2254(d).  Hodge's sixteenth claim for relief is hereby **denied**.

### N.    Claim 17: Hodge's Rights Were Violated When Judge Met with the Jury in the Absence of Him and Defense Attorney Dale Mitchell

"One of the most basic of the rights guaranteed by the Confrontation Clause is the accused's right to be present in the courtroom at every stage of his trial."  *Illinois v. Allen*, 397 U.S. 337, 338 (1970) (explaining further that the guarantees of the Sixth Amendment's Confrontation Clause are applicable to the States by virtue of the Fourteenth Amendment). "[E]ven in situations where the defendant is not actually confronting witnesses or evidence against him," the Supreme Court of the United States has assumed that the defendant "has a due process right 'to be present in his own person whenever his presence has a relation, reasonably substantial, to the fulness of his opportunity to defend against the charge.'" *Kentucky v. Stincer*, 482 U.S. 730, 745 (1987) (quoting *Snyder v. Massachusetts*, 291 U.S. 97, 105-06 (1934)).

On direct appeal, Hodge argued that his right to be present was violated when Judge Hogg met with the jury after the start of the trial.  (Doc. # 30-12 at 32-35).  This meeting took place at the jury's request, and neither Hodge nor his attorney were present. (Doc. # 26-15 at 10-12).  During the meeting, the jury expressed concern about being left

alone in the courtroom with the defendants during a recess. (*Id.*).  They also complained

that television cameras were hovering over them while they viewed exhibits. (*Id.*).  Finally,

the jurors made some requests about their weekend accommodations. (*Id.*).

> The Kentucky Supreme Court disposed of the claim as follows:

> The trial judge did not abuse his discretion when he denied a mistrial following a motion by the defendants alleging that the jurors improperly met with the trial judge.  About one and a half weeks after the trial began, the jury requested a meeting with the trial judge.  Both defense counsel were fully aware of the request and neither objected.  The meeting was recorded and the jurors expressed their concern about the absence of a law enforcement officer in the court room, television cameras hovering over their shoulders and accommodations for the upcoming weekend.  There is no basis for the claim of error.

> The admonition of the trial judge cured any possible prejudice and there was no abuse of discretion.  *Cf. Kinser v. Commonwealth*, Ky. 741 S.W.2d 648 (1987).

*Epperson*, 809 S.W.2d at 842.

Once again, Hodge concedes that this claim was adjudicated on the merits, but

insists that the Kentucky Supreme Court's decision was "contrary to and/or an

unreasonable application of clearly existing Supreme Court authority." (Doc. # 12 at 97-

99).  However, Hodge does not suggest that the Kentucky Supreme Court applied a rule

that was contrary to U.S. Supreme Court precedent. (*Id.*).  He argues instead that "very

subject of the conversation between the jurors and the trial judge indicated prejudice"

because they complained about being left alone in the courtroom with Hodge and

Epperson. (*Id.*).  According to Hodge, "[t]he only reasonable interpretation of this concern

is that the jurors feared them and could no longer accord[ ] them the presumption of

innocence required by the state and federal constitutions." (*Id.*).  He further asserts that,

had he and his trial counsel been present during this meeting, they could have asked the jurors questions to clarify their comments and concerns.  (*Id.*).

In this case, the issue before the Kentucky Supreme Court was whether Hodge's presence at the meeting would have had a reasonably substantial relation to his opportunity to defend against the charge.  *Stincer*, 482 U.S. at 745.  Hodge believes that his presence, along with his counsel's presence, would have allowed him to expose the fact that the jurors were no longer impartial.  However, the jury's concerns about being left alone in the courtroom with Hodge and Epperson do not necessarily lead to the conclusion that it had already made a determination of guilt.  The record reflects that the jurors wished to avoid the discomfort that they experienced when they were left alone in a room with the men whose fate they would soon decide.  Under these circumstances, the Court cannot conclude that the Kentucky Supreme Court was unreasonable in rejecting Hodge's claim.  Further review of this claim is therefore barred by AEDPA.  *See* 28 U.S.C. § 2254(d).  Hodge's seventeenth claim for relief is **denied**.

### O.   Claim 18: The Trial Court Committed Reversible Error When Dr. Acker's Patients Were Not Struck for Cause from the Jury Panel

In *United States v. Wood*, the Supreme Court of the United States stated that "[t]he bias of a prospective juror may be actual or implied; that is, it may be bias in fact or bias conclusively presumed as a matter of law."  *See* 299 U.S. 123, 133 (1936).  It has since reaffirmed that "the remedy for allegations of juror partiality is a hearing in which the defendant has the opportunity to prove actual bias."  *Smith*, 455 U.S. at 215 (citing *Remmer*, 347 U.S. at 227).  However, the Court has cast doubt on the continued validity of the implied-bias doctrine.  *Id.*; *see Johnson v. Luoma*, 425 F.3d 318, 326 (6th Cir. 2005)

(highlighting this unresolved issue).

In *Smith*, the Court cited several cases involving unsuccessful claims of implied bias, then concluded that "due process does not require a new trial every time a juror has been placed in a potentially compromising situation." *Id.* While the Court did not explicitly dispense with the implied-bias doctrine, Justice O'Connor felt it necessary to write a concurring opinion, in which she expressed her view "that the [majority] opinion does not foreclose the use of 'implied bias' in appropriate circumstances." *Id.* at 221-22. Specifically, Justice O'Connor explained that a finding of implied bias might be justified when the juror is an actual employee of the prosecuting agency, when the juror is a close relative of one of the participants in the trial or criminal transaction, or when the juror was a witness or otherwise involved in the criminal transaction. *Id.*

On direct appeal, Hodge complained that the trial court deprived him of his right to an impartial jury by failing to strike all of Dr. Acker's current and former patients for cause. (Doc. # 30-12 at 19-20). He noted that "[l]arge numbers of the jury panel stated that they were formerly or were currently patients of Dr. Roscoe Acker, the victim of the attempted murder and father of the murder victim." (*Id.*). As an aside, Hodge insisted that this situation would not have arisen if Judge Hogg had granted him a change of venue. (*Id.*). While some of these jurors were struck for cause, five of the twenty-nine jurors on the final panel were patients or business associates of Dr. Acker. (*Id.*). Three more of these jurors were struck by peremptory challenge, but two patients ultimately served on the jury. (*Id.*). Hodge contended that Dr. Acker's relationship with these jurors created a presumption of implied bias. (*Id.*).

The Kentucky Supreme Court discussed the related issue of venue thoroughly, but did not expressly analyze the issue of juror bias. Rather, the court simply stated that "this opinion will focus on those issues which we believe are most important, although we have considered and rejected all other assignments of error presented by each of the appellants." *Epperson*, 809 S.W.2d at 837-38. This is essentially an unexplained merits determination. *Richter*, 562 U.S. at 99. Accordingly, the Kentucky Supreme Court's decision will not be disturbed unless it is either contrary to, or an unreasonable application of, clearly established federal precedent. *See* 28 U.S.C. § 2254(d).

Hodge insists that this decision was unreasonable because it failed to take account of the implied bias that the doctor-patient relationship would create. (Doc. # 38 at 121). In support of this proposition, Hodge notes that "[p]atients place a special trust in their personal physicians and the probability of prejudice is very high if a current patient sits in judgment, including sentence, of a capital defendant alleged to have murdered the doctor's child." (*Id.*).

This argument relies heavily on the *Wood* decision, which states that "[t]he bias of a prospective juror may be . . . bias in fact or bias conclusively presumed as a matter of law." 299 U.S. at 133. However, as the Sixth Circuit has observed, "the implied-bias doctrine may not even be viable after *Smith*." *See Johnson*, 425 F.3d at 326 (citing *Conner v. Polk*, 407 F.3d 198, 206 n. 4 (4th Cir. 2005)). Because the law is not clearly established in this respect, the Kentucky Supreme Court's apparent decision to reject Hodge's implied-bias claim cannot be unreasonable. *See Yarborough*, 541 U.S. at 666 (explaining that "[s]ection 2254(d)(1) would be undermined if habeas courts introduced rules not clearly

104

established under the guise of extensions to existing law").  Further review is therefore barred by AEDPA.  *See* 28 U.S.C. § 2254(d).  Hodge's eighteenth claim for relief is **denied**.

### P.   Claim 19: Judge Hogg's Refusal to Move the Venue From Letcher County Deprived Hodge of a Fair and Impartial Jury

As the Court explained above, "the right to a jury trial guarantees to the criminally accused a fair trial by a panel of impartial, indifferent jurors."  *Irvin*, 366 U.S. at 722 (explaining further that these rights are a basic component of due process) (internal quotations omitted).  "It is not required, however that the jurors be totally ignorant of the facts and issues involved."  *Id.*  As the Supreme Court of the United States recognized:

> In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case.  This is particularly true in criminal cases.  To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard.  It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.

*Id.* at 723-24.

"The adoption of such a rule, however, cannot foreclose inquiry as to whether, in a given case, the application of that rule works a deprivation of the prisoner's life or liberty without due process of law."  *Id.* (internal quotations omitted).  Accordingly, the Court has occasionally found that pervasive pretrial publicity adversely affected the impartiality of the jury and amounted to a due process violation.  *See, e.g., Sheppard v. Maxwell*, 384 U.S. 333, 356 (1966).  Similarly, in *Rideau v. Louisiana*, the Court held that "it was a denial of

due process of law to refuse the request for a change of venue, after the people of Calcasieu Parish had been exposed repeatedly and in depth to the spectacle of Rideau personally confessing in detail to the crimes with which he was later to be charged." *See* 373 U.S. 723, 726 (1963).

On direct appeal, Hodge claimed that Judge Hogg's refusal to grant a change of venue deprived him of a fair and impartial jury. (Doc. # 30-12 at 13-19). In support of this proposition, Hodge noted that the Ackers were a prominent family in Letcher County and knew many people in the region. (*Id.* at 15). He also emphasized the "pervasive publicity about the case," noting that forty-five of the forty-seven jurors individually voir dired had read or heard it. (*Id.* at 17).

The Kentucky Supreme Court analyzed this claim as follows:

The victims were prominent members of the community in the county in which the case was tried. Coverage of the case appeared with frequency in the local and state-wide newspapers, and most of the jurors admitted having heard or read about the case. It is not the amount of publicity which determines whether venue should be changed, but whether public opinion is so aroused as to preclude a fair trial. *Kordenbrock v. Commonwealth*, Ky., 700 S.W.2d 384 (1985). The appellants refused the trial court's suggestion of a Pike County jury and the trial judge ordered individual voir dire on the issue of pretrial publicity. Extensive voir dire was conducted and a jury was impaneled with very little difficulty. This shows that the trial judge considered every issue very carefully and did not abuse his discretion.

In order to obtain a change of venue, the defendant must demonstrate actual prejudice except in extreme circumstances. *Cf. Coleman v. Kemp*, 778 F.2d 1487 (11th Cir. 1985). That is not the case here. We are satisfied that those who were permitted to sit were not prejudiced against Hodge. *Britt v. Commonwealth*, Ky., 512 S.W.2d 496 (1974); *Brewster v. Commonwealth*, Ky., 568 S.W.2d 232 (1978). When an individual who has heard about the case has been subjected to extensive voir dire examination, there is no abuse of discretion when they are seated and profess an oath as to their ability to try the issue solely on the law and evidence produced in court. *Smith v. Commonwealth*, Ky., 473 S.W.2d 829 (1971). *Cf. Gall, supra*.

*Epperson*, 809 S.W.2d at 843-44.

Hodge concedes that the Kentucky Supreme Court adjudicated this claim on the merits, but insists that its decision was contrary to U.S. Supreme Court precedent.  In support of this proposition, Hodge argues that the Kentucky Supreme Court erroneously required him to show actual prejudice.  (Doc. # 38 at 124-25).  Thus, he urges the Court to review this claim *de novo*.  *See* 28 U.S.C. § 2254(d)(1).

Although the Supreme Court of the United States has recognized that pretrial publicity can create venue problems, it has yet to articulate a precise standard for determining when a change of venue is appropriate.  Because the law is not clearly established in this respect, the Kentucky Supreme Court's apparent decision to reject Hodge's claim cannot be unreasonable.  *See Yarborough*, 541 U.S. at 666 (explaining that "[s]ection 2254(d)(1) would be undermined if habeas courts introduced rules not clearly established under the guise of extensions to existing law").  Moreover, the record reflects that the attorneys were able to voir dire the jurors about the issue of pretrial publicity and weed out those who had already made up their minds about the case.  The record also demonstrates that Judge Hogg sequestered the jurors in an effort to shield them from further publicity.  Further review is therefore barred by AEDPA.  *See* 28 U.S.C. § 2254(d). Hodge's nineteenth claim for relief is **denied**.

### Q.   Claim 20: Defense Attorney Dale Mitchell was Ineffective When He Informed the Jury of the Possibility of Appeal from Their Verdict

The Supreme Court of the United States has recognized that "it is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the

defendant's death rests elsewhere." *Caldwell*, 472 U.S. at 328-29 (explaining further that "the limits that this Court has placed on the imposition of capital punishment are rooted in a concern that the sentencing process should facilitate the responsible and reliable exercise of sentencing discretion"). Specifically, the *Caldwell* Court found fault with the prosecutor's effort "to minimize the jury's importance in its role" by stating in his closing that an appeal was inevitable:

> ASSISTANT DISTRICT ATTORNEY: Ladies and gentlemen, I intend to be brief. I'm in complete disagreement with the approach the defense has taken. I don't think it's fair. I think it's unfair. I think the lawyers know better. Now, they would have you believe that you're going to kill this man and they know–they know that your decision is not the final decision. My God, how unfair can you be? Your job is reviewable. They know it. Yet they . . .
>
> COUNSEL FOR DEFENDANT: Your Honor, I'm going to object to this statement. It's out of order.
>
> ASSISTANT DISTRICT ATTORNEY: Your Honor, throughout their argument, they said this panel was going to kill this man. I think that's terribly unfair.
>
> THE COURT: Alright, go on and make the full expression so the Jury will not be confused. I think it proper that the jury realizes that it is reviewable automatically as the death penalty commands. I think that information is now needed by the Jury so they will not be confused.
>
> ASSISTANT DISTRICT ATTORNEY: Throughout their remarks, they attempted to give you the opposite, sparing the truth. They said 'Thou shalt not kill.' If that applies to him, it applies to you, insinuating that your decision is the final decision and that they're gonna take Bobby Caldwell out in the front of this Courthouse in moments and string him up and that is terribly, terribly unfair. For they know, as I know, and as Judge Baker has told you, that the decision you render is automatically reviewable by the Supreme Court. Automatically, and I think it's unfair and I don't mind telling them so.

*Id.* at 324-26.

This case raises the inverse situation, in that Hodge complains of his own attorney's references to an appeal. During his state post-conviction proceedings, Hodge argued that

108

Mitchell was constitutionally ineffective in asking Judge Hogg to make sure that the record was clear for appellate purposes, thereby notifying the jury that "the ultimate responsibility for the decisions in Hodge's case would lie elsewhere than with them." (Doc. # 31-7 at 53-54).

As the Court has already stated, the Kentucky Supreme Court devoted most of its RCr 11.42 analysis to the jury tampering and mitigation issues. *See supra*, p. 87-91, 95-96. It then addressed all remaining claims in one paragraph:

> Both Epperson and Hodge argue that they were denied effective assistance of counsel due to each of their counsel's failure to adequately voir dire the jury, failure to adequately prepare for the testimony of Anthony Smith and Donald Bartley, and failure to adequately cross-examine each of these witnesses. Further, they argue that the Commonwealth's Attorney failed to disclose exculpatory material to the defense in violation of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Finally, they each argue that they were denied effective assistance of counsel due to a conflict of interest between Epperson's counsel, Lester Burns, and Hodge's counsel, Dale Mitchell. As found by the trial court, each of these allegations were addressed and resolved on direct appeal and cannot be raised in an RCr 11.42 motion. *Thacker v. Commonwealth*, Ky., 476 S.W.2d 838 (1972).

*Hodge*, 68 S.W.3d at 345.

Hodge argues that the Kentucky Supreme Court's "treatment of this claim is contrary to and/or an unreasonable application of clearly existing Supreme Court authority, and/or an unreasonable determination of the facts." (Doc. # 12 at 108). Relying on *Caldwell*, Hodge insists that Mitchell's comments led the jury to believe that it did not have the ultimate responsibility of sentencing him to death. (Doc. # 12 at 108). He further asserts that Mitchell was ineffective in failing to object to a similar reference made by the Commonwealth. (*Id.*).

Although Hodge seems to concede that this claim was adjudicated on the merits, the Kentucky Supreme Court rejected it without any analysis. While this might ordinarily qualify as an unexplained merits determination, the Kentucky Supreme Court's citation to *Thacker* suggests that it disposed of the claim on procedural grounds. Thus, the Court will assume that the *Richter* presumption has been rebutted and review this claim *de novo*. *See* 562 U.S. at 99.

The Court will once again look to the *Strickland* test to determine whether Mitchell's assistance was constitutionally ineffective. *See* 466 U.S. at 686-87. This test requires Hodge to establish that Mitchell's performance was deficient and that his deficiencies prejudiced the defense. *Id.* Although the Court is not convinced that Mitchell's brief references to a possible appeal were "errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment," it will assume that this prong has been met. *Id.*

Even so, Hodge has still failed to establish that, but for Mitchell's deficiencies, the result of the trial would have been different. *Id.* at 694. The record reflects that, on a few occasions, Mitchell simply stated to Judge Hogg that "[t]hese things must be preserved for appeal if there is ever a need for an appeal." (Doc. # 26-16 at 1). These statements are a far cry from the arguments at issue in *Caldwell*. While Mitchell simply acknowledged in passing that an appeal *may* be taken in the future, the prosecutor *Caldwell* insinuated that the jury's role was minimal because a conviction would automatically lead to an appeal. Because the Court does not believe that Mitchell's comments had this same effect, it cannot conclude that Hodge was prejudiced by them. Further review is barred by AEDPA.

110

*See* 28 U.S.C. § 2254(d).  Hodge's twentieth claim for relief must be **denied**.

> **R.**    **Claim 21: Hodge's Privilege Against Self-Incrimination was Violated When Judge Hogg Failed to Give a "No-Inference" Instruction During the Guilt or Sentencing Phase and Defense Attorney Dale Mitchell was Ineffective for Failing to Request the Same**

### 1.    Hodge's Claim on Direct Appeal

The Fifth Amendment guarantees that no person "shall be compelled in any criminal case to be a witness against himself."  U.S. Const. amend. V; *see also Malloy v. Hogan*, 378 U.S. 1, 6 (1964) (holding that "the Fifth Amendment's exception from compulsory self-incrimination is also protected by the Fourteenth Amendment against abridgment by the States").  "[I]t is a violation of this constitutional guarantee to tell a jury in a state criminal trial that a defendant's failure to testify supports an unfavorable inference against him." *Lakeside v. Oregon*, 435 U.S. 333, 337 (1978) (citing *Griffin v. California*, 380 U.S. 609, 615 (1965)).

This rule of law does not prohibit the judge from instructing the jury that it must not draw any adverse inferences from the defendant's failure to testify, even if the defendant objects to such an instruction.  *Id.* at 339 (recognizing that "[i]t may be wise for a trial judge not to give such a cautionary instruction over a defendant's objection").  Indeed, "a state trial judge has the constitutional obligation, upon proper request, to minimize the danger that the jury will give evidentiary weight to a defendant's failure to testify."  *Carter v. Kentucky*, 450 U.S. 288, 303-05 (1981) (describing the "no inference" instruction as "a powerful tool at [the judge's] disposal to protect the constitutional privilege").

On direct appeal, Hodge argued that the trial court's failure to give a "no inference" instruction during the guilt phase violated his Fifth Amendment right against self-

incrimination.  (Doc. # 30-13 at 16).   The Kentucky Supreme Court did not explicitly address this claim.  *Epperson*, 809 S.W.2d at 837-38.  It simply stated that "[t]his opinion will focus on those issues which we believe are most important, although we have considered and rejected all other assignments of error presented by each of the appellants."  *Id.*  This decision qualifies as an unexplained merits determination under *Harrington*, so the Court must review the claim under the deferential lens of AEDPA.  *See* 28 U.S.C. § 2254(d)(1).

Hodge claims that the Kentucky Supreme Court's decision was an unreasonable application of clearly established federal precedent.  (Doc. # 12 at 109-10).  However, he fails to explain *why* this decision was unreasonable.  (Doc. # 38 at 129-33).  Instead, much of his brief focuses on the related ineffective assistance of counsel issue, discussed *infra*. (*Id.*).  In short, Hodge has done nothing more than express his disagreement with the Kentucky Supreme Court's decision, which is insufficient to demonstrate that the opinion is "objectively unreasonable."  *See Lockyer*, 538 U.S. at 74.  Moreover, the record reflects that defense counsel did not request a "no inference" instruction.  While the law permitted Judge Hogg to provide such an instruction, he was not constitutionally obligated to do so in the absence of a request from Hodge and Epperson.  *See Lakeside*, 435 U.S. at 339; *Carter*, 450 U.S. at 305.  Under these circumstances, the Court sees no indication that the Kentucky Supreme Court's summary disposition of this claim was an unreasonable application of federal law.  Further review is therefore denied under 28 U.S.C. § 2254(d)(1).

## 2.  Hodge's State Post-Conviction Claim

During his state post-conviction proceedings, Hodge argued that Mitchell was

constitutionally ineffective in failing to request a "no inference" instruction in both the guilt

and penalty phases.  (Doc. #31-6 at 44-45).  As this Court has previously observed, the

Kentucky Supreme Court devoted most of its RCr 11.42 analysis to the jury tampering and

mitigation issues, then addressed all remaining claims in one paragraph:

> Both Epperson and Hodge argue that they were denied effective assistance
> of counsel due to each of their counsel's failure to adequately voir dire the
> jury, failure to adequately prepare for the testimony of Anthony Smith and
> Donald Bartley, and failure to adequately cross-examine each of these
> witnesses.  Further, they argue that the Commonwealth's Attorney failed to
> disclose exculpatory material to the defense in violation of *Brady v.
> Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).  Finally, they
> each argue that they were denied effective assistance of counsel due to a
> conflict of interest between Epperson's counsel, Lester Burns, and Hodge's
> counsel, Dale Mitchell.  As found by the trial court, each of these allegations
> were addressed and resolved on direct appeal and cannot be raised in an
> RCr 11.42 motion.  *Thacker v. Commonwealth*, Ky., 476 S.W.2d 838 (1972).

*Id.*

Neither party addresses the effect of this ruling.  However, the State seems to

characterize this decision as an unexplained merits determination under *Richter*, while

Hodge treats it as a claim subject to *de novo* review.  (Docs. # 23 at 63; 38 at 129-33).

Because the Kentucky Supreme Court relied on *Thacker*'s procedural rule in rejecting the

claim, the Court will once again assume that this situation is sufficient to rebut the *Richter*

presumption and review this claim *de novo*.

Additionally, the Court will rely on the *Strickland* test to determine whether Mitchell's

assistance was constitutionally ineffective.  *See* 466 U.S. at 686-87.  This test requires

Hodge to establish that Mitchell's performance was deficient and that his deficiencies

prejudiced the defense.  *Id.*  The State suggests that Mitchell's failure to request a "no

inference" instruction was trial strategy, as evidenced by the fact that he opted to address

113

the issue during voir dire.   (Doc. # 23 at 63).   There is some force to this argument.

Although the "no inference" instruction is a powerful tool, meant to discourage jurors from

drawing adverse conclusions about a defendant based on his failure to testify, it also draws

attention to the fact that a defendant chooses not to testify.   In this case, Mitchell may have

decided that it was best not to emphasize Hodge's silence, especially since Bartley gave

a detailed account of their crimes.   However, the Court will assume, for purposes of this

analysis, that Mitchell was deficient in failing to request such an instruction.

Even so, Hodge has failed to establish that, but for Mitchell's deficiencies, the result

of the trial would have been different.   *Id.* at 694.   Although Mitchell failed to request the

instruction, he did not totally fail to address this issue.   The record reflects that he

discussed the issue with jurors in voir dire, repeatedly emphasizing that Hodge did not bear

the burden of proof.   (Doc. # 27-11 at 50-52).   He further noted that Hodge was not

obligated to testify or present any witnesses on his behalf.   (*Id.*).   For this reason, the Court

finds that Mitchell was not constitutionally ineffective in failing to request a "no inference"

instruction.   Hodge's twenty-first claim for relief must be **denied**.

### S.    *Claim 22: Hodge was Denied His Right to Confront Bartley When Judge Hogg Restricted Cross Examination*

"The Sixth Amendment to the Constitution guarantees the right of an accused in a

criminal prosecution 'to be confronted with the witnesses against him.'" *Davis v. Alaska*,

415 U.S. 308, 315 (1974) (quoting U.S. Const. amend. VI); *see also Pointer v. Texas*, 380

U.S. 400, 401 (1965) (explaining that this right is guaranteed to defendants in state and

federal criminal proceedings).   The Confrontation Clause not only allows the defendant to

confront the witness physically, it provides him with an opportunity for cross-examination.

*Id.*

"Cross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested." *Id.* at 316. "Subject always to the broad discretion of the trial judge to preclude repetitive and unduly harassing interrogation, the cross-examiner is not only permitted to delve into the witness' story to test the witness' perceptions and memory, but the cross-examiner has traditionally been allowed to impeach, i.e., discredit, the witness." *Id.*; *accord Delaware v. Fensterer*, 474 U.S. 15, 20 (1985) (explaining that "the Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense may wish") (emphasis in original).

An attack on the witness' credibility may be "effected by means of cross-examination directed toward revealing possible biases, prejudices, or ulterior motives of the witness as they may relate directly to issues or personalities in the case at hand." *Id.* "The partiality of a witness is subject to exploration at trial, and is always relevant as discrediting the witness and affecting the weight of his testimony." *Id.* (internal quotations omitted). Accordingly, the Supreme Court of the United States has "recognized that the exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination." *Id.* (citing *Green v. McElroy*, 360 U.S. 474, 496 (1959)).

On direct appeal, Hodge took issue with Judge Hogg's decision to limit the scope of cross-examination. (Doc. # 30-11 at 44-45). Specifically, Hodge complained that Judge Hogg erroneously precluded him from exploring Bartley's motives for testifying against his

co-defendants.  (*Id.*).  The Kentucky Supreme Court rejected his claim with the following

analysis:

> The restricted cross-examination of Bartley did not deny the appellants their right to confrontation.  The scope and extent of cross-examination for motive is within the sound discretion of the trial judge.  *Barrett v. Commonwealth*, Ky., 608 S.W.2d 374 (1980).  The restrictions placed on the cross-examination by the trial judge were minimal.  The jury had ample opportunity to determine the veracity and demeanor of Bartley.  The right to confrontation guarantees an opportunity for effective cross-examination but not cross-examination in whatever way and to whatever extent the defense might wish.  *Delaware v. Fensterer*, 474 U.S. 15, 106 S.Ct. 292, 88 L.Ed.2d 15 (1985).
>
> Bartley was cross-examined with over 500 questions during two days of trial.  The jury was made aware of his involvement in the crimes and the fact that he was facing charges for that involvement and that he was informed before testifying that the death penalty would not be sought against him.  The trial judge ruled that this was adequate cross-examination and it was within his sound discretion to so rule.

*Epperson*, 809 S.W.2d at 842-43.

Hodge concedes that the claim has been adjudicated on the merits and  asserts that

the Kentucky Supreme Court's decision is "contrary to, or an unreasonable application of,

clearly established Federal law."  28 U.S.C. § 2254(d)(1).  Although Hodge relies on both

clauses of § 2254(d)(1), he makes no effort to explain how the Kentucky Supreme Court's

decision is "contrary to" federal law.  In fact, the record reflects that the Kentucky Supreme

Court identified the proper standard for reviewing judicially-imposed limits on cross-

examination.

As for Hodge's contention that the Kentucky Supreme Court's decision was

unreasonable, he does nothing more than express his disagreement with its analysis.  This

is insufficient to demonstrate that the opinion is objectively unreasonable.  *See Lockyer*,

538 U.S. at 74.  The record reflects that Hodge's attorney cross-examined Bartley on a

116

variety of topics, including his involvement with the crime and the benefits he would receive from testifying.   Under these circumstances, the Kentucky Supreme Court was not unreasonable in concluding that the trial judge's decision to limit the scope of cross-examination did not deprive Hodge of his right to confrontation or his right to due process. Therefore, further review of this claim is barred by § 2254(d)(1).  Hodge's twenty-second claim for relief is **denied**.

### T.      Claim 23: Hodge was Erroneously Precluded from Calling Witnesses and Forcing Them to Take the Fifth Amendment Before the Jury

In his Petition, Hodge complains that the trial court prohibited him from calling his co-defendant, Roger Epperson, and his wife, Carol Epperson, as witnesses and compelling them to take the Fifth Amendment in open court.  (Doc. # 12 at 113).  He claimed that the trial court's decision deprived him of the right to due process, the right to present a defense by calling witnesses, and the right to a fair and rational sentencing.  (*Id*.).  He has since expressed an intent to withdraw this claim.  (Doc. # 38 at 135).  Therefore, Hodge's twenty-third claim for relief is **denied as withdrawn**.

### U.      Claim 24: Judge Hogg Committed Reversible Error in Failing to Suppress Evidence of the Identification of Hodge by Various Witnesses Because Such Identifications Were Unreliable and Made from a Highly Suggestive Photo Packet

In *Stovall v. Denno*, the Supreme Court of the United States considered whether the circumstances of an identification were so suggestive as to deny the defendant due process of law under the Fourteenth Amendment.  *See* 388 U.S. 293, 294 (1967).  It held that "a claimed violation of due process of law in the conduct of a confrontation depends on the totality of the circumstances surrounding it."   *Id.* at 302 (concluding that the

117

defendant's due process rights were not violated, even though he was brought to the hospital in handcuffs for his victim to identify or exonerate him, because she was the only person who could do so and no one knew how long she might live); *see also Foster v. California*, 394 U.S. 440, 442-43 (1969) (finding that the case presented a "compelling example of unfair lineup procedures" where the defendant stood several inches taller than the other men in the lineup and was clad in a leather jacket similar to that worn by the robber).  The Court refined this test in *Neil v. Biggers*, stating that the "central question" was "whether under the 'totality of the circumstances' the identification was reliable even though the confrontation procedure was suggestive."   *See* 409 U.S. 188, 199 (1972) (quoting *Stovall*, 388 U.S. at 302).

> The Court has since harmonized the tests set forth in *Stovall* and *Biggers* as follows:
>
> We therefore conclude that reliability is the linchpin for determining the admissibility of identification testimony for both pre- and post-*Stovall* confrontations.  The factors to be considered are set out in *Biggers*. 409 U.S., at 199-200, 93 S.Ct., at 382.  These include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation.  Against these factors is to be weighed the corrupting effect of the suggestive identification itself.

*Manson v. Brathwaite*, 432 U.S. 98, 114 (1977).

On direct appeal, Hodge argued that the trial court should have suppressed evidence of identifications made from a suggestive photo packet.  (Docs. # 30-12 at 48-52; 30-13 at 1-2).  Specifically, Hodge complained that the photo of him was taken from a shorter distance than the other photos in the packet, thereby drawing attention to his photo.  (*Id.*).  He also took issue with the fact that he had the darkest tan in the packet.  (*Id.*).

118

Because the witnesses knew that he was arrested in Florida, Hodge believed that his tan distinguished him from the others in the packet.[30]  (*Id.*).

The Kentucky Supreme Court did not explicitly address this claim.  *Epperson*, 809 S.W.2d at 837-38.  It simply stated that "[t]his opinion will focus on those issues which we believe are most important, although we have considered and rejected all other assignments of error presented by each of the appellants."  *Id.*  This decision qualifies as an unexplained merits determination under *Harrington*, so the Court must review the claim under the deferential lens of AEDPA.  *See* 28 U.S.C. § 2254(d)(1).

Hodge concedes that the Kentucky Supreme Court adjudicated this claim on the merits, but insists that its decision was "contrary to and/or an unreasonable application of clearly existing Supreme Court authority."  (Doc. # 12 at 114-18).  However, he does nothing more than reiterate arguments that have been summarily rejected by the Kentucky Supreme Court, which is insufficient to demonstrate that the opinion is objectively unreasonable.  *See Lockyer*, 538 U.S. at 74.  Although there were some differences between Hodge's photo and those of the other men in the packet, this identification procedure was nowhere near as suggestive as that dealt with in *Stovall*, where one man was brought before the victim, or even *Foster*, where the defendant stood several inches taller than the other men in the lineup and was clad in clothing similar to that worn by the robber.  *See Stovall*, 388 U.S. at 294; *Foster*, 394 U.S. at 442-43.

---

30) Different photo packets were made for Epperson and Bartley.  (Doc. # 30-12 at 48-52).  According to Hodge, their packets had the same flaws that his did.  (*Id.*).

119

Moreover, even if the photo packet was unduly suggestive, the record reflects that there was some indicia of reliability in the identification.[31]  Although Dr. Acker's head was covered with a hood for most of the robbery, he had a chance to observe the perpetrators when he first let them into the house and when he helped them open the safe.  He made his photo identification one month after the crime occurred.   The description of the perpetrators that Dr. Acker initially gave to the police was not entirely consistent with the appearance of the defendants, but the record reflects that they had changed their appearances slightly after the crime.   Hodge had an opportunity to cross-examine the witnesses about these discrepancies at trial.  Under these circumstances, the Court cannot conclude that the Kentucky Supreme Court's decision was contrary to, or an unreasonable application of, clearly established federal law.   Further review is therefore barred by AEDPA.  *See* 28 U.S.C. § 2254(d)(1).  Hodge's twenty-fourth claim for relief is **denied**.

### V.     Claim 25: The Commonwealth was Erroneously Allowed to Emphasize that a Commonwealth Witness Had Received an Anonymous Threatening Phone Call

As discussed in Claims 14 and 15, the Supreme Court of the United States has suggested that erroneous evidentiary rulings may amount to a due process violation, depending on the circumstances.  *See, e.g., Chambers*, 410 U.S. at 302 (concluding that the defendant did not receive "a trial in accord with traditional and fundamental standards of due process" because he was not permitted to cross-examine an individual who had previously confessed to the crime and then withdrew his confession, nor was he allowed

---

31) The same can be said of Ms. Binge.  Although the men were in her store for a brief period of time, she did observe them because their presence made her uncomfortable.  She too made her identification one month after the crime and noted that the three men had changed some aspects of their appearances.

to introduce testimony from officers who received that individual's confession); *Crane*, 476 U.S. at 687 (1986) (holding that the trial court's exclusion of testimony bearing on the circumstances of the defendant's confession deprived him of his fundamental constitutional right to present a defense"). However, it has yet to precisely define the contours of this principle. *See Egelhoff*, 518 U.S. at 42 (discussing the holdings of *Chambers* and *Crane*).

On direct appeal, Hodge complained that one of the Commonwealth's witnesses, Travis McDowell, was permitted to testify about a threatening phone call he had recently received. (Doc. # 30-13 at 25-26). Specifically, an unknown caller told McDowell that they would "get him" if he testified. (*Id.*). Hodge insisted that the Commonwealth elicited this testimony so that it could suggest that he and Epperson were responsible for the threat, and therefore, guilty of the crimes at issue in the case. (*Id.*). He then concluded that the admission of this evidence led to a "fundamentally unfair" trial. (*Id.*).

Once again, the Kentucky Supreme Court chose not to address this claim directly. *Epperson*, 809 S.W.2d at 837-38. It simply stated that "[t]his opinion will focus on those issues which we believe are most important, although we have considered and rejected all other assignments of error presented by each of the appellants." *Id.* This decision qualifies as an unexplained merits determination under *Richter*, so the Court must review the claim under the deferential lens of AEDPA. *See* 28 U.S.C. § 2254(d)(1).

Recognizing that this claim has been adjudicated on the merits, Hodge simply argues that the Kentucky Supreme Court's decision was contrary to, or an unreasonable application of, clearly established federal law. However, he does nothing more than reiterate arguments that have been summarily rejected by the Kentucky Supreme Court,

which is insufficient to demonstrate that the opinion is objectively unreasonable. *See Lockyer*, 538 U.S. at 74. Moreover, at the time of the Kentucky Supreme Court's decision, the Supreme Court of the United States had generally acknowledged that evidentiary rulings may amount to due process violations in some circumstances. *Egelhoff*, 518 U.S. at 42. Although the Court has since attempted to clarify the effect of its rulings in *Chambers* and *Crane*, it still has not articulated a precise standard for evaluating these claims. *Id.* Therefore, the Kentucky Supreme Court's apparent decision to reject Hodge's claim cannot be unreasonable. *See Yarborough*, 541 U.S. at 666. Further review is therefore barred by AEDPA. *See* 28 U.S.C. § 2254(d)(1). Hodge's twenty-fifth claim for relief is **denied**.

### W.     Claim 26: Judge Hogg Erred in Refusing to Instruct the Jury, in Both Phases, that Bartley was an Accomplice as a Matter of Law and on the Necessity of Corroboration of an Accomplice's Testimony

The Supreme Court of the United States has recognized that a trial court's decision to give an inappropriate jury instruction may be grounds for habeas relief if "the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." *See Cupp v. Naughten*, 414 U.S. 141, 147 (1973). The instruction "may not be judged in artificial isolation, but must be viewed in the context of the overall charge." *Id.* The Court further observed:

> While this does not mean that an instruction by itself may never rise to the level of constitutional error, *see Cool v. United States*, 409 U.S. 100, 93 S.Ct. 354, 34 L.Ed.2d 335 (1972), it does recognize that a judgment of conviction is commonly the culmination of a trial which includes testimony of witnesses, argument of counsel, receipt of exhibits in evidence, and instruction of the jury by the judge. Thus not only is the challenged instruction but one of many such instructions, but the process of instruction itself is but one of several components of the trial which may result in the judgment of

122

conviction.

*Id.*; *see also Goff v. Bagley*, 601 F.3d 445, 461 (6th Cir. 2010) (suggesting that the same rule applies to a trial court's failure to give a requested instruction); *Young v. Trombley*, 435 F. App'x 499, 503 (6th Cir. 2011) (expressing the same proposition).

"Accomplice instructions have long been in use and have been repeatedly approved." *Cool*, 409 U.S. at 103. "In most instances, they represent no more than a commonsense recognition that an accomplice may have a special interest in testifying, thus casting doubt upon his veracity." *Id.* (explaining that the instruction is most often used when the accomplice turns State's evidence and testifies against the defendant). "No constitutional problem is posed when the judge instructs a jury to receive the prosecution's accomplice testimony 'with care and caution.'" *Id.* However, neither the Supreme Court of the United States nor the Court of Appeals for the Sixth Circuit have "requir[ed] accomplice instructions as a general matter." *Scott v. Mitchell*, 209 F.3d 854, 883 (6th Cir. 2000).

On direct appeal, Hodge argued that the trial court should have given an accomplice instruction during both phases of the trial, which would have informed them that it was necessary to find corroboration of Bartley's testimony. (Doc. # 30-13 at 35-37). At a minimum, Hodge insisted that the jury should have been given a cautionary instruction concerning accomplice testimony. (*Id.*).

The Kentucky Supreme Court chose not to address this claim directly, stating simply that "[t]his opinion will focus on those issues which we believe are most important, although we have considered and rejected all other assignments of error presented by each of the

123

appellants." *Epperson*, 809 S.W.2d at 837-38.   Because this decision qualifies as an unexplained merits determination under *Richter*, the Court must review the claim under the deferential lens of AEDPA.   *See* 28 U.S.C. § 2254(d)(1).

Hodge recognizes that this claim has been adjudicated on the merits.[32]  (Docs. # 12 at 121-22; 38 at 142-47).  Although he insists that the Kentucky Supreme Court's decision was contrary to, or an unreasonable application of, clearly established federal law, he does nothing more than reiterate arguments that have been summarily rejected by the Kentucky Supreme Court.  (*Id.*).  This is insufficient to demonstrate that the opinion is objectively unreasonable.[33]  *See Lockyer*, 538 U.S. at 74.

Moreover, the record reflects that the jury instructions given "adequately informed the jury regarding the credibility of witness testimony" and "alerted the jury to the various considerations that it should take into account in weighing testimony."  *See Goff*, 435 F. App'x at 503.  Because Hodge's attorney thoroughly explored Bartley's incentives for testifying on cross-examination, the jury was likely well aware of Bartley's credibility issues by the time they received instructions.  Under these circumstances, the Kentucky Supreme Court was not unreasonable in finding that the failure to give an accomplice instruction did not amount to a due process violation.  Further review of this claim is barred by AEDPA.  *See* 28 U.S.C. § 2254(d)(1).  Hodge's twenty-sixth claim for relief is **denied**.

---

32) The State hints that this issue is non-reviewable because the incorrectness of an instruction under state law is not a basis for habeas relief.  (Doc. # 23 at 70-71).  However, an instruction can be so deficient as to amount to a due process violation.  *See Estelle*, 502 U.S. at 72.  Thus, to the extent that Hodge alleges a constitutional violation, this claim is reviewable by the Court.

33) Because the Court is not aware of any case law from the Supreme Court of the United States applying the *Cupp* test to a trial court's *failure* to give a requested jury instruction, there is an argument to be made that the law is not clearly established in this respect.  *See Yarborough*, 541 U.S. at 666.  However, the Court assumes that the law is clearly established for purposes of this analysis, as it makes for a cleaner discussion.

**X.    Claim 27: Hodge was Denied Due Process Because the Penalty Phase Instructions Did Not Inform the Jury of Their Absolute Option to Return a Sentence Less Than Death and Otherwise Failed to "Guide and Channel" the Jury's Discretion Adequately**

"[I]f a State wishes to authorize capital punishment it has a constitutional responsibility to tailor and apply its law in a manner that avoids the arbitrary and capricious infliction of the death penalty."  *Godfrey v. Georgia*, 446 U.S. 420, 428 (1980).  "Part of a State's responsibility in this regard is to define the crimes for which death may be the sentence in a way that obviates 'standardless [sentencing] discretion.'"  *Id.* (quoting *Gregg v. Georgia*, 153, 196 n. 47 (1976)).  The State "must channel the sentencer's discretion by clear and objective standards that provide specific and detailed guidance, and that make rationally reviewable the process for imposing a sentence of death." *Id.* (internal quotations omitted).

It is also "beyond dispute that in a capital case "'the sentencer [may] not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death.'"  *Mills v. Maryland*, 486 U.S. 367, 374 (1988) (quoting *Eddings v. Oklahoma*, 455 U.S. 104, 110 (1982)).   "The corollary that the sentencer may not refuse to consider or be precluded from considering any relevant mitigating evidence is equally well established."   *Id.* (internal quotations omitted).

On direct appeal, Hodge complained that the trial court's inadequate penalty phase instructions deprived him of his rights to a fair trial, a rational sentencing, and due process of law.   (Docs. # 30-13 at 47-50; 30-14 at 1-4).  Specifically, Hodge argued that the trial court should have incorporated the following instructions: (1) a "life option" instruction

125

informing the jury that it did not have to sentence Hodge to death, even if it found that the aggravating circumstances outweighed the mitigating circumstances; (2) an instruction on the role of mitigation evidence and the standard of proof for mitigating factors; (3) an instruction permitting a non-unanimous finding as to mitigation evidence; and (4) an instruction defining reasonable doubt.[34]  (*Id.*).

The Kentucky Supreme Court again chose not to address this claim directly, stating simply that "[t]his opinion will focus on those issues which we believe are most important, although we have considered and rejected all other assignments of error presented by each of the appellants." *Epperson*, 809 S.W.2d at 837-38.  Because this decision qualifies as an unexplained merits determination under *Harrington*, the Court must review the claim under the deferential lens of AEDPA.  *See* 28 U.S.C. § 2254(d)(1).

Hodge recognizes that this claim has been adjudicated on the merits.  (Docs. # 12 at 121-22; 38 at 148-52).  Although he insists that the Kentucky Supreme Court's decision

---

34) Although he does not re-argue these issues in his Petition, Hodge also argued for the inclusion of the following instructions on direct appeal: (1) an instruction specifically limiting the jury's consideration of aggravating evidence to the circumstances identified in the instructions; (2) instructions on the elements of first-degree robbery and first-degree burglary; (3) an instruction requiring the jury to indicate which mitigating circumstances were found to exist and which were rejected; (4) an instruction that the jury could return a death verdict only if it found beyond a reasonable doubt that the aggravating circumstances outweighed the mitigating factors; (5) an instruction explaining which party bears the burden of proof on the existence of aggravating circumstances; (6) an instruction that the law presumes a defendant is innocent of any aggravators, and thus, the law presumes that the appropriate punishment for murder is a sentence other than death; (7) an instruction that the jury should not be influenced by passion, prejudice, or other extraneous factors; (8) an instruction that the jury's sentencing decision could be based on mercy; (9) an instruction that "life imprisonment" should be understood in its plain meaning; (10) an instruction that Hodge would be executed via electric chair if sentenced to death; (11) an instruction that Hodge should not be sentenced to death if the jury had "any doubt" as to the appropriate punishment; (12) an instruction that a sentence less than death should be given when any juror disagrees; (13) a "no inference" instruction regarding Hodge's failure to testify; and (14) an instruction defining "extreme mental disturbance" or "extreme emotional disturbance." (Docs. # 30-13 at 47-50; 30-14 at 1-4).  He then objected to the trial court's decision to instruct on certain statutory mitigating factors not supported by the evidence, while omitting instructions on applicable non-statutory mitigating factors, apart from a brief "catchall" factor.  (*Id.*).  Finally, Hodge took issue with the repeated references to the jury's "recommendation" in the instructions.  (*Id.*).

was contrary to, or an unreasonable application of, clearly established federal law, he does little more than express disagreement with the Kentucky Supreme Court's summary decision on the first three instructions.[35]  (*Id.*).  This is insufficient to demonstrate that the opinion is objectively unreasonable.  *See Lockyer*, 538 U.S. at 74.

Hodge makes more of an effort to develop his argument regarding a non-unanimous finding of mitigation evidence.  (Doc. # 38 at 148-52).  He argues that the Kentucky Supreme Court's decision amounts to an unreasonable application of *Mills v. Maryland*. *See* 486 U.S. at 381.  In *Mills*, the Supreme Court of the United States vacated the conviction and remanded the case for further proceedings because "there [wa]s a substantial probability that reasonable jurors, upon receiving the judge's instructions in this case, and in attempting to complete the verdict form as instructed, well may have thought they were precluded from considering any mitigating evidence unless all 12 jurors agreed on the existence of a particular such circumstance."  *Id.*

However, the instructions in that case stated that the jurors had to make a unanimous decision on the issue of aggravating circumstances, but was silent on whether unanimity was required for mitigating circumstances.  *Id.*  As the defendant successfully argued, the aggravating circumstance instruction could well have led the jury to believe that

---

[35]  Hodge supports his argument about the "life option" instruction with case law from the Eleventh Circuit.  *See Moore v. Kemp*, 809 F.2d 702 (11th Cir. 1987).  Even if this case supported his claim on direct appeal, it certainly does not qualify as clearly established federal law for purposes of AEDPA review. As for the second instruction, pertaining to the standard of proof for mitigation, Hodge cites no case law whatsoever to support his argument.  Hodge's third proposed instruction would have defined reasonable doubt for the jurors.  Although Hodge cites *Cage v. Louisiana* for this proposition, it does not actually require courts to define "reasonable doubt."  *See* 498 U.S. 39, 41 (1990).  In that case, the Supreme Court of the United States simply found fault with the trial court's definition of reasonable doubt, which "suggest[ed] a higher degree of doubt than is required for acquittal under the reasonable-doubt standard."  *Id.*

their decision on mitigating evidence had to be unanimous as well, contrary to the law.  *Id.*

In this case, by contrast, the instructions were silent on the issue of unanimity as to the

aggravating circumstances and the mitigating circumstances.  (Doc. # 27-14).  It simply

stated that the verdict itself had to be unanimous.  (*Id.*).  Moreover, nothing in the record

suggests that the jurors were confused by these instructions.  (*Id.*).  On this record, the

Court cannot conclude that the Kentucky Supreme Court's decision is an unreasonable

application of *Mills.*  Thus, AEDPA bars further review of this claim.  *See* 28 U.S.C. §

2254(d)(1).  Hodge's twenty-seventh claim for relief is hereby **denied**.

### Y.    Claim 28: Judge Hogg Violated Hodge's Rights Under the Sixth, Eighth, and Fourteenth Amendments by Sentencing Hodge to Death Based on Unrebutted, Confidential Information and Non-Statutory Aggravating Circumstances

The Supreme Court of the United States has observed that "the sentencing process,

as well as the trial itself, must satisfy the requirements of the due process clause."

*Gardner v. Florida*, 430 U.S. 349, 358 (1977).  "Even though the defendant has no

substantive right to a particular sentence within the range authorized by statute, the

sentencing is a critical stage of the criminal proceeding at which he is entitled to the

effective assistance of counsel."  *Id.*  The defendant has a legitimate interest in the

character of the procedure which leads to the imposition of sentence even if he may have

no right to object to a particular result in the sentencing process."  *Id.*

In *Gardner*, the jury convicted the defendant of first-degree murder, but found that

the mitigating circumstances outweighed the aggravating circumstances.  *Id.* at 352-53.

Accordingly, the jury recommended a sentence of life imprisonment.  *Id.*  At sentencing,

the trial court judge disregarded the jury's verdict and imposed the death sentence, relying

128

in part on a pre-sentence report.  *Id.*  Portions of that report were not shared with the parties.  *Id.*  The Court vacated the death sentence and remanded the case, reasoning that the defendant "was denied due process of law when the death sentence was imposed, at least in part, on the basis of information which he had no opportunity to deny or explain." *Id.* at 362.  The Court further explained that "since the judge found, in disagreement with the jury, that the evidence did not establish any mitigating circumstances, and since the pre-sentence report was the only item considered by the judge but not the jury the factual basis for the judge's rejection of the advisory verdict is plainly required."  *Id.*

On direct appeal, Hodge argued that Judge Hogg's sentencing decision was influenced by ex parte communications he had with the FBI and others about Hodge and Epperson being a security risk.  (Doc. # 30-14 at 12-14).  Hodge also complained that Judge Hogg's decision on the following non-statutory aggravating factors: (1) his opinion that Hodge and Epperson may kill again; (2) the brutality of the crime; and (3) the attempted murder of Dr. Acker.[36]  (*Id.*).

The Kentucky Supreme Court again chose not to address this claim directly, stating simply that "[t]his opinion will focus on those issues which we believe are most important, although we have considered and rejected all other assignments of error presented by each of the appellants."  *Epperson*, 809 S.W.2d at 837-38.  Because this decision qualifies as an unexplained merits determination under *Richter*, the Court must review the claim under the deferential lens of AEDPA.  *See* 28 U.S.C. § 2254(d)(1).

---

36) Some of these circumstances do qualify as aggravating factors in other jurisdictions, but not in Kentucky. *See, e.g., Mills*, 486 U.S. at 381.

Hodge recognizes that this claim has been adjudicated on the merits.  (Docs. # 12 at 125-26; 38 at 153-57).  Although he insists that the Kentucky Supreme Court's decision was contrary to, or an unreasonable application of, clearly established federal law, he does nothing more than reiterate arguments that have been summarily rejected by the Kentucky Supreme Court.  (*Id.*).  This is insufficient to demonstrate that the opinion is objectively unreasonable.  *See Lockyer*, 538 U.S. at 74.

Although Judge Hogg observed in passing that there was "a substantial risk that this defendant will kill again," he proceeded to state that "it is therefore the opinion of the Court that the defendant should be taken by the sheriff of this county and delivered to the Department of Corrections" and that "the Sheriff of Letcher County be provided sufficient security to do so."  (Doc. # 27-14 at 48).  In imposing the actual sentence, Judge Hogg relied heavily on the jury's finding that certain aggravating circumstances were present in this case.  (*Id.*).  There being no sufficient evidence to suggest that the jury's verdict should not be imposed, Judge Hogg adopted it accordingly.  (*Id.*).

However, even if Judge Hogg considered this issue, Hodge has not established that his sentencing amounts to a due process violation.  Hodge broadly relies on *Gardner* for the proposition that his due process rights were violated because he was sentenced to death "on the basis of information which he had no opportunity to deny or explain." *Gardner*, 430 U.S. at 362.  While the *Gardner* sentencing was marked by a lack of notice, which in turn inhibited the defendant's ability to respond to certain issues, this case does not present the same problem.  The record reflects that Judge Hogg briefly referenced the

130

viciousness of Hodge's and Epperson's crime,[37] as well as their future dangerousness, but the evidence and testimony presented at trial lent support to these observations.  Hodge and Epperson also waived the preparation of a pre-sentence report and chose not to make any arguments prior to sentencing.   Thus, they cannot complain that they had no opportunity to deny or explain Judge Hogg's observations.   On this record, the Court concludes that the Kentucky Supreme Court was not unreasonable in rejecting this claim. Further review is therefore barred by AEDPA.   *See* 28 U.S.C. § 2254(d)(1).   Hodge's twenty-eighth claim for relief is hereby **denied**.

### Z.     *Claim 29: On Its Face, KRS 532.025 Violates the Constitutions of Kentucky and the United States*

The Supreme Court of the United States has held that "the penalty of death may not be imposed under sentencing procedures that create a substantial risk that the punishment will be inflicted in an arbitrary and capricious manner."  *Godfrey v. Georgia*, 466 U.S. 420, 427 (1980) (citing *Furman v.* Georgia, 408 U.S. 238 (1972)).   Thus, as explained in Claim 27, "if a State wishes to authorize capital punishment it has a constitutional responsibility to tailor and apply its law in a manner that avoids the arbitrary and capricious infliction of the death penalty."   *Godfrey*, 446 U.S. 420, 428 (1980).   However, the State has a responsibility " to define the crimes for which death may be the sentence in a way that obviates 'standardless [sentencing] discretion.'"  *Id.* (quoting *Gregg*, 153 U.S. at 196 n. 47). The State "must channel the sentencer's discretion by clear and objective standards that

---

37) Although Hodge complains that Judge Hogg commented on the viciousness of the crime during sentencing, the record reflects that this comment was made while sentencing Epperson. (Doc. # 27-14 at 45). However, even if one were to assume that this observation influenced Hodge's sentence, this case is still a far cry from *Gardner*, for reasons stated above.

provide specific and detailed guidance, and that make rationally reviewable the process for imposing a sentence of death." *Id.* (internal quotations omitted).

On direct appeal, Hodge asserted that the Commonwealth of Kentucky's death penalty statute, codified at KRS § 532.025, "violates the mandates of both the Kentucky and United States Constitutions, as interpreted in the light of contemporary society." (Doc. # 30-14 at 18-21). Specifically, Hodge criticized the statute for the following failings: (1) failure to require a finding beyond reasonable doubt that aggravating circumstances outweigh mitigating circumstances and that death is the appropriate punishment; (2) failure to provide guidance on the role of mitigating circumstances; (3) failure to allocate to the prosecution the burden of proof on questions of aggravation and the appropriateness of the penalty; and (4) failure to require findings regarding mitigating circumstances. (*Id.*). He also claimed that the statute was unconstitutionally vague. (*Id.*).

> The Kentucky Supreme Court addressed this issue as follows:
>
> Pursuant to K.R.S. § 532.075, we have made a careful review of the record and we have determined that the death sentence was not imposed under the influence of passion, prejudice, or any other arbitrary factor. The death sentence was not excessive or disproportionate to the penalty imposed in similar sentences since 1970 considering both the crime and the defendant. Those cases have been previously recited by this Court most recently in *Simmons v. Commonwealth*, Ky., 746 S.W.2d 393 (1988), and that list is incorporated herein by reference and our review in this case is in accordance with K.R.S. 532.075(5). In addition, we have considered the case of *Moore v. Commonwealth*, 771 S.W.2d 34 (1989). We have conducted an independent review of all the circumstances and conclude that they exceed any minimum justifying capital punishment.

*Epperson*, 809 S.W.2d at 845.

While Hodge recognizes that this claim has been adjudicated on the merits, he insists that the Kentucky Supreme Court's decision was contrary to, or an unreasonable

application of, clearly established federal law.  (Docs. # 12 at 127-30; 38 at 157).  However, he does nothing more than reiterate arguments that have already been rejected by the Kentucky Supreme Court.  (*Id.*).  This is insufficient to demonstrate that the opinion is objectively unreasonable.  *See Lockyer*, 538 U.S. at 74.  None of the cases cited by Hodge have held death penalty statutes to be constitutionally infirm based on the deficiencies raised here.  *See, e.g., Godfrey*, 446 U.S. at 428-29 (finding that the defendant's rights under the Eighth and Fourteenth Amendments were violated when he was sentenced to death "based upon no more than a finding that the offense was "outrageously or wantonly vile, horrible and inhuman").  In fact, the cited cases involved very different statutes than that at issue here.  *See, e.g., Woodson v. North Carolina*, 428 U.S. 280, 303 (1976) (invalidating a mandatory death penalty statute).  On this record, the Kentucky Supreme Court was not unreasonable in finding that KRS § 532.075 was constitutionally sound. Further review is therefore barred by AEDPA.  *See* 28 U.S.C. § 2254(d)(1).  Hodge's twenty-ninth claim for relief is hereby **denied**.

## V.   Certificate of Appealability

Under the AEDPA, an appeal from a denial of a writ of habeas corpus may not be taken unless a circuit justice or judge issues a certificate of appealability ("COA").  *See* 28 U.S.C. § 2253.  Recently, in *Castro v. United States*, 310 F.3d 900 (6th Cir. 2002), the Sixth Circuit held that a district court need not wait until a petitioner moves for a COA before issuing one for claims raised in the petition.  Because a district judge who has recently denied a writ of habeas corpus will have "an intimate knowledge of both the record and the relevant law and could simply determine whether to issue the certificate of

appealability when she denies the initial petition," it follows that a proper time to determine whether to grant a COA is at the conclusion of the opinion granting or denying the writ. *Id.* at 901 (internal quotation marks and citations omitted).[38]  Thus, in concluding this Opinion, it is now appropriate to determine whether to grant or deny a COA as to any of the claims Hodge presented in his petition.

A COA may not issue unless "the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2).  To demonstrate this denial, the applicant is required to show that reasonable jurists could debate whether, or agree that, the petition should have been resolved in a different manner, or that the issues presented were adequate to deserve encouragement to proceed further. *Slack v. McDaniel*, 529 U.S. 473, 483-484 (2000).  When a district court rejects a habeas petitioner's constitutional claims on the merits, the petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims to be debatable or wrong.  *Id.*

Applying this standard to the claims raised herein, and for the reasons set forth in this Memorandum Opinion and Order, the Court concludes that reasonable jurists could debate the issues raised in **Claims 4, 5, and 6**.  Accordingly, the Court will issue a COA as to those claims only.

---

38) Because *Castro* was decided subsequent to the Sixth Circuit's decision in *Murphy v. Ohio*, 263 F.2d 466 (6th Cir. 2001) wherein a different panel of the Sixth Circuit suggested that it was improper for the district court to deny a certificate of appealability before the petitioner had even applied for one, the Court believes that *Castro* is controlling and will proceed to determine which claims in Hodge's Petition, if any, warrant a COA.

## VI.   Conclusion

Accordingly, for the reasons stated herein,

**IT IS ORDERED** as follows:

(1)     Petitioner Benny Lee Hodge's Petition for Writ of Habeas Corpus (Doc. # 11) and Motion for Summary Judgment (Doc. # 73) be, and are, hereby **DENIED**;

(2)     This action be, and is, hereby **DISMISSED WITH PREJUDICE** and **STRICKEN** from the Court's active docket;

(3)     This is a final and appealable order.  With regard to any appeal, a certificate of appealability pursuant to 28 U.S.C. § 2253(c) and Fed. R. App. P. 22(b) will be **issued for Claims 4, 5, and 6**, and **denied for all other Claims raised**.

(4)     Judgment will be entered contemporaneously with this Memorandum Opinion and Order in favor of Respondent Randy White, Warden of the Kentucky State Penitentiary.

This 17th day of August, 2016.



Signed By:

_David L. Bunning_   DB

United States District Judge

K:\DATA\DeathPenalty\Hodge\13-5 MOO Denying Petition for Writ of HC.wpd